UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TOMI TRANCHITA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 5956 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| COLLEEN CALLAHAN, JOHN FISCHER, | ) | |
| and JOSHUA MOOI, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On April 24, 2019, agents from Illinois' Department of Natural Resources ("the IDNR")

seized four coyotes Plaintiff Tomi Tranchita was raising at her home in Tinley Park, Illinois.

Three of the four coyotes died after the seizure; the only surviving coyote, Luna, is now living at

the Indiana Coyote Rescue Center ("ICRC") in Burlington, Indiana.  Luna is elderly and in poor

health, and Tranchita asserts that Luna may not have much longer to live.  Tranchita wants ICRC

to return Luna so that she can live out her remaining days with Tranchita.  Tranchita claims,

however, that the ICRC will not release Luna to her until a court declares that Tranchita can

legally possess Luna in Illinois.

On October 7, 2020, Tranchita filed this lawsuit against Colleen Callahan, Director of the

IDNR; John Fischer, Legal Counsel for the IDNR; and Joshua Mooi, a Conservation Police

Sergeant with the IDNR (collectively, "Defendants").[1]  A week later, Tranchita moved for a

temporary restraining order ("TRO") and preliminary injunction enjoining Defendants from

(1) requiring her to hold a hound running area permit (hereinafter, "Hound Running Permit") in

order to possess Luna in Illinois; and (2) seizing Luna so long as Tranchita holds a current fur-

---

[1] Tranchita also named Kwame Raoul, Illinois' Attorney General, as a defendant, but the Court dismissed
Raoul from this case on October 19, 2020.

bearing mammal breeder permit (hereinafter, "Breeder Permit"). The Court held two video hearings on Tranchita's motion, and the motion is now fully briefed. Because Tranchita has not demonstrated that she is likely to succeed on the merits of her claims, the Court denies her motion for a TRO and preliminary injunction [5].

## BACKGROUND

Tranchita is a wildlife educator living in Tinley Park, Illinois, a suburb of Chicago. In 2006, she began caring for orphaned coyote pups, which she exhibited to the public under a federal Class C Exhibitor License issued by the United States Department of Agriculture ("USDA"). Tranchita also obtained Breeder Permits in 2011, 2012, 2013, 2014, and 2015. After her 2015 Breeder Permit expired in March 2016, however, Tranchita forgot to obtain another Breeder Permit. She then did not obtain a Breeder Permit in 2017, 2018, or before May 2019. Nor did she attempt to obtain a Hound Running Permit at any time before May 2019.

By April 2019, Tranchita was raising four coyotes, including Luna. Although Tranchita possessed a USDA Exhibitor License at this time, she did not possess a Breeder Permit or a Hound Running Permit.

## I.      Breeder and Hound Running Permits

In Illinois, an individual must possess a Breeder Permit before she can keep or raise a fur-bearing mammal, such as a coyote. *Tranchita v. Dep't of Nat. Res.*, 2020 IL App (1st) 191251, ¶ 16; *see also* 520 Ill. Comp. Stat. 5/1.2g (designating coyotes as one of thirteen species of "fur-bearing mammals"). Section 3.25 of Illinois' Wildlife Code states that "[b]efore any individual shall hold, possess or engage in the breeding or raising of live fur-bearing mammals, he shall first procure a fur-bearing breeder permit" from the IDNR. 520 Ill. Comp. Stat. 5/3.25. Section 3.25 further states that the IDNR will not issue a Breeder Permit to a person for breeding or

raising "coyotes acquired after July 1, 1978, except for coyotes that are held or possessed by a person who holds a hound running area permit under Section 3.26 of this Act." *Id.*

Section 3.26 of the Wildlife Code, in turn, requires "[a]ny person . . . who desires to establish a hound running area to pursue authorized species with hounds in a way that is not designed to capture or kill the authorized species" to apply for a Hound Running Permit.[2] *Id.* § 3.26(a). Upon receiving an application for a Hound Running Permit, the IDNR "shall assess the ability of the applicant to operate a property as a hound running area," and the IDNR shall approve and issue a Hound Running Permit if it "finds that (i) the area meets the requirements of all applicable laws and rules, (ii) the authorized species are healthy and disease free, and (iii) the issuing of the permit will otherwise be in the public interest." *Id.* The applicable administrative regulations require a hound running area for use with coyotes to, among other things, have an area of at least ten contiguous acres. *See* Ill. Admin. Code tit. 17, § 970.40(d)(1), (2) (requiring at least one hundred sixty contiguous acres for coyote hound running areas and ten to eighty contiguous acres for coyote hound running areas "for inexperienced hounds one year or less in age").

Thus, for an individual to legally possess coyotes in Illinois after July 1978, she must have a Breeder Permit, which she should not be able to obtain unless she already has a Hound Running Permit.[3] According to Defendants, this means that Tranchita must possess *both* a Breeder Permit and a Hound Running Permit before she can possess a coyote.

---

[2] "'Hound running' means pursuing any fox, coyote, raccoon, or rabbit with a hound," 520 Ill. Comp. Stat. 5/1.2y, and a "hound running area" is "[a] fenced enclosure authorized by [the IDNR] where fit animals," such as coyotes, "may be pursued by hounds," Ill. Admin. Code tit. 17, § 970.10.

[3] The administrative regulations further indicate that an individual who applies for a Hound Running Permit so that she can raise coyotes must already have a Breeder Permit. *See* Ill. Admin. Code tit. 17, § 970.20(c) ("Applicants for Hound Running Area Permits must possess a Fur-bearing Mammal Breeders Permit for possession of coyotes[.]"). This potentially creates a Catch-22 for individuals who want to

However, Tranchita claims that an IDNR officer who visited her property in 2011 instructed her that she only needed to purchase a Breeder Permit to raise coyotes.  She also asserts that Defendants have allowed or currently allow ten other individuals or entities to possess coyotes without requiring them to have a Hound Running Permit.  And in practice, an individual raising coyotes can obtain a Breeder Permit without first obtaining a Hound Running Permit.  The IDNR issued a Breeder Permit to Tranchita five straight years (2011, 2012, 2013, 2014, and 2015) even though she was raising coyotes without a Hound Running Permit at the time of issuance.  The IDNR again issued Breeder Permits to Tranchita in 2019 and 2020 although she did not have a Hound Running Permit when she applied for either of these permits.  Indeed, because the IDNR does not require an applicant for a Breeder Permit "to specify what species of fur bearing mammal [she] intend[s] to keep," Doc. 13-1 at 3 (¶ 10), it may not even know whether the applicant seeks to raise a fur-bearing mammal that requires a Hound Running Permit, i.e., a coyote.

## II.     The IDNR's Seizure of Coyotes from Tranchita

Mooi is a Conservation Police Sergeant with the IDNR.  In March 2019, Mooi, who lived near Tranchita, became aware of her coyotes, and on April 23, 2019, Mooi obtained a warrant to search and seize any coyotes from Tranchita's residential property on the basis that they constituted evidence of various offenses under the Wildlife Code, including a violation of Section 3.25.  The next day, April 24, Mooi and five other armed IDNR agents seized Tranchita's four coyotes.  Mooi issued Conservation Citations and Complaints to Tranchita

---

possess coyotes: they must obtain a Hound Running Permit before obtaining a Breeder Permit, but they may not be able to obtain a Hound Running Permit without first obtaining a Breeder Permit.  But neither side raises this issue, so the Court does not say anything more about it.  *See Marling v. Littlejohn*, 964 F.3d 667, 669 (7th Cir. 2020) (declining to pursue a potential argument that a party did not make).

charging her with violating three provisions of the Wildlife Code, including Section 3.26. Tranchita later pleaded guilty to one count of violating Section 3.25.

Three of the four coyotes seized by IDNR on April 24 ultimately died. The only surviving coyote, Luna, is currently being held at the ICRC. Luna is elderly and in poor health, and Tranchita asserts that Luna may not have much longer to live.

### III. Tranchita's 2019 and 2020 Breeder and Hound Running Permits

Tranchita applied for, and received, a Breeder Permit on May 3, 2019, shortly after the IDNR's seizure of coyotes from her property. She also applied for, and received, a Hound Running Permit on May 18, 2019. But four days later, the IDNR notified Tranchita that it had erroneously issued the May 18, 2019 Hound Running Permit and that it would be revoking the permit on June 24, 2019. According to the IDNR, in applying online for the Hound Running Permit, Tranchita completed a form that "was not in compliance with Illinois law and administrative rules." Doc. 13-1 at 5. The IDNR notified Tranchita that she could request a hearing to appeal the revocation "within 30 days of the date of this notice" pursuant to 520 Ill. Comp. Stat. 5/3.33. *Id.* The IDNR also included the "correct" Hound Running Permit application for Tranchita to complete. *Id.*

Tranchita completed this application, which she submitted to the IDNR on June 20, 2019. In the application, Tranchita identified the size of her property, 1.125 contiguous acres, and represented that she would be keeping one coyote on the property. Tranchita also submitted a "petition for hearing request." *Id.* at 18. On August 26, the IDNR returned Tranchita's application on the basis that it did not meet the necessary requirements for a Hound Running Permit. Specifically, Tranchita's proposed hound running area ("HRA") did not meet the definition of an HRA, the minimum HRA acreage required was not achievable in the proposed

5

location, and the proposed HRA was "located in a developed urban area where the operation of

an HRA would not be compatible or appropriate." *Id.* at 8. After the IDNR denied her June

2019 application, Tranchita withdrew her request for a hearing. *See id.* at 3 (¶ 6) ("After the

second application was denied, Ms. Tranchita withdrew her appeal.").

On March 2, 2020, Tranchita again applied for, and received, a Breeder Permit. The

following month, she applied for a Hound Running Permit as well. Despite its revocation of

Tranchita's previous Hound Running Permit in June 2019, and despite its denial of Tranchita's

Hound Running Permit application in August 2019, the IDNR issued a Hound Running Permit to

Tranchita on April 30, 2020. At the hearings on Tranchita's motion, Defendants asserted that

this issuance was erroneous because Tranchita does not meet the acreage requirements for a

Hound Running Permit. Defendants say that Tranchita was able to obtain the 2020 Hound

Running Permit "due to a technological error with the IDNR website's permit payment portal."

Doc. 13-1 at 3 (¶ 7). Defendants further contend that "no one at IDNR was aware" that IDNR

had issued the 2020 Hound Running Permit to Tranchita until she filed her motion because she

"did not submit any supporting paperwork or documentation" for the permit. *Id.* (¶ 8). At the

same time, there is no indication that the IDNR asks an individual who applies online for a

Hound Running Permit to submit any sort of "supporting paperwork or documentation." Nor

does it appear that the IDNR asks an individual applying online for a Hound Running Permit for

any information that would shed light on the propriety of issuing the permit. *See* Doc. 1 ¶ 71

(allegation that Tranchita's 2020 online application process for a Hound Running Permit

consisted of providing her IDNR customer number, driver license number, social security

number, date of birth, and payment); Oct. 19, 2020 Hr'g Tr. at 5:17–24 (assertion by Tranchita's

6

counsel that the online application process for a Hound Running Permit consists of giving a name, driver's license number, and payment).

Although Tranchita currently possesses a 2020 Breeder Permit and a 2020 Hound Running Permit—both of which do not expire until March 31, 2021—she is afraid that if Luna is returned to her, the state will revoke her Hound Running Permit again, prosecute her again, and re-seize Luna. Tranchita's fear is not unfounded; at the hearings on Tranchita's motion, Defendants asserted its intent to revoke Tranchita's 2020 Hound Running Permit on the basis that the IDNR erroneously issued the permit to Tranchita.[4]

## IV. Tranchita's State Court Litigation

While Tranchita was navigating the permit application process in 2019 and 2020, she was also seeking relief in Illinois state court. On May 14, 2019, Tranchita filed a six-count complaint against IDNR, Mooi, and Cook County in the Circuit Court of Cook County, asserting, among other things, violations of her constitutional rights under the Fourth and Fourteenth Amendments. *Tranchita*, 2020 IL App (1st) 191251, ¶ 9; Verified Compl., No. 2019 CH 05968, 2019 WL 10377774 (Ill. Cir. Ct. May 14, 2019). The same day, Tranchita "filed an emergency motion for preliminary injunctive relief," arguing that the lives of the coyotes seized by the IDNR "were at risk if [the coyotes were] not returned" to her. *Tranchita*, 2020 IL App (1st) 191251, ¶ 9; Mem. in Support of Mot. for TRO, No. 2019 CH 05968, 2019 WL 10377772 (Ill. Cir. Ct. May 14, 2019). Tranchita alleged a procedural due process claim; she argued that because "she had a constitutionally protected property interest in the coyotes[] pursuant to her federal exhibitor license[,] . . . she was entitled to notice and an opportunity for a hearing prior to the seizure of the coyotes." *Tranchita*, 2020 IL App (1st) 191251, ¶¶ 9, 12. She also "argued

---

[4] The Court ordered Defendants not to revoke Tranchita's 2020 Hound Running Permit pending the Court's resolution of Tranchita's motion.

that she had a likelihood of success on the merits because she had valid possession of the coyotes under Illinois law" and that "she would suffer irreparable harm" if the coyotes were not returned because they "were unique creatures with no market value and no amount of money could compensate for their loss." *Id.* ¶ 9.

Three days later, the state trial court denied Tranchita's motion for preliminary injunctive relief. *Id.* ¶¶ 3, 10. The trial court found that Tranchita failed to show a likelihood of success on the merits of her complaint and that she "did not have a protected property interest in [Luna] because she did not possess the proper Illinois permit at the time of the seizure." *Id.* ¶¶ 8, 10. Tranchita appealed, contending that she had "a property interest in her coyotes" when Mooi seized them. *Id.* ¶ 1.

On May 1, 2020, the Illinois Appellate Court issued an opinion affirming the trial court's order. *Id.* ¶¶ 1, 24. The appellate court held that under Illinois law, a person must have a Breeder Permit before she can legally possess or raise a coyote. *Id.* ¶ 16. The court further found that because Tranchita did not have a Breeder Permit when the IDNR seized the coyotes in April 2019, the coyotes were "contraband" in which she could not legally assert a right of ownership or possession. *Id.* ¶¶ 6, 17. And "[w]ithout a legitimate claim of entitlement to the [coyotes, Tranchita] had no right to a property interest protected by due process when her coyotes were seized." *Id.* ¶ 24.

In coming to its conclusion, the appellate court rejected Tranchita's argument that section 48-10(b) of Illinois' Criminal Code "recognizes a 'right of property' in her coyotes pursuant to" her federal exhibitor's license. *Id.* ¶¶ 18–20. The court, however, expressly declined to consider whether Tranchita "could or should regain possession of Luna, based on the fact she now has a valid [Breeder Permit], or on the merits of any pending claims in [the] proceedings below." *Id.*

¶ 23.  The court also did not address whether an individual who wants to possess a coyote must possess a Hound Running Permit or any other permit in addition to a Breeder Permit.  In other words, although the appellate court found that a Breeder Permit was necessary to possess a coyote in Illinois, it did not consider whether a Breeder Permit was sufficient to possess a coyote.

Tranchita did not ask the Supreme Court of Illinois to review the appellate court's decision.  Instead, she voluntarily dismissed her state court complaint without prejudice three weeks after the appellate court issued its decision.  *See* Order, No. 2019 CH 05968, 2020 WL 5584983 (Ill. Cir. Ct. May 22, 2020).

## V.  Tranchita's Federal Court Litigation

More than four months after dismissing her state court litigation, Tranchita filed a six-count verified complaint under 42 U.S.C. § 1983 in this Court.  In her complaint, Tranchita alleges that Defendants violated her constitutional rights by requiring her to hold a Hound Running Permit before she can keep a coyote, and she asserts that the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 *et seq.*, preempts such a requirement.  Tranchita does not seek damages; she only seeks prospective declaratory and injunctive remedies that are all directed to allowing her to keep Luna in Illinois without a Hound Running Permit.[5]  On October 14, a week after filing her complaint, Tranchita moved for a TRO and preliminary injunction enjoining Defendants from (1) requiring her to hold a Hound Running Permit in order to keep Luna in Illinois; and (2) seizing Luna so long as Tranchita holds a current Breeder Permit.  Defendants oppose the motion.

---

[5] Tranchita expressly limits her claims against Defendants to those allowed by the *Ex parte Young* doctrine, which provides an exception to a state's sovereign immunity under the Eleventh Amendment by permitting a private party to "sue a state officer in his or her official capacity to enjoin prospective action that would violate federal law" or the Constitution.  *Ameritech Corp. v. McCann*, 297 F.3d 582, 585–86 (7th Cir. 2002) (citation omitted).

**LEGAL STANDARD**

Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The party seeking such relief must satisfy three threshold requirements: she must show (1) some likelihood of success on the merits; (2) an inadequate remedy at law; and (3) that irreparable harm is likely if the relief is not granted. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).[6] If the moving party fails to satisfy any one of these threshold requirements, the Court must deny the preliminary relief. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the moving party makes this threshold showing, however, the Court must "proceed[] to a balancing analysis, where the [C]ourt must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the [C]ourt were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in [her] favor, and vice versa." *Id.* Where appropriate, the Court's balancing process should also consider the public interest, that is, "any effects that granting or denying the preliminary injunction would have on nonparties." *Girl Scouts*, 549 F.3d at 1086. "[T]he moving party bears the burden of showing that a preliminary injunction [or TRO] is warranted." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

---

[6] Although *Winter* and *Mays* involved preliminary injunctions, "[t]he standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (citing cases).

## ANALYSIS

### I.     Likelihood of Success on the Merits

The Court begins with the likelihood of success requirement.  To meet this requirement, the "plaintiff must demonstrate that 'its claim has some likelihood of success on the merits.'" *Mays*, 974 F.3d at 822 (citation omitted).  "What amounts to 'some' depends on the facts of the case at hand because of [the Seventh Circuit's] sliding scale approach," *id.*, but satisfying this standard requires a "strong" showing that "normally includes a demonstration of how the applicant proposes to prove the key elements of its case," *see Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020).  And it is clear that "a mere possibility of success" does not meet this standard.  *Id.* at 762.  Moreover, "[i]f it is plain that the party seeking the preliminary injunction has *no* case on the merits, the injunction should be refused regardless of the balance of harms."  *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (emphasis added) (citation omitted).

The Court first addresses Defendants' contention that the *Rooker-Feldman* doctrine bars Tranchita's claims.  Then, the Court turns to Tranchita's assertion that she is likely to succeed on her "class-of-one" equal protection claim, preemption claim, free exercise claim, procedural due process claim, and substantive due process claim.[7]  As discussed further, the Court concludes that Tranchita is unlikely to succeed on the merits of any of these claims.

### A.     *Rooker-Feldman* Doctrine

Defendants first argue that Tranchita "has little chance of success on the merits because her claims are barred under the *Rooker-Feldman* doctrine."  Doc. 13 at 9.  Specifically, Defendants claim that Tranchita is essentially asking the Court "to overrule the Illinois appellate

---

[7] Tranchita represents that she intends to amend her due process claim based on vagueness and, therefore, she does not argue for injunctive relief based on this claim.

court's decision on her state court motion for a temporary restraining order/preliminary injunction." *Id.* Tranchita counters that none of her claims challenge the IDNR's 2019 seizure of coyotes and that she is not asking the Court to overrule the state appellate court's decision.

The *Rooker-Feldman* doctrine bars federal courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district [court] proceedings commenced and inviting district court review and rejection of those judgments." *Lennon v. City of Carmel*, 865 F.3d 503, 506 (7th Cir. 2017) (citation omitted). "Claims that directly seek to set aside a state-court judgment are *de facto* appeals that trigger the doctrine[,] [b]ut even federal claims that were not raised in state court, or that do not on their face require review of a state court's decision, may be subject to *Rooker-Feldman* if those claims are closely enough related to a state-court judgment." *Mains v. Citibank, N.A.*, 852 F.3d 669, 675 (7th Cir. 2017) (citation omitted). The question is "whether the federal plaintiff is alleging that his injury was caused by the state-court judgment." *Id.* If the plaintiff alleges such an injury or she "seeks relief that is tantamount to vacating the state judgment," *Rooker-Feldman* applies. *Bauer v. Koester*, 951 F.3d 863, 866 (7th Cir. 2020); *Mains*, 852 F.3d at 675. On the other hand, if the plaintiff's suit "does not seek to vacate the judgment of the state court" and "alleges an injury independent of the state-court judgment that the state court failed to remedy, *Rooker-Feldman* does not apply." *Mains*, 852 F.3d at 675.

The Court first considers whether there is a state-court "judgment" that could trigger the *Rooker-Feldman* bar in the first place. *See* 18B Edward H. Cooper, *Fed. Prac. & Proc. Juris.* § 4469.2 (2d ed. Oct. 2020 update) ("The starting point [for a *Rooker-Feldman* analysis] is clear. If there is no state-court judgment, whatever injury is claimed cannot have been caused by a judgment and *Rooker-Feldman* does not apply."). In *Bauer*, the Seventh Circuit signaled that

*Rooker-Feldman*'s judgment requirement does not require a final, appealable state-court order or judgment; rather, the requirement is satisfied so long as the state-court case is "effectively final." *See* 951 F.3d at 867 (citing *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 459 (3d Cir. 2019)). Under this "practical finality" approach, there is a judgment for *Rooker-Feldman* purposes if "the state case has ended." *Malhan*, 938 F.3d at 460; *see also Bauer*, 951 F.3d at 867 ("[I]nterlocutory orders entered prior to the *final disposition* of state court lawsuits are not immune from the jurisdiction-stripping powers of *Rooker-Feldman*." (citation omitted)). A state proceeding ends when it "has reached a point where neither party seeks further action," for example, where the state court "does not issue a *judgment* but merely an interlocutory order . . . and the parties then voluntarily terminate the litigation." *Malhan*, 938 F.3d at 459 (citations omitted). Here, the state trial court issued an interlocutory order denying Tranchita's motion for a preliminary injunction, *see Heim v. Herrick*, 344 Ill. App. 3d 810, 812–13 (2003), which the state appellate court affirmed. Tranchita thereafter voluntarily dismissed her claims, thereby ending the state-court litigation. *See* Order, 2020 WL 5584983. Therefore, under *Bauer* and *Malhan*, there is a state-court "judgment" under *Rooker-Feldman*. *See Bauer*, 951 F.3d at 867; *Malhan*, 938 F.3d at 459–60.

Next, the Court must determine whether Defendants have demonstrated that the *Rooker-Feldman* doctrine likely bars Tranchita's claims in this lawsuit. In the state court litigation, the appellate court only addressed a procedural due process claim based on Tranchita's asserted property right in the coyotes and a corresponding entitlement to notice and a pre-deprivation hearing before the IDNR's April 2019 seizure. *Tranchita*, 2020 IL App (1st) 191251, ¶¶ 12, 23. The appellate court rejected this claim; it found that an individual must have a Breeder Permit to

legally possess coyotes, and that because Tranchita did not possess this permit at the time of the seizure, she did not have a protected property right in the coyotes at that time. *Id.* ¶¶ 16–20, 24.

Tranchita's claims in this litigation do not appear to allege injuries that derive from the appellate court's findings about the Breeder Permit requirement, whether Tranchita satisfied this requirement in April 2019, and whether Tranchita was entitled to procedural due process in April 2019. Instead, Tranchita's federal claims all assert injuries stemming from Defendants' post-April 2019 insistence that she possess a *different* permit, the Hound Running Permit, before she can keep a coyote. *See Mains*, 852 F.3d at 675 ("If the claim alleges an injury independent of the state-court judgment that the state court failed to remedy, *Rooker-Feldman* does not apply."). At this point, the Court does not see (and Defendants do not explain) how addressing these asserted injuries would require the Court to evaluate any of the appellate court's findings. *See Bauer*, 951 F.3d at 856 (*Rooker-Feldman* bars claims that require the court "to evaluate the state court judgments" (citation omitted)). Even if the Court finds that Defendants are impermissibly requiring Tranchita to hold a Hound Running Permit before possessing a coyote, such a finding would not alter or contradict any of the appellate court's findings because the appellate court did not address, let alone make any findings about, this issue. *See Milchtein v. Chisholm*, 880 F.3d 895, 898 (7th Cir. 2018) ("The vital question [for the *Rooker-Feldman* inquiry] is whether the federal plaintiff seeks the alteration of a state court's judgment. The [plaintiffs] do not, so the *Rooker[-]Feldman* doctrine does not block this suit."); *cf. Bauer*, 951 F.3d at 866 ("This suit is barred by the *Rooker-Feldman* doctrine, however, because any finding in favor of the [plaintiffs] would require us to contradict the state court's orders.").

The Court concludes that Defendants have failed to demonstrate that the *Rooker-Feldman* doctrine likely bars Tranchita's claims in this lawsuit. Therefore, the Court declines to deny

Tranchita's motion on that basis and proceeds to consider her likelihood of success for each asserted claim.

###    B.    "Class-of-One" Equal Protection Claim (Count I)

Tranchita first alleges a "class-of-one" claim under the Equal Protection Clause of the Fourteenth Amendment.  To succeed on her class-of-one equal protection claim, Tranchita "must prove that (1) [she] has been 'intentionally treated differently from others similarly situated,' and (2) 'there is no rational basis for the difference in treatment.'"  *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 979–80 (7th Cir. 2019) (citation omitted).  Tranchita contends that Defendants are "intentionally treating her differently than others similarly situated" by requiring her to hold a Hound Running Permit to possess a coyote, while, at the same time, not requiring other individuals and entities that possess coyotes to hold the same permit. Doc. 6 at 6–7.  She also contends that there is no rational basis for this differential treatment.[8]

Most of the parties' briefing on Tranchita's class-of-one claim focuses on the "similarly situated" requirement.  As "similarly situated" comparators, Tranchita identifies ten individuals and entities that allegedly have possessed or currently possess, with IDNR's knowledge, coyotes without a Hound Running Permit.[9]  Defendants counter with evidence that seven of these comparators possess scientific and special purpose permits (commonly referred to as rehabilitator permits), which appear to allow the possession of coyotes without a Hound Running

---

[8] Tranchita further asserts that "there is no rational basis for Defendants to require anyone to hold a Hound Running Area permit, unless those persons desire to run hounds after coyotes, which Tranchita clearly does not desire."  Doc. 6 at 7.  The Court addresses this assertion in connection with Tranchita's free exercise claim.

[9] These alleged comparators are: (1) Flint Creek Wildlife Rehabilitation ("Flint Creek"); (2) Dawn Keller, the founder and director of Flint Creek; (3) Forest Preserve District of DuPage County d/b/a Willowbrook Wildlife Center ("Willowbrook"); (4) Big Run Wolf Ranch ("Big Run"); (5) John Basile, the founder and president of Big Run; (6) Wheaton Park District d/b/a Cosley Zoo ("Cosley Zoo"); (7) Fox Valley Wildlife Center ("Fox Valley"); (8) Treehouse Wildlife Center ("Treehouse"); (9) Hoo Haven Wildlife and Education Center ("Hoo Haven"); and (10) Karen Herdklotz, the director of Hoo Haven.

Permit. Doc. 13-2 at 2 (¶¶ 2, 3); *see* 520 Ill. Comp. Stat. 5/3.22 (authorizing the issuance of scientific and special purpose permits to individuals handling or possessing wildlife in certain circumstances). As for the three comparators that do not possess rehabilitator permits, Defendants claim they are not similarly situated because two of them, Cosley Zoo and Big Run, "are large educational facilities that cannot be compared to [Tranchita] keeping coyotes on her residential property[,]" and the third comparator, John Basile, is the president of Big Run. Doc. 13 at 12 & n.2.

The Court does not need to resolve the parties' various arguments on this issue, however, because even if Tranchita could prove that she is similarly situated with at least one of the ten purported comparators, she still is unlikely to succeed on her class-of-one claim. The essence of Tranchita's claim is that Defendants are selectively enforcing the Wildlife Code's Hound Running Permit requirement against her but not others. *E.g.*, Doc. 1 ¶¶ 303, 310, 317 ("Tranchita alleges that Defendants have singled her out for selective enforcement for irrational and improper reasons. . . . Defendants are selectively enforcing this dual permit requirement. . . . Tranchita, compared with the comparators, is being selectively treated."); Doc. 6 at 6 ("Despite Defendants' awareness of others['] possession of coyotes without holding a Hound Running Area permit, to date Tranchita is the *only* person who has been subject to enforcement."). But enforcement of a law, by its nature, is a prosecutorial decision that entails selectivity, *Van Dyke v. Vill. of Alsip*, 819 F. App'x 431, 432 (7th Cir. 2020), and the government does not violate the Equal Protection Clause simply by enforcing a law against only some of the law's violators, *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985) ("The Constitution does not require states to enforce their laws (or cities their ordinances) with Prussian thoroughness as the price of being allowed to enforce them at all."); *Smith v. Wolf*, No. 13 cv 63, 2013 WL 3168753,

at *4 (N.D. Ill. June 20, 2013) (allegations of "uneven law enforcement" did not state a class-of-one claim). "Selective, incomplete enforcement of the law is the norm in this country," *Hameetman*, 776 F.2d at 641, and selective prosecution in the form of a government's failure "to prosecute all known lawbreakers . . . has no standing in equal protection law," even though "it involves dramatically unequal legal treatment[,]" with some people "being punished and others getting off scot-free," *Esmail v. Macrane*, 53 F.3d 176, 178–79 (7th Cir. 1995); *see also Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 603–04 (2008) ("[A]llowing an equal protection claim on the ground that a [speeding] ticket was given to one person and not others, *even if for no discernible or articulable reason*, would be incompatible with the discretion inherent in the challenged action." (emphasis added)). Accordingly, a defendant's enforcement of a law or ordinance against the plaintiff and not others "is not typically a basis for a class-of-one challenge" unless the enforcement is "based on some invidious discrimination." *Van Dyke*, 819 F. App'x at 431–33 (affirming the district court's dismissal of a class-of-one claim based on the defendant's enforcement of a zoning ordinance against the plaintiff but not against others who were violating the same ordinance).

Defendants' enforcement of the Wildlife Code, and the Hound Running Permit requirement in particular, is necessarily selective and discretionary—there is no indication that the IDNR has the time, money, and resources to identify every single individual or entity in Illinois that violates the Wildlife Code, including the Hound Running Permit requirement at issue. Tranchita, therefore, must show that invidious discrimination motivated Defendants' enforcement of the Hound Running Permit requirement against her but no other alleged violators. *Van Dyke*, 819 F. App'x at 432–33. Yet Tranchita does not argue in her briefing that she will be able to prove invidious discrimination; she only claims that Defendants' selective

enforcement lacks a rational basis.  Doc. 6 at 7.  This is not enough to support a class-of-one claim based on selective enforcement.  *See United States v. Moore*, 543 F.3d 891, 899–900 (7th Cir. 2008) (finding that the plaintiff's class-of-one challenge to the defendant's prosecutorial decision was foreclosed because the challenge was based on irrationality, as opposed to invidious discrimination, and "a no-rational-basis challenge to the exercise of prosecutorial discretion is doomed to failure"); *CBS Outdoor, Inc. v. Vill. of Plainfield*, 38 F. Supp. 3d 896, 906–08 (N.D. Ill. 2014) (finding that the plaintiff failed to sufficiently allege a class-of-one claim where it alleged "selective prosecution" without alleging that the distinction made between the plaintiff and another was "retaliatory or inappropriately motivated in any way"); *Stevo v. Frasor*, No. 07 C 6647, 2011 WL 253963, at *12 (N.D. Ill. Jan. 3, 2011) ("Simply to assert that the City enforced its Water Ordinance against one resident and not against others, without more, would not make out a Constitutional claim.").

Furthermore, Defendants appear to have a rational basis for enforcing the Hound Running Permit requirement against Tranchita: the desire to enforce the Wildlife Code enacted by Illinois' legislature.  *See Murphy v. Vill. of Plainfield*, 918 F. Supp. 2d 753, 757–58, 762–63 (N.D. Ill. 2013) (finding that the defendant's enforcement of an ordinance against the plaintiffs but not others who were violating the ordinance passed the rational basis test because it "served a government interest by enforcing local law").  And there are conceivable rational bases for Defendants' failure to enforce the Hound Running Permit requirement against any other alleged violator.  *See Chi. Studio Rental*, 940 F.3d at 980 (a rational basis exists so long as the Court identifies "a conceivable rational basis for the different treatment," even if it is not "the actual basis for [the] defendant's actions").  Perhaps the IDNR does not currently have the manpower or resources to sufficiently investigate whether others illegally possess coyotes without a Hound

18

Running Permit. Or perhaps the IDNR is in the process of conducting these investigations. Ultimately, Tranchita has not shown that she is likely to negate "any reasonably conceivable state of facts that could provide a rational basis" for Defendants' differential treatment, as she must do to prevail on her class-of-one claim. *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015) (citation omitted).

In sum, Tranchita's displeasure and disagreement with Defendants' failure to enforce the Hound Running Permit requirement against other alleged violators likely does not give rise to a class-of-one claim. *See Storey v. City of Alton*, 710 F. App'x 706, 707–08 (7th Cir. 2018) (noting that the plaintiff, who alleged a class-of-one claim based on the City's selective enforcement of local ordinances, had "no right to insist that the City exercise its prosecutorial discretion to cite other property owners"). Given the applicable law, Tranchita has not demonstrated that she is likely to succeed on the merits of her equal protection claim.

## C.     AWA Preemption Claim (Count II)

Tranchita also brings a claim asserting that the AWA preempts the IDNR's policy requiring an individual who wants to possess a coyote to obtain a Hound Running Permit—a requirement that is set forth in Section 3.25 of the Wildlife Code. "When the federal government acts within its constitutional authority, it is empowered to preempt state or local laws to the extent it believes such action to be necessary to achieve its purposes." *DeHart v. Town of Austin*, 39 F.3d 718, 721 (7th Cir. 1994). The federal government preempts state or local laws in three situations: (1) where Congress expressly defines "to what extent a federal statute preempts a state or local law"; (2) where "a pervasive scheme of federal regulation makes it reasonable to conclude that Congress intended exclusive federal regulation of the area"; and (3) "where state or local law actually conflicts with federal law," such that "'compliance with both federal and state

or local regulations is a physical impossibility,' or when state or local law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citations omitted). The ultimate task in a preemption inquiry "is to ascertain the intent of Congress." *Id.* at 722.

Tranchita only argues that the third situation, conflict between federal and state law, applies, so the Court limits its analysis to that situation. Tranchita contends that the Wildlife Code's Hound Running Permit requirement "conflicts with the AWA primarily because animal fighting is a violation of the AWA, and [her] USDA License would be revoked and she could be charged with animal cruelty if she engaged in hound running." Doc. 6 at 8–9. Neither argument is persuasive.

First, hound running in Illinois does not constitute an "animal fighting venture" that the AWA prohibits. An animal fighting venture requires fighting between at least two animals, 7 U.S.C. § 2156(f)(1), whereas hound running, as authorized in Illinois, is intended to prohibit any violent contact between the animals, *see* 520 Ill. Comp. Stat. 5/3.26(b)(1) ("Authorized species may be pursued with dogs in a hound running area, *but not in a manner or with the intent to capture or kill*." (emphasis added)). And even if hound running, in practice, involves capturing or killing the pursued species, this amounts to the use of hounds to hunt the pursued species, which the AWA expressly excludes from its definition of an animal fighting venture. 7 U.S.C. § 2156(f)(1) ("[T]he term 'animal fighting venture' shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting another animal[.]"); *see also* Doc. 6-5 at 6 (assertion by Tranchita that "[t]he purpose of hound running is the training of hunting dogs"). Tranchita appears to dispute the latter conclusion by asserting that an individual does not need a separate hunting permit to possess coyotes in Illinois, but she

20

makes no attempt to explain how this assertion, even if true, makes hound running an animal fighting venture prohibited by the AWA.

To be sure, the Court does not doubt Tranchita's (and others') sincere belief that hound running is no different than dog fighting or other animal fighting ventures prohibited by the AWA. But Tranchita does not identify any legal authority holding or even suggesting that the members of *Congress* felt the same way when they passed the AWA, i.e., that Congress intended for the AWA's animal fighting prohibition to extend to hound running as that activity is defined and authorized in Illinois. *See DeHart*, 39 F.3d at 722 ("Our ultimate task [in a preemption analysis] is to ascertain the intent of Congress."). In fact, the Seventh Circuit in *DeHart* found it clear that Congress did not intend for the AWA to preempt or ban state legislation, like the Wildlife Code, that regulates wild animals. *Id.*

Second, Tranchita does not identify any case, law, or regulation to support her claim that engaging in hound running would result in the revocation of her USDA license and a charge of animal cruelty. What is more, even if Tranchita had done so, she still does not point to any aspect of the Wildlife Code that requires an individual who obtains a Hound Running Permit to *actually* engage in hound running. Instead, Section 3.25 requires an individual seeking to possess coyotes to obtain a permit that allows her to engage in hound running, if she so chooses. Tranchita's own actions reflect this distinction; she currently has a Hound Running Permit, yet she is not operating a hound run or otherwise engaging in hound running. Nor does Tranchita point to anything indicating that the IDNR requires anybody to engage in hound running simply because they possess a Hound Running Permit. Therefore, even if federal law prohibited hound running, an individual seeking to raise coyotes in Illinois could comply with the Wildlife Code without running afoul of the federal prohibition by doing exactly what Tranchita is doing. *See*

21

*DeHart*, 39 F.3d at 722 (finding the actual conflict preemption theory inapplicable where the plaintiff failed to show "that it is physically impossible to comply with both the federal and local regulations").

For these reasons, Tranchita is unlikely to succeed on her AWA preemption claim.

### D.   Free Exercise Claim (Count IV)

Tranchita next asserts that the Hound Running Permit requirement violates her rights under the Free Exercise Clause of the First Amendment.  Although the Free Exercise Clause "gives special protection to the exercise of religion," *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 713 (1981), the Supreme Court has explained that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes),'" *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (citation omitted); *see Grayson v. Schuler*, 666 F.3d 450, 452 (7th Cir. 2012) ("Regulations of general applicability, not intended to discriminate against a religion or a particular religious sect, were held in [*Smith*] not to violate the free exercise clause.").  "Under *Smith*, a neutral law of general applicability is constitutional if it is supported by a rational basis." *Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017).

The "first part of a free exercise analysis" asks whether the plaintiff has "sincere religious beliefs." *Young v. Lane*, 922 F.2d 370, 374 n.11 (7th Cir. 1991).  Tranchita contends that it is her religious belief that she must "'do unto others as [she] would have them do unto [her],'" that this belief "extends to animals as well as humans," and that running hounds after coyotes violates this belief.  Doc. 1 ¶¶ 242–245; Doc. 6-5 at 6.  Defendants correctly point out that Tranchita has not specified a particular religion underlying her belief, but the Supreme Court has "reject[ed]

22

the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization."[10] *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989). Moreover, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). The Court has no reason to doubt the sincerity of Tranchita's assertions about her religious beliefs, so it proceeds to address whether the Hound Running Permit requirement impermissibly impedes on her right to exercise these beliefs. *See Mack v. Chaplain*, No. 18-cv-00507-DRH, 2018 WL 1532813, at *1, *3 (S.D. Ill. Mar. 29, 2018) (declining to "question the sincerity of Plaintiff's religious beliefs" in screening the plaintiff's First Amendment claim under 28 U.S.C. § 1915A); *Pérez v. Frank*, No. 06 C 248 C, 2007 WL 1101285, at *10 (W.D. Wis. Apr. 11, 2007) ("[I]ncreasingly[,] free exercise jurisprudence has emphasized deference to individuals' professed beliefs, so long as there is no reason to doubt their sincerity.").

Next, the Court considers whether the Wildlife Code's Hound Running Permit requirement is neutral and generally applicable. A law is neutral so long as the object of the law does not "infringe upon or restrict practices because of their religious motivation." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir. 2007) (citation omitted). Relatedly, a law is generally applicable so long as it does not selectively impose "burdens only on conduct motivated by religious belief." *Id.* (citation omitted). "[T]he neutrality and general applicability requirements usually rise or fall together." *Cassell v. Snyders*, 458 F. Supp. 3d 981, 995 (N.D. Ill. 2020).

---

[10] That said, the Court notes that treating others as one would be treated is generally known as the Golden Rule, and it is a recognized tenet of several religions. *See* Lua Kamál Yuille, *Creating a Babel Fish for Rights & Religion: Defining "Rights" Through Sacred Texts*, 25 Transnat'l L. & Contemp. Probs. 309, 326 & n.85 (2016); Jonathan Granoff, *Nuclear Weapons, Ethics, Morals, and Law*, 2000 B.Y.U. L. Rev. 1413, 1421 & n.37 (2000).

23

The Court concludes, and Tranchita does not dispute, that the Hound Running Permit requirement is neutral and generally applicable. The text of Sections 3.25 and 3.26 does not refer to, let alone target, any particular religion, and there is no indication that the object of the Hound Running Permit requirement is to restrict or otherwise influence practices based on their underlying religious motivation. *See Ill. Bible Colls.*, 870 F.3d at 639 (statutes were neutral where they did "not target religion or religious institutions[,] [t]here [was] no allegation of an underlying religious animus," and certification under the statutes was based on secular criteria). The Hound Running Permit requirement also applies to "[a]ny individual who, within the State of Illinois," wishes to possess or raise a fur-bearing mammal, regardless of the individual's particular religious beliefs. 520 Ill. Comp. Stat. 5/3.25; *see Ill. Bible Colls.*, 870 F.3d at 639 (statutes were generally applicable because they "appl[ied] equally to secular and religious post-secondary institutions").

Because the Hound Running Permit requirement is neutral and generally applicable, the Court must next ask whether the requirement "is rationally related to a legitimate government interest." *Ill. Bible Colls.*, 870 F.3d at 639; *Scariano v. Justs. of Sup. Ct. of State of Ind.*, 38 F.3d 920, 924 (7th Cir. 1994). And it is here that Tranchita fails to show a likelihood of success on the merits. No matter how tame a coyote may seem, it is still a wild animal that could pose danger to other animals (such as pets) and people if it were to escape from its enclosure in a densely populated area. Illinois has a legitimate interest in trying to prevent such situations from occurring, and it may do so through regulating who can possess coyotes and where. *See Mayle v. City of Chicago*, 803 F. App'x 31, 33 (7th Cir. 2020) ("The government has a legitimate interest in maintaining social order and public safety. It also may legitimately give the public predictability about what animals they may encounter in urban spaces." (citations omitted));

*DeHart*, 39 F.3d at 722 ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals. The regulation of animals has long been recognized as part of the historic police power of the States." (citations omitted) (internal quotation marks omitted)); *Cortez v. Cty. of Alameda*, No. C-11-03199-YGR, 2012 WL 822377, at *4 (N.D. Cal. Mar. 9, 2012) ("Regulation of the keeping of animals is rationally related to the legitimate governmental interest of promoting the safety and welfare of the general public."). The Hound Running Permit requirement is rationally related to the government's interest in regulating who can keep coyotes (and where) in that it requires an individual who wants to raise a coyote to do so on at least ten contiguous acres of land, *see* Ill. Admin. Code tit. 17, § 970.40(d)(2), which is likely impossible for an individual who wants to keep coyotes in the city or a suburban housing development. In fact, in denying Tranchita's second application for a Hound Running Permit in August 2019, the IDNR specifically referred to the fact that Tranchita lived "in a developed urban area where the operation of [a hound running area] would not be compatible or appropriate." Doc. 13-1 at 8. It was permissible for Illinois' legislature to conclude that raising coyotes is an activity that should be restricted to more rural areas, and it was rational for the legislature to implement this restriction by way of the Hound Running Permit requirement, which requires an amount of land that would likely prevent an individual living in an urban or developed area from keeping a coyote.

Tranchita, however, contends that the Hound Running Permit requirement has no rational basis because the IDNR issued her a Breeder Permit on seven occasions when she did not hold a Hound Running Permit. But the IDNR's repeated failure to follow the Hound Running Permit requirement has no bearing on whether the requirement, as set forth in the Wildlife Code, has a rational basis. Tranchita also contends (albeit in connection with her class-of-one claim) that

there is no rational basis for the state to require individuals who do not want to run hounds to hold a Hound Running Permit so that they can keep a coyote. This contention fails as well. Even if an individual has no desire to keep a coyote for purposes of hound running, like Tranchita, the state still has a legitimate interest in ensuring that the individual does not possess the coyote in an urban or otherwise developed area. The Hound Running Permit requirement rationally relates to this interest by limiting who can possess coyotes, and where, based on acreage requirements. And the fact that the requirement makes certain individuals who have no intention of hound running obtain a permit that allows them to do so does not undermine this rational relationship. *See Scariano*, 38 F.3d at 925 ("Rationality does not require that a rule be the least restrictive means of achieving a permissible end. . . . Nor is it relevant that some unfairness results from the application of the rule. . . . Under rational basis review, some slippage is permissible.").

In short, because the Hound Running Permit requirement appears to be supported by a rational basis, Tranchita is not likely to succeed on her Free Exercise claim.[11]

---

[11] Tranchita also contends that hound running and the Hound Running Permit requirement significantly burden the exercise of her religious beliefs. Because the Hound Running Permit requirement is neutral and generally applicable, the Court questions whether the free exercise analysis takes into consideration any alleged burden on Tranchita's beliefs. *See, e.g., Nat'l Inst. of Family and Life Advocates v. Schneider*, --- F. Supp. 3d ----, 2020 WL 5253855, at *19 n.27 (N.D. Ill. Sept. 3, 2020) (noting that recent decisions from the Supreme Court, the Seventh Circuit, and this District have not asked whether neutral and generally applicable laws unduly burden the plaintiff's religious practice). But even if it did, the Court's conclusion would not change. The Hound Running Permit requirement does not require Tranchita to actually run hounds; it merely requires her to obtain a permit that allows her to do so. As already noted, Tranchita's own actions reflect this distinction; she currently has a Hound Running Permit, yet she is not operating a hound run or otherwise engaging in hound running. Moreover, Tranchita does not explain how merely having a Hound Running Permit—with no mandate from the state to actually engage in hound running—substantially pressures her to behave in a way that she believes will harm other animals. *See Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (a substantial burden on an individual's religious practice "is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs'" (citation omitted)). Notably, Tranchita told the IDNR that she is "willing to purchase any permit [it] request[s] of [her]," Doc. 6-5 at 5, and she already obtained a Hound Running Permit for 2020–2021 and attempted to obtain the same permit for 2019–2020.

### E.     Due Process Claims (Counts V and VI)

Finally, Tranchita brings claims for procedural and substantive due process violations. For the Constitution's procedural and substantive due process requirements to "apply in the first place," the plaintiff must establish an interest that is "within the Fourteenth Amendment's protection of liberty and property."  *Proctor v. McNeil*, 14 F. Supp. 3d 1108, 1112 (N.D. Ill. 2014) (citation omitted); *see Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013) ("[T]he threshold question in any due process challenge is whether a protected property or liberty interest actually exists.").  Tranchita does not assert that Defendants have impeded on a protected liberty interest, such as "bodily integrity, the right to marry, marital privacy, and the right to have children," so her due process claims must be grounded in a protected property interest.  *See Proctor*, 14 F. Supp. 3d at 1112.  "A protected property interest is a legitimate claim of entitlement—not defined by the Constitution—but 'by existing rules or understandings that stem from an independent source such as state law.'"  *Id.* (citation omitted).

Tranchita's identification of her property interests for each due process claim has been less than clear.  Nonetheless, the Court addresses all the purported property interests it has discerned from Tranchita's complaint, her briefing, and her representations at the court hearings. To the extent Tranchita has identified a protected property interest, the Court then analyzes whether she is likely to demonstrate a violation of procedural or substantive due process with respect to that interest.

#### 1.     Luna

Tranchita first appears to contend that she has a property interest in Luna that is protected by both procedural and substantive due process.  *See, e.g.*, Doc. 1 ¶ 384 (alleging as part of her substantive due process claim that she "has a property interest in Luna"); Doc. 6 at 13 (arguing in

the context of her procedural due process claim that "she has a legitimate claim of entitlement to Luna [that] is protected by due process"); Doc. 16 at 14 (arguing that she has a property interest in Luna); Oct. 16, 2020 Hr'g Tr. at 18:3–9 (asserting that the property interest for her substantive due process claim is "ownership of the coyote"). When Tranchita's 2015 Breeder Permit expired in March 2016, however, she relinquished any property interest in Luna that she may have had. *See Tranchita*, 2020 IL App (1st) 191251, ¶¶ 17, 24. Moreover, she did not possess any such property interest when the IDNR seized Luna in April 2019. *Id.* ¶¶ 7, 17, 24. Thus, to succeed on this contention, Tranchita must point to something that happened *after* April 2019 that could arguably return her property interest in Luna (to the extent one existed in the first place) or provide her with a new, independent property interest in Luna.

Tranchita has not done so. First, she contends that the state appellate court "explained that a property interest in a coyote is created when a fur-bearing mammal breeder permit is obtained." Doc. 16 at 14. But the appellate court did no such thing. Instead, the court explained that Tranchita did not have a property interest in Luna at the time of the seizure because she did not have a Breeder Permit at that time. Tranchita cannot simply take a variation of the holding's inverse proposition—that an individual has a property interest in a coyote if she possesses a Breeder Permit—and declare that to constitute the appellate court's holding. *See Capitol Recs., Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 480 (2d Cir. 2004) ("An inverse statement of a proposition is possibly but not necessarily true. That a work protected by a foreign copyright can have its United States copyright restored does not necessarily mean that a work unprotected by a foreign copyright cannot receive any protection in the United States." (citation omitted)); Courtney Taylor, *What are the Converse, Contrapositive, and Inverse?*, https://www.thoughtco.com/converse-contrapositive-and-inverse-3126458 (last visited Nov. 9,

28

2020) (explaining that a conditional statement and its inverse are not logically equivalent). Far from setting forth Tranchita's explantion as a holding, the appellate court explicitly disclaimed the explanation by noting that it was *not* determining whether Tranchita's possession of the 2020 Breeder Permit entitled her to "regain possession of Luna." *Tranchita*, 2020 IL App (1st) 191251, ¶ 23 ("[W]e will not determine at this time whether plaintiff could or should regain possession of Luna, based on the fact she now has a valid permit[.]").

Second, Tranchita argues that "the Dangerous Animal Act gives [her] a 'right of property'" in Luna "because [she] holds a 2020–2021 USDA Class C Exhibitor license." Doc. 16 at 14; *see also* Doc. 1 ¶ 384 ("Tranchita has a property interest in Luna because she is a federally licensed Exhibitor."). But Tranchita made the same argument before the state appellate court—"Plaintiff [] argues that at all times she possessed a federal Class C exhibitor's license and that section 48-10(b) of the Criminal Code of 2012 [720 Ill. Comp. Stat. 5/48-10(b)] recognizes a 'right of property' in her coyotes pursuant to her federal license"—and the appellate court squarely rejected this argument.[12] *Tranchita*, 2020 IL App (1st) 191251, ¶¶ 18–20. The Court will not question this rejection, especially given Tranchita's representation that she is not asking the Court "to overrule the state [appellate] court decision."[13] Doc. 16 at 12.

Because Tranchita has not demonstrated that she is likely to establish a protected property interest in Luna, she has failed to show that she is likely to succeed on either due process claim based on this interest. *See New Burnham Prairie Homes, Inc. v. Vill. of Burnham*,

---

[12] Tranchita's briefing purports to quote 720 Ill. Comp. Stat. 585/1, *see* Doc. 16 at 14–15, but the legislature repealed this statutory provision in 2013. Prior to its repeal, the statute contained the same language as section 48-10(b) from the Criminal Code, which Tranchita relied upon in the state court appellate proceedings. *Compare* 720 Ill. Comp. Stat. 585/1(a) (eff. date Jan. 1, 2011 to Dec. 31, 2012), *with Tranchita*, 2020 IL App (1st) 191251, ¶ 19 (quoting 720 Ill. Comp. Stat. 5/48-10(b)).

[13] The Court cautions Tranchita that additional reliance on arguments contradicting the state appellate court's findings may bring *Rooker-Feldman* into play and deprive the Court of jurisdiction over her claims.

29

910 F.2d 1474, 1479 (7th Cir. 1990) ("Before a party may assert a due process argument—procedural or substantive—it must establish that it has a 'legitimate claim of entitlement' to the right being asserted." (citations omitted)); *Haney v. Winnebago Cty. Bd.*, No. 3:19-cv-50191, 2020 WL 1288881, at *6 (N.D. Ill. Mar. 18, 2020) ("Both substantive and procedural due process claims require a plaintiff to identify a constitutionally protected right to property or liberty.").

### 2. 2020 Breeder Permit

Tranchita also asserts that procedural and substantive due process protect her property interest in the benefits of her 2020 Breeder Permit. *See, e.g.*, Doc. 1 ¶¶ 366, 376, 385, 388, 398, 399 (asserting, in connection with both due process claims, the right to enjoy the benefits of her 2020 Breeder Permit); Oct. 16, 2020 Hr'g Tr. at 18:3–15 (asserting that her substantive due process property interest includes "the right to possess" a coyote given by the Breeder Permit). These benefits, Tranchita continues, allow her to possess a coyote without also having a Hound Running Permit. *See* Doc. 1 ¶¶ 375, 376, 398, 399; Doc. 6 at 13 ("IDNR has a long-standing custom and practice of issuing the [Breeder Permit] to Tranchita, without requiring her to also hold a Hound Running Area permit. . . . The banning of Tranchita from possessing a coyote without a Hound Running Permit[] has deprived Tranchita of her protected property interest.").

"[I]n some instances, permits and licenses, once granted, can constitute protected property interests, at least for due process purposes." *Dyson v. City of Calumet City*, 306 F. Supp. 3d 1028, 1041 (N.D. Ill. 2018). "To maintain a claim of property over a . . . license or permit, a plaintiff must show that she has 'a legitimate claim of entitlement to it,' rather than 'a unilateral expectation to it.'" *Id.* (citation omitted). Defendants do not argue that Tranchita lacks a legitimate claim of entitlement to her 2020 Breeder Permit, and they have not expressed any

intention to revoke this permit, as they have with Tranchita's 2020 Hound Running Permit. Thus, the Court assumes for purposes of Tranchita's motion that she is legitimately entitled to the 2020 Breeder Permit.

But that does not end the inquiry; the Court must also determine what rights are, or are not, conferred by the 2020 Breeder Permit. Tranchita asserts that her 2020 Breeder Permit entitles her to possess a coyote without also owning a Hound Running Permit, and she claims that three reasons support this purported entitlement: (1) the state's policy and custom of issuing her Breeder Permits and allowing her to keep coyotes while only having that permit; (2) the state appellate court's decision; and (3) the plain language of the statute. Doc. 1 ¶¶ 366, 367, 388, 389; Doc. 6 at 12–13 ("A policy or custom can form the basis of a property interest. . . . IDNR has a long-standing custom and practice of issuing the [Breeder Permit] to Tranchita, without requiring her to also hold a [Hound Running Permit]."); Doc. 16 at 4–5 (arguing that in light of the state appellate court's decision, "as long as Tranchita holds [her 2020 Breeder Permit,] Luna will not be contraband if she is reunited with Tranchita in Illinois").

The Court begins with the plain language of the relevant statutory provision. Section 3.25 of the Wildlife Code states that "[b]efore any individual shall hold, possess or engage in the breeding or raising of live fur-bearing mammals, he shall first procure a fur-bearing mammal breeder permit." 520 Ill. Comp. Stat. 5/3.25. Thus, an individual must first have a Breeder Permit before she can possess any fur-bearing mammal, like a coyote, in Illinois. *Id.*; *see also* 520 Ill. Comp. Stat. 5/1.2g (identifying coyote as one of thirteen "fur-bearing mammals"). However, this provision is subject to exceptions for striped skunks and coyotes, which are set forth in the last paragraph of Section 3.25:

> No fur-bearing mammal breeder permits will be issued to hold,
> possess, or engage in the breeding and raising of striped skunks

31

> acquired after July 1, 1975, or coyotes acquired after July 1, 1978,
> except for coyotes that are held or possessed by a person who
> holds a hound running area permit under Section 3.26 of this Act.

520 Ill. Comp. Stat. 5/3.25. Pursuant to this paragraph, the IDNR will not issue a Breeder Permit to an individual for keeping coyotes unless the individual also holds a Hound Running Permit. As can be seen, nothing in Section 3.25 suggests that an individual can legally possess a coyote in Illinois with only a Breeder Permit. Rather, the structure and language of Section 3.25 indicate that Illinois' legislature intended for the possession of coyotes to be generally prohibited, with one limited exception carved out for individuals who possess both a Breeder Permit and a Hound Running Permit.

The state appellate court's decision, which the Court considers next, is not to the contrary. Tranchita asserts that because the appellate court held that "coyotes possessed without [a Breeder Permit] are contraband," *Tranchita*, 2020 IL App (1st) 191251, ¶ 24, individuals "who possess coyotes with a [Breeder Permit] do not possess contraband," Doc. 16 at 5. But Tranchita's argument relies upon the same logical fallacy that she used with her argument about Luna. The inverse of the appellate court's holding upon Tranchita seeks to rely—if an individual has a Breeder Permit, then she does not possess contraband—is not necessarily true. For instance, an individual who possesses a coyote while having a Breeder Permit but not a Hound Running Permit does not comply with Section 3.25 and, therefore, possesses contraband. *Tranchita*, 2020 IL App (1st) 191251, ¶ 17 ("Wildlife possessed 'contrary to any of the provisions [of the Wildlife Code]' is contraband." (quoting 520 Ill. Comp. Stat. 5/1.2c)). And the appellate court did not address whether a Breeder Permit alone was *sufficient* to possess a coyote; it only addressed whether a Breeder Permit was *necessary* to possess a coyote.

Therefore, the state appellate court's decision provides no support for Tranchita's contention that her 2020 Breeder Permit alone entitles her to possess a coyote.

That brings the Court to Tranchita's last argument: that the IDNR's custom and policy of issuing her Breeder Permits and allowing her to keep coyotes without a Hound Running Permit created an entitlement to possess a coyote based on a Breeder Permit alone. For this argument, Tranchita points to the fact that the IDNR issued her a Breeder Permit on several separate occasions without requiring her to first have a Hound Running Permit and at times (from 2011 through 2015) when she already possessed coyotes. She also claims that an IDNR officer told her in 2011 that she only needed a Breeder Permit to keep her coyotes.

A protected property interest may "arise from mutually explicit understandings," and "an established custom or policy may be used as evidence that a mutually explicit understanding exists." *Davis v. City of Chicago*, 841 F.2d 186, 188 (7th Cir. 1988). The understanding must be truly mutual, however; "a merely subjective and unilateral expectancy is *not* protected by due process." *Id.* A party using "evidence of custom or policy to establish a mutually explicit understanding capable of giving rise to a legitimate claim of entitlement . . . must demonstrate an expectation . . . that was legally enforceable, a mutually binding obligation." *Common v. Williams*, 859 F.2d 467, 470 (7th Cir. 1988) (citations omitted) (internal quotation marks omitted). A "mutually explicit understanding" that constitutes a property interest, however, "cannot be based on the representations of government officials who are not authorized to make such representations." *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1334 (7th Cir. 1989); *cf. Williams v. Off. of Chief Judge of Cook Cty.*, 839 F.3d 617, 625 (7th Cir. 2016) ("[u]nauthorized acts of ministerial officers or misinterpretations generally do not" bind a municipality under the doctrine of equitable estoppel). The plaintiff bears the burden of demonstrating the existence of

a mutually explicit understanding. *See Crull v. Sunderman*, 384 F.3d 453, 464–65 (7th Cir. 2004).

Tranchita is unlikely to demonstrate, based on custom, policy, or mutually explicit understanding, that her 2020 Breeder Permit entitles her to possess a coyote without also owning a Hound Running Permit. As an initial matter, the Court is skeptical that the IDNR's interactions with one person, Tranchita, are sufficient to demonstrate a department-wide custom or policy. *Cf. Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (noting, in the context of a *Monell* claim, that a plaintiff "must show more than the deficiencies specific to his own experience" to "prove an official policy, custom, or practice"). The Court also questions whether the IDNR officer's apparently incorrect interpretation of the law in 2011 and the IDNR's erroneous issuances of Breeder Permits could be found to manifest the IDNR's explicit understanding and agreement that an individual could, contrary to the Wildlife Code, possess coyotes with only a Breeder Permit. *Cf. Wolf*, 870 F.2d at 1334 (noting that a "mutually explicit understanding" cannot be based on unauthorized representations). Rather, these actions simply seem to reflect imperfect or lax enforcement of the Wildlife Code.

But regardless of any mutual understanding Tranchita and the IDNR may have had in the past, the IDNR has made it known that it did *not* understand its issuance of the Breeder Permit in March 2020 to allow Tranchita to possess coyotes. Ever since Tranchita filed the state court litigation in May 2019, the IDNR has consistently taken the position that Tranchita needed both a Breeder Permit and a Hound Running Permit to possess a coyote. *See, e.g.*, Doc. 6-14 at 8–9 (May 16, 2019 court filing: "Illinois law clearly states that coyotes are considered contraband unless the individual has both a fur-bearing mammal breeder permit and a hound running permit under Section 3.26 of the Act."); Doc. 6-17 at 16 (Dec. 31, 2019 court filing: "The only way to

34

lawfully keep coyotes in Illinois is to have both a fur-bearing mammal breeder permit and a hound running area permit."); Doc. 6-16 at 4 (Jan. 16, 2020 court filing: "The plain language of the Wildlife Code provides [that] the fur-bearing mammal permit does not allow for the possession of coyotes. The only exception to this bar is if an individual possesses a hound-area running permit."); *see also* Doc. 1-7 (Oct. 24, 2019 correspondence from Fischer to Tranchita: "The possession of a fur bearing breeder permit alone, or with a USDA Exhibitor's license, does not allow you to possess coyotes in the State of Illinois."). In light of these assertions, it is unlikely that Tranchita can show that *both* she and the IDNR understood that the issuance of the Breeder Permit in March 2020 entitled her to own a coyote without a Hound Running Permit. And that this may have been Tranchita's unilateral understanding is not enough to establish the requisite property right. *Davis*, 841 F.2d at 188 ("[A] merely subjective and unilateral expectancy is *not* protected by due process.").

For these reasons, Tranchita is unlikely to show that she has a protected property interest in the right to possess a coyote based on her 2020 Breeder Permit alone. Therefore, she is unlikely to succeed on the merits of either due process claim based on this interest. *See New Burnham*, 910 F.2d at 1479; *Haney*, 2020 WL 1288881, at *6.

### 3. 2020 Hound Running Permit

For the first time in her reply, Tranchita asserts that she has a protected interest in the 2020 Hound Running Permit "because she holds this permit, she has held this permit for seven months, and IDNR issued her that permit." Doc. 16 at 4. She also asserts that she has "a protected interest in not having the permit revoked unlawfully."[14] *Id.*

---

[14] Although Defendants did not confirm their intention to revoke the 2020 Hound Running Permit until the Court's hearings on Tranchita's motion, which took place after Tranchita filed her opening motion and brief, Tranchita knew before the hearings that revocation was a possibility, as reflected in her complaint and opening memorandum. *See, e.g.*, Doc. 1 ¶ 267 ("Tranchita is fearful that IDNR will

35

Tranchita is unlikely to succeed on either a procedural or substantive due process claim based on this alleged property interest. "[T]o maintain a claim of property over a government-issued benefit, such as a license or permit, a plaintiff must show she has 'a *legitimate* claim of entitlement to it.'" *Dyson*, 306 F. Supp. 3d at 1041 (emphasis added) (citations omitted). The "legitimacy" requirement means that a plaintiff cannot have a property right in a permit that was erroneously issued. *See id.* (building permits that were "invalid when issued" to the plaintiff "could not have provided her with a [protected] property interest in proceeding with her project"); *Space Station 2001, Inc. v. Moses*, 118 Ill. App. 3d 658, 663 (1983) ("A building permit cannot be granted in violation of the terms of a zoning ordinance; an unauthorized permit is a nullity and it confers no right on the permittee."); *see also New Burnham*, 910 F.2d at 1479–80 (noting holdings from other circuits that a due process claim does not exist unless the plaintiff establishes a *right* to receive the permit being asserted as the protected property interest).

Here, Tranchita does not meaningfully dispute that the IDNR erroneously issued the 2020 Hound Running Permit. Notably, she does not argue that she meets all the necessary requirements for a Hound Running Permit. Nor could she, as her property is only 1.125 contiguous acres, which is well below the minimum number of contiguous acres required for a Hound Running Permit. *See* Ill. Admin. Code tit. 17, § 970.40(d)(2) (requiring at least ten contiguous acres for coyote hound running areas "for inexperienced hounds one year or less in age"). Thus, because Tranchita does not satisfy at least the acreage requirement for a Hound

---

revoke her 2020–2021 Hound Running Area permit."); Doc. 6 at 5–6 ("[A]lthough IDNR issued [the 2020 Hound Running Permit], [Tranchita] fears this permit will be revoked."). Thus, Tranchita arguably lost her chance to argue that the 2020 Hound Running Permit constituted a protected property interest. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020); *Franklin v. Howard Brown Health Ctr.*, No. 17 C 8376, 2018 WL 4590010, at *2 (N.D. Ill. Sept. 25, 2018) ("[R]eply briefs are . . . not for raising and developing points that ought to have been raised and developed in an opening brief."). The Court has nonetheless considered the merits of this argument.

Running Permit, she likely does not have a *legitimate* claim to her 2020 Hound Running Permit that entitles her to procedural or substantive due process.[15]

Moreover, even if Tranchita had a protected property interest in her 2020 Hound Running Permit, she still would be unlikely to succeed on either due process claim. With respect to procedural due process, the IDNR's current revocation process provides her a sufficient opportunity to be meaningfully heard. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 747 F.3d 470, 474 (7th Cir. 2014) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (citation omitted) (internal quotation marks omitted)). The Wildlife Code allows the IDNR to revoke a Hound Running Permit if, among other reasons, the property or area is being "operated in violation of other provisions of this Act, or in an unlawful or illegal manner." 520 Ill. Comp. Stat. 5/3.33. But before the IDNR can revoke the permit, it must give the licensee "at least 15 days notice, in writing, of the reasons for the" revocation, as well as "an opportunity to appear before the [IDNR] or a representative thereof" to oppose the revocation. *Id.* Indeed, when the IDNR notified Tranchita of the revocation of her 2019 Hound Running Permit on May 22, 2019, it explained that it would be revoking the permit more than a month later, on June 24, 2019. In the meantime, Tranchita had the opportunity to request a hearing to appeal the revocation. *See* Doc. 13-1 at 5 ("In accordance

---

[15] Tranchita also suggested at the second hearing that Defendants should be equitably estopped from revoking her 2020 Hound Running Permit, *see* Oct. 19, 2020 Hr'g Tr. at 7:18–8:24, and Defendants address this issue in their opposition, Doc. 13 at 19–20. But in her reply to Defendants' opposition, Tranchita does not even mention estoppel with respect to the 2020 Hound Running Permit, let alone develop an argument to counter Defendants' argument. Thus, Tranchita abandoned any such estoppel argument for purposes of this motion. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (a party waives an argument related to a discrete issue by failing to develop the argument); *see also Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them."). In any event, equitable estoppel is unlikely to apply because, among other things, Tranchita does not argue that she substantially changed her position in reliance on the IDNR's erroneous issuance of the 2020 Hound Running Permit. *See Williams*, 839 F.3d at 625 ("Under Illinois law, to obtain equitable estoppel against a municipality, a plaintiff must demonstrate that . . . the aggrieved party substantially changed its position as a result of its justifiable reliance [on the municipality's affirmative act.]").

with 520 ILCS 5/3.33, you may file a request for a hearing to appeal this revocation within 30 days of the date of this notice."). Thus, the IDNR did not immediately revoke Tranchita's 2019 Hound Running Permit, and Tranchita had a meaningful opportunity to challenge the revocation before it actually took place. And if the IDNR revokes Tranchita's 2020 Hound Running Permit, she will have the same opportunity to challenge the revocation before it goes into effect. *See* 520 Ill. Comp. Stat. 5/3.33; Doc. 13-1 at 3 (¶ 9) ("If IDNR revokes Ms. Tranchita's 2020–2021 hound running area permit she will receive notice of the revocation (similar to [the May 22, 2019 notice of revocation]) and will have an opportunity for a hearing to appeal the revocation."). This likely provides sufficient procedural due process to Tranchita. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 101 (1993) (if the state "'offers a meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing,' the 'availability of a predeprivation hearing constitutes a procedural safeguard . . . sufficient by itself to satisfy the Due Process Clause'" (citation omitted)).

As for Tranchita's substantive due process claim, "when a substantive-due-process challenge involves only the deprivation of a property interest," like the 2020 Hound Running Permit, "a plaintiff must show 'either the inadequacy of state law remedies or an independent constitutional violation' before the court will even engage in [the] deferential rational-basis review." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003) (citation omitted). Tranchita's briefing makes no attempt to establish either of these threshold requirements, so she has failed to show a likelihood of success on her substantive due process claim based on the 2020 Hound Running Permit for this reason as well. *See GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 368–69 (7th Cir. 2019).

## II.    Remaining Factors

Because Tranchita has no likelihood of succeeding on the merits of the claims she pursues in her motion, the Court does not need to further analyze "the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase.'" *Id.* at 367–68. The Seventh Circuit, however, has encouraged district courts to "conduct at least a cursory examination" of all the preliminary injunction considerations even where, as here, the plaintiff does not satisfy one of the threshold requirements. *Girl Scouts*, 549 F.3d at 1087. The Court, therefore, briefly addresses the remaining preliminary injunction factors.

### A.    Inadequate Remedy at Law

Tranchita argues that she has no adequate remedy at law because she brought this lawsuit under the *Ex parte Young* doctrine and she "will be unable to recover damages" from Defendants. Doc. 6 at 15; *see Watson v. Bush*, No. 09-cv-1871, 2010 WL 1582228, at *4 (N.D. Ill. Apr. 20, 2010) ("The Eleventh Amendment bars official capacity claims against state officials for money damages. However, under the *Ex parte Young* doctrine, a plaintiff may seek prospective equitable relief for ongoing violations of federal law without running afoul of the Eleventh Amendment." (citations omitted)). Defendants, for their part, do not argue otherwise. The Court agrees that Tranchita has no adequate remedy at law. *Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F. Supp. 3d 1157, 1170 (S.D. Ind. 2020) ("[The plaintiff] also has no adequate remedy at law because it cannot pursue compensatory damages against the state actor Defendants because of sovereign immunity."); *Doston v. Duffy*, 732 F. Supp. 857, 873 (N.D. Ill. 1988) ("Plaintiffs have no adequate remedy at law since the Eleventh Amendment bars an award of damages by the court.").

### B.     Irreparable Harm

Tranchita argues that she will suffer irreparable harm absent injunctive relief because "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." Doc. 6 at 14 (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)).  This principle, however, does not apply because Tranchita has not demonstrated a likelihood that Defendants are violating her constitutional rights in the first place.

Tranchita also asserts that she "will suffer irreparable harm absent an injunction because Luna is ailing and needs to come home to live the rest of her days with Tranchita." *Id.*  The Court interprets this as an assertion that Tranchita will be irreparably harmed if Luna dies while being held at the ICRC.  Defendants respond that such harm is speculative and that Tranchita cannot show when this harm would occur.

Although neither side addresses the issue, the Court assumes that Tranchita would suffer legally cognizable harm if Luna died in captivity even though Tranchita likely does not have a recognized property interest in Luna.  *See, e.g.*, *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1263 (W.D. Wash. 2015) ("Courts have [] found irreparable injury from the deaths of individual animals where plaintiffs have established an affinity for or an aesthetic interest in the particular, individual animals at issue."); *Humane Soc'y of U.S. v. Bryson*, No. 3:12-cv-00642-SI, 2012 WL 1952329, at *6–7 (D. Or. May 30, 2012) (finding that the plaintiffs, who interacted with but did not own particular sea lions, would suffer irreparable injury from knowing that those sea lions had been killed).  Moreover, Luna is already fourteen years old; she is very thin with little body fat or muscle mass and weighs ten to fifteen pounds below her normal weight; and she has not grown a thick winter coat.  On these facts, it is not unreasonable for Tranchita to assert that Luna may not live through the winter.

Even so, the irreparable harm must be "likely" in the absence of an injunction, not just possible. *Winter*, 555 U.S. at 20, 22. Tranchita does not provide any evidence, such as an affidavit or declaration from a veterinarian or expert, regarding the likelihood of Luna surviving the winter. And although Tranchita asserts that Luna "may have only weeks or months to live[,]" she likewise asserts that Luna "may have a year" or "a few years" left to live. Doc. 6-5 at 10. Furthermore, the Court questions why Tranchita waited until October 2020—more than four months after she dismissed her state court case—to file this lawsuit and seek preliminary injunctive relief. Luna's health has not just suddenly taken a turn for the worse in the past month or so. Tranchita asserted in state court filings filed in May 2019 that Luna is "particularly susceptible to being injured or dying from stress and trauma, given [her] advanced age," that she would likely die if she was not immediately returned home, and that "[t]ime [was] running out for" her. Verified Compl., 2019 WL 10377774, ¶ 110; Mem. in Support of Mot. for TRO, 2019 WL 10377772. True, some of the delay may be attributable to Tranchita's attorneys' attempts to reach out to Defendants and resolve the issue after dismissing the state court litigation but before filing this lawsuit. *See* Docs. 6-2, 6-3. But while the Court certainly encourages parties to attempt to solve their differences without resorting to litigation, the timing of the attempts at issue here—the first made in June 2020, seven weeks after the state appellate court's decision, and the second made in September 2020, almost three months after the first attempt—do not reflect the type of urgency the Court would expect when Luna's time has been "running out" since May 2019. *See* Mem. in Support of Mot. for TRO, 2019 WL 10377772. Although not dispositive on the issue, Tranchita's delay in seeking preliminary injunctive relief in this Court after her state court case ended undermines her irreparable harm argument. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may

raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at *9 (N.D. Ill. Oct. 25, 2018) ("[A] significant delay in filing a motion for preliminary injunction undermines the moving party's argument that it will suffer irreparable harm without an injunction.").

The Court is sympathetic to Tranchita's concern for Luna's health and well-being, and it concludes that Luna's death in captivity would constitute an irreparable harm to Tranchita. But in the end, Tranchita has not done enough to persuade the Court that this death is likely to occur without the issuance of a TRO or a preliminary injunction.

### C.    Balancing of Harms and Public Interest

If Tranchita were to meet all the threshold requirements, the Court would then "weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the [C]ourt were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in [her] favor, and vice versa." *Id.* Where appropriate, the Court's balancing process should also consider the public interest. *Girl Scouts*, 549 F.3d at 1086. Here, because Defendants are employees of the state government, their harm coincides with the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting, in determining whether to issue a stay, that "the harm to the opposing party and weighing the public interest . . . factors merge when the Government is the opposing party"); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]he FEC's harm and the public interest are one and the same, because the government's interest *is* the public interest.").

42

Tranchita argues that the balance of harms weighs in her favor because Defendants are violating her constitutional rights, which means (1) Defendants have suffered no harm, and (2) the public interest would be served by an injunction. Doc. 6 at 15; *see Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute."); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("[U]pholding constitutional rights serves the public interest."). But this argument falls flat because, again, Tranchita has not demonstrated a likelihood that Defendants are violating her constitutional rights in the first place. The Court does, however, acknowledge the harm that would occur if Luna died in captivity while this case played out in the normal course of litigation.

On the other side of the scale, the preliminary injunction sought by Tranchita would prevent Defendants from enforcing the Wildlife Code enacted by Illinois' legislature. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Proft v. Madigan*, 340 F. Supp. 3d 683, 695 (N.D. Ill. 2018) (citation omitted). In the same vein, it is in the public interest for Defendants to be allowed to enforce Section 3.25 and other sections of the Wildlife Code to regulate where and how wild animals can be kept. *See Prof'l Towing & Recovery Operators of Ill. v. Box*, No. 08 c 4096, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11, 2008) ("[T]he public has an interest in the enforcement of laws that promote safety or otherwise are valid.").

The balance of these harms weighs in Defendants' favor. At the very least, they do not weigh decidedly in *Tranchita*'s favor, which would be necessary for Tranchita to obtain a preliminary injunction given the low likelihood that she will succeed on the merits of her claims. *See Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 826 n.5 (7th Cir. 1998) ("[T]he

movant must compensate for the lesser likelihood of prevailing by showing the balance of harms tips *decidedly* in favor of the movant.").

## CONCLUSION

For the foregoing reasons, the Court denies Tranchita's motion for a TRO and preliminary injunction [5].

Dated: January 5, 2021

_____
SARA L. ELLIS
United States District Judge