## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TOMI TRANCHITA,<br><br>               Plaintiff,<br><br>v.<br><br>COLLEEN CALLAHAN, Director of the Illinois Department of Natural Resources, in her official capacity as the official decisionmaker for the Illinois Department of Natural Resources; JOHN FISCHER, Legal Counsel for the Illinois Department of Natural Resources, in his official capacity as a decisionmaker for legal matters for the Department; JOSHUA MOOI, Conservation Police Sergeant, in his official capacity as an official decisionmaker for the law enforcement division of the Illinois Department of Natural Resources.<br><br>               Defendants. | CASE NO. 20 C 5956<br><br>JUDGE SARA L. ELLIS<br><br><br>**FIRST AMENDED 42 U.S.C. § 1983 COMPLAINT**<br><br>**[Jury Demand Endorsed Hereon]** |

Plaintiff Tomi Tranchita, by and through counsel, hereby sues COLLEEN CALLAHAN, Director of the Illinois Department of Natural Resources, in her official capacity as the official decisionmaker for the Department of Natural Resources; JOHN FISCHER, Legal Counsel for the Illinois Department of Natural Resources, in his official capacity as a decisionmaker for legal matters for the Department of Natural Resources; JOSHUA MOOI, Conservation Police Sergeant, in his official capacity as a decisionmaker for the law enforcement division of the Illinois Department of Natural Resources, for declaratory relief and states:

### JURISDICTION AND VENUE

1.      This action arises under Article I, Section 8, Clause 3 of the United States Constitution,

as well as 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 2201 and 2202.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all defendants are residents of this State and one or more reside in this district, and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

3.      This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 (Federal Question) and 28.U.S.C. § 2201 and 2202 (Declaratory Judgment Act).

4.      This Court has authority to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

5.      Tomi Tranchita at all times relevant hereto, is a citizen of the United States and a resident of Tinley Park, Cook County, Illinois.

6.      Colleen Callahan

      a.   is a Defendant in this lawsuit.

      b.   is a public official,

      c.   is the Director of the Illinois Department of Natural Resources ("IDNR").

      d.   acted and is acting under color of state law,

      e.   is being sued under *Ex parte Young*.

      f.   is being sued to obtain declaratory relief for ongoing violations of federal law.

      g.   is being sued only for prospective relief.

      h.   is acting in violation of federal law.

      i.   has a connection with violations alleged.

7.      John Fischer

      a.   is a Defendant in this lawsuit.

2

    b.   is a public official.

    c.   is Illinois Department of Natural Resources' legal counsel.

    d.   acted and is acting under color of state law.

    e.   is being sued under *Ex parte Young*.

    f.   is being sued to obtain declaratory relief for ongoing violations of federal law.

    g.   is being sued only for prospective relief.

    h.   is acting in violation of federal law.

    i.   has a connection with the violations alleged.

8.    Joshua Mooi

    a.   is a Defendant in this lawsuit.

    b.   is a public official and is an Illinois Department of Natural Resources' Conservation Police Sergeant.

    c.   acted and is acting under color of state law and is being sued under *Ex parte Young*.

    d.   is being sued only for prospective relief to obtain declaratory relief for ongoing violations of federal law.

    e.   has a connection with the violation alleged.

## FACTUAL ALLEGATIONS

**I.    Background on Tranchita and Her Coyotes**

9.    In 2006 Tranchita began to care for three sick and orphaned coyote pups named Luna, Sandy, and Frodo.

10.    These pups were given to her by an organization called Wildlife Guardians/the SAFE Project.

11.     In 2008 Tranchita began to care for another coyote pup named Bella.  Bella was rescued

by a third-party from an abusive situation.

12.     In 2015, Peytah was rescued by Tranchita from a coyote inappropriate situation.

13.     Until April 24, 2019, Plaintiff Tomi Tranchita had devoted more than thirteen years of

her life taking care of four abused and abandoned coyotes, Luna (now 14 years old), her brother

Sandy (13 years old at time of death), Bella (11 years old at time of death) and Peytah (4 years

old at time of death), by nursing them back to health and providing a nurturing and protective

environment for these coyotes.

14.     Luna, Sandy, Bella, and Peytah thrived under Tranchita's care. Nurturing coyotes suited

her.  The experience also made her acutely aware of how coyotes are misunderstood and

villainized by the public, especially in urban areas.  It was not long until Tranchita realized her

true calling and mission in life, which is caring for, and educating the public about coyotes, and

she stepped on that path without hesitation**.**

15.     Tranchita

     a.  Had her female coyotes (Luna and Bella) surgically sterilized.

     b.  Never bred her coyotes, or any other coyotes.

     c.  Has never desired to breed coyotes.

     d.  Invested over $25,000.00 in special designed escape-proof, USDA-approved,

        enclosures, and educated the public with programs about coyote behavior and

        peaceful coexistence to lessen coyote/human conflicts.

     e.  Worked for hours every day with the four coyotes daily to ensure they remained calm

        and were appropriate ambassadors for public viewing under her USDA exhibitor's

        license.

    f.  Was a responsible steward of these rescued coyotes, and there were never any complaints about her care of them.

    g.  Worked two jobs to fund the care of the coyotes and to maintain their habitat.

    h.  Invested an additional $50,000 in her rescue and educational efforts over 13 years.

    i.  Tranchita passed every annual surprise USDA inspection with no infractions.

    j.  Never had any of her coyotes escape or bite anyone.

    k.  Built relationships with local hunters, who regularly donated meat for the coyotes.

    l.  Fed the coyotes well and provided them environmental enrichment

    m.  Created an exceptional refuge for a few very fortunate, rescued coyotes and a rich educational program for the public.

16.    Tranchita's coyotes were deemed non-releasable by,

    a.  USDA Veterinarian Ken Kerstein,

    b.  USDA Veterinarian Dawn Barksdale.

    c.  Tranchita's personal veterinarian, Kate Ball, DVM.

17.    Until the brutal raid and seizure by IDNR on April 24, 2019, the coyotes were alive, happy, and healthy.

18.    Firstly, Luna is a "domesticated wild animal" according to the Domesticated Wild Animals Act. See 510 ILCS 60/1 (West 2016). *Tranchita v. Department of Natural Resources* identified Luna as a domesticated wild animal,

> [A]ll birds and animals ferae naturae or naturally wild, including fur bearing animals not native to this State, when raised or in domestication, or kept in enclosures and reduced to possession, are hereby declared to be objects of ownership and absolute title, the same as cattle and other property, and shall receive the same protection of law, and in the same way and to the same extent shall be the subject of trespass or theft, as other personal property.

5

*Tranchita v. Department of Natural Resources*, 2020 IL App (1st) 191251, ¶ 15 (May 1, 2020)

(quoting 510 ILCS 60/1 (West 2016)).

19.     Additionally, Tranchita has never considered her coyotes to be pets.

20.     A large part of her educational mission has always been to inform the public that coyotes are NOT pets.

21.     In 2018 Tranchita published a YouTube video, which has received over a thousand views, and is titled "Coyotes are not pets. Please adopt a dog instead."

22.     In another video that Tranchita published in 2016, which has over 148,000 views, she emphasizes that coyotes are not pets.


**II.     In 2012 IDNR Had Actual Knowledge that Tranchita Possessed Coyotes**

23.     Even though Tranchita is not a breeder, has never bred coyotes, nor has any intention of breeding coyotes, she nevertheless followed Illinois Department of Natural Resources instructions in 2012, that she must obtain a Fur-Bearing Mammal Breeder permit in order to possess coyotes in the State of Illinois.

24.     A Field Report dated January 4, 2012 completed by Conservation Officer Ron O'Neal in 2012 shows a Complaint for "Unlawful Possession/breeding of fur bearing mammal without permit.

25.     The Synopsis of that 2012 Field Report states, "This report formally documents issue of written warning [ ] to Tomi Sue Tranchita for violating Chapter 520 ILCS 5/3.25: Fur Bearing mammals breeders permit, when discovered "raising" four (4) coyotes at her residence."

26.     In 2012, IDNR Officers Ron O'Neal and Suzanne Klemme, Cook County Animal Control Officer Frank Pierson, and Ruby Wilson, Tinley Park Animal Control Officer

        a.   arrived at Tranchita's property in Tinley Park.

6

    b.   viewed Tranchita's coyotes in their escape-proof enclosures.

    c.   viewed Tranchita's USDA license.

    d.   O'Neal asked her to please just purchase the permit so that if they got another call asking if this were legal, she would be on their records. He told Tranchita it is a simple online permit and IDNR will never be out again as they do not require inspections for this permit.

27.    IDNR Officer Ron O'Neal informed Tranchita that

    a.   IDNR did not have an exact permit applicable to her situation.

    b.   that IDNR did not have an appropriate permit for refuges.

    c.   She was required to possess a Fur-bearing Mammal Breeder permit (520 ILCS 5/3.25) to possess coyotes,

    d.   Once she obtained a Fur-bearing Mammal Breeder permit she would be in compliance with state law.

    e.   Specifically, he stated to Tranchita After searching his rule book for an hour, he told Tranchita "just buy the fur bearing permit and you're good."

28.    In 2012, when IDNR Conservation Officer O'Neal told Tranchita she was required to obtain a Fur-bearing Mammal Breeder Permit, Tranchita informed him that she was not a breeder.

29.    Tranchita found it peculiar that she was required to obtain a Fur-bearing Mammal Breeder permit even though she was not breeding coyotes, had no intention of breeding coyotes, was a USDA-licensed wildlife educator, was not killing animals to harvest their fur, and not using the coyotes or her facility for any commercial purposes.

7

30.     Tranchita decided to comply with the demand for a breeder permit because she had no choice if she wished to continue to retain possession of the four coyotes, she had rescued in 2006 and 2008.

31.     IDNR Conservation Officer Suzanne Klemme

    a.  was present at, and involved with, the 2012 inspection of Tranchita's property.

    b.  was present at, and involved with, the 2019 raid and seizure of Tranchita's four coyotes.

32.     In 2012 when IDNR inspected her property, IDNR Conservation Officer Ron 'O Neal had been employed by IDNR, as a Conservation Police Officer, for at least seven years.

33.     The outcome of this 2012 IDNR inspection was that IDNR, Cook County Animal Control and Tinley Park Animal Control told Tranchita that they were satisfied with the coyotes' healthy condition and the level of care and escape proof enclosures that contained the educational and non-releasable coyotes.


**III.     In 2013 IDNR Knew that Tranchita Possessed Coyotes**

34.     In May and June of 2013, Tranchita made several contacts by telephone with IDNR Conservation Officer Ron O'Neal and several people at the Springfield IDNR office.

35.     In the same timeframe she also contacted via telephone IDNR employee Brian Clark and Bob Bluett. Bluett, who was the manager of the fur bearer licensing at the time and a wildlife biologist.

36.     The communications were in regard to a coyote pup that a resident of Orland Park (Illinois) named Jill Fenn had contacted Tranchita about.

37.     Jill Fenn contacted Tranchita and informed her that she had found the coyote pup, had been raising him, and asked Tranchita for advice as to what to feed him and how to care for him.

38.    Tranchita informed her that she would need licensing and a large escape-proof enclosure.

39.    Tranchita encouraged her to consider placing the pup with Tranchita or another facility that already had licensing and enclosures, as well as other coyotes so that the coyote pup could benefit from same species interaction, as they are very social animals and need that interaction to thrive.

40.    Ms. Fenn informed Tranchita that she was enjoying his puppy stage and asked her if she would take the coyote when he was older.

41.    She also later informed Tranchita that she had decided she was going to keep the coyote pup.

42.    She told Tranchita that she owned a landscape company, Fenn Landscape, and that some of her Mexican laborers assured her that they could help her raise him to behave just like a dog.

43.    Tranchita tried to explain to her that a coyote will never be just like a dog and that he needed outdoor enclosures and she needed licensing.

44.    Ms. Fenn told Tranchita that her laborers were keeping the coyote in the back of a truck, which Tranchita informed her was not suitable or legal, and also was during extremely hot summer weather.

45.    Tranchita was very concerned for the coyote's health and safety and called Orland Park Animal Control and IDNR officer Ron O'Neal.

46.    She also called IDNR in Springfield and spoke to Bob Bluett, fur bearer license manager and Brian Clark.

47.    Tranchita discussed with Conservation Officer O'Neal, Mr. Bluett and Mr. Clark about what was going on with the coyote pup and informed them that she would take the coyote pup into her possession since she already had coyotes and enclosures.

9

48.     Tranchita asked the above IDNR employees to contact Ms. Fenn.

49.     Officer Ron O'Neal requested that Tranchita send him an email stating what she knew about Ms. Fenn and the coyote pup which she did.

50.     Somewhere between June 3rd and June 20th Conservation Officer O'Neal went to Ms. Fenn's residence and handed her the emails Tranchita had sent to him.

51.     Conservation Officer O'Neal called Tranchita to inform her that Ms. Fenn told him that she had released the coyote pup back into the wild and informed Tranchita that was the end of his involvement.

**IV.     IDNR Conservation Police Sgt. Joshua Mooi Investigates**

52.     On March 27, 2019 Wildlife Officer, Joshua Mooi, lived less than a block from Tranchita, on the same street.

53.     Defendant Mooi claims that on that day he was off-duty and walking his dog and heard the Coyotes.

54.     Defendant Mooi had lived near Tranchita's property for two months before the raid.

55.     During a month-long investigation, Defendant Mooi,

    a.   reviewed Tranchita's Facebook page and Instagram account which showed she possessed four coyotes.

    b.   Searched the Illinois Department of Natural Resources licensing and permit records to check if Tranchita possessed any permits.

    c.   Interviewed Tranchita's neighbors.

    d.   Was told by Tranchita's neighbors that they were fond of the coyotes.

    e.   Was told by Tranchita's neighbors that Tranchita took good care of them;

    f.   Searched the USDA License database and found Tranchita possessed a current (2019)

10

USDA Class C Exhibitor License.

56. According to one of Tranchita's neighbors, sometime in April or March of 2019 Defendant Mooi,

      a. Entered the neighbor's property (driveway) without permission.

      b. Used the neighbor's property to access Tranchita's property.

      c. Climbed Tranchita's fence, which was on Tranchita's property.

      d. Looked over Tranchita's fence, which showed a view of her property, including the coyotes.

57. Defendant Mooi did not possess a search warrant when he climbed Tranchita's fence and looked at Tranchita's property.

58. Defendant Mooi did not receive consent from Tranchita's neighbor to access Tranchita's property through the neighbor's property.

59. Tranchita did not give Defendant Mooi consent to search her property.

60. Tranchita did not know Defendant Mooi had climbed her fence on her property until after the raid and seizure.

61. At no time during Defendant Mooi's month-long investigation did Mooi contact Tranchita and talk to her.

**V.**    **Mooi Lies to the Judge and Obtains a Search Warrant**

62. Defendant Mooi obtained a search warrant on April 23, 2019.

63. According to the Complaint for Search Warrant, Defendant Mooi falsely attested to the state judge, that '[t]here were no current licenses or permits listed for that address, or for Tranchita."

11

64.     Defendant Mooi failed to inform the magistrate that Tranchita possessed a USDA Class C Exhibitor License.

65.     At the time the search warrant was obtained, Tranchita possessed a current USDA Exhibitor License, and possessed that License every year since 2006.

66.     Defendant Mooi also conveniently failed to inform the magistrate that she had previously possessed a Fur-bearing Mammal Breeder permit from 2011 to 2016.

67.     The search warrant did not mandate seizure of the coyotes, and read "possible seizure," but that did not matter to Defendant Mooi.

68.     The search warrant made no mention of a Hound Running Area permit.

69.     The search warrant listed the criminal offenses Defendant Mooi alleged Tranchita committed were,

    a.  520 ILCS 5/2.2 Unlawful Taking[1] of a Protected Species;

    b.  520 ILCS 5/2.30 – Unlawful Taking[2] of a Fur-Bearing Animals;

    c.  520 ILCS 5/2.33bb – Unlawful to Import, Carry Into, or Possess Alive, Any Wildlife From Another State Without a License;[3]

    d.  520 ILCS 5/2.33nn – Possession of Wildlife or Wildlife Parts Taken[4] Unlawfully In Any State or Country; and

    e.  520 ILCS 5/3.25 – Unlawful Possession of a Fur-Bearing Mammal without a Fur-

---

[1] According to 520 ILCS 5/1.2o ""Take" means hunt, shoot, pursue, lure, kill, destroy, capture, gig or spear, trap or ensnare, harass, or to attempt to do so."  At no time in Tranchita's life has she taken a coyote.

[2] Id.

[3] None of Tranchita's coyotes were imported from another state.

[4] According to 520 ILCS 5/1.2o ""Take" means hunt, shoot, pursue, lure, kill, destroy, capture, gig or spear, trap or ensnare, harass, or to attempt to do so."  At no time in Tranchita's life has she taken a coyote.

Bearing Mammal Breeders permit.

## VI. The Raid and Inhumane Seizure

70. On April 24, 2019, 13 years of rewarding work and peaceful living with her ambassador coyotes came to a sudden and tragic end.

71. Early in the morning on April 24, 2019, six armed officers from IDNR and Cook County burst onto Tomi Tranchita's property and raided her coyote refuge and brutally seized her four coyotes.

72. On that day Defendant Mooi and five other armed public officials, in an armed raid orchestrated by Defendant Mooi, violently and cruelly seized her coyotes.

73. Defendant Mooi pushed past Tranchita and their shoulders hit as he pushed open Tranchita's driveway gate to enter Tranchita's fenced off property.

74. Defendant Mooi asked Tranchita if she still had a lock on the gate, which seemed strange that he would know the gate had a lock but made sense later when Tranchita discovered that Defendant Mooi had entered her property (without a warrant or consent) prior to the raid.

75. As Defendant Mooi aggressively, and with his hand on his gun confronted Tranchita, repeatedly yelling, "We're taking your coyotes *NOW!* You should be happy you had 13 years with the coyotes, but now it's over."

76. The video of the seizure is painful to watch.

77. During the raid Mooi had his hand on his rifle and told Tranchita that he did not want to have to come into the coyote enclosure and get Tranchita.

78. Tranchita perceived this as a physical threat to her safety and exited the pen.

79. Tranchita had entered the pen after veterinarian and administrator Tom Wake from Cook County Animal Control had told her that she could go into the pen.

13

80.    At this point Defendant Mooi put his hand on his rifle, which was hanging in front of him, and he said I do not want to have to come in there after you and he started opening the gate.

81.    Defendant Mooi intended to intimidate when he approached Tranchita saying he did not want to have to come in after her and put his hand on his rifle.

82.    One of the IDNR Conservation Officers involved in this 2019 raid and seizure was Suzanne Klemme.

83.    Suzanne Klemme inspected Tranchita's property in 2012, along with IDNR Conservation Officer O'Neal.

84.    At the beginning of the raid in April 2019, Defendant Mooi confiscated all Tranchita's coyote records, including documentation of veterinary care, 13 years of federal USDA exhibitor licenses and inspection reports, and her prior Fur-bearing Mammal Breeder Permits.

85.    During this raid, and as Tranchita's coyotes were being horrifically and inhumanely seized, Defendant Mooi told Tranchita

      a.   her "furbearing permit" had lapsed, but that it did not matter, because it was the wrong permit anyway. (Yet he still cited her for not having a furbearing permit.)

      a.   she needed an *educational permit* from the State, and once she had that permit, she could get "new" coyotes, "but you'll never see your four coyotes again!"

86.    Tranchita to no avail begged Defendant Mooi to let her pay that day, for whatever permit she needed.

87.    If Defendant Mooi had allowed her to, Tranchita could have immediately obtained her $25.00 Fur-Bearing Mammal Breeder Permit on her cell phone.

88.    Tranchita told Defendant Mooi that she would obtain whatever permit she is required to hold.

14

89.     Tranchita begged Defendant Mooi to allow her to implement her USDA Class C Exhibitor License Emergency Plan, which would have ensured the coyotes were transferred to Indiana Coyote Rescue Center, where Luna is currently located.

90.     Tranchita begged Defendant Mooi to allow her to crate the coyotes for their safety.

91.     Tranchita told Defendant Mooi that it would be easy for her to place the coyotes in crates, because they trusted Tranchita and were crate trained as part of Tranchita's USDA Emergency Plan.

92.     Defendant Mooi denied those pleas.

93.     Defendant Mooi, in the presence of witnesses, told Tranchita

        a.  he was "going on vacation this afternoon" and wanted the seizure performed "as quickly as possible" so as not to interfere with his vacation.

        b.  he did not have time to wait for her to crate the coyotes.

        c.  the coyotes were being seized no matter what permits she obtained.

        d.  she could not crate the coyotes.

        e.  sarcastically that she should call a mental Healthline.

94.     Defendant Mooi also told Tranchita that he found her listed on the USDA website as having an active Class C Exhibitor's License.

95.     In obtaining the search warrant, Defendant Mooi failed to disclose to the Judge that Tranchita possessed a 2019-2020 USDA license.

96.     With no professionalism and no sensitivity for Tranchita's feelings or the safety of the coyotes, the Cook County Officers,

        a.  joked and laughed loudly about seizing the coyotes.

15

    b.   terrorized the coyotes by chasing them and flipping over all the structures they tried to hide in.

    c.   shot three of Tranchita's coyotes at close range with tranquilizer darts.

    d.   without giving the tranquilizer time to take effect – noosed and dragged the terrified and struggling coyotes across the cement, leaving trails of the coyotes' blood on the ground.

97.    One of the Cook County Officers shouted gleefully, "I love the sound of a dart hitting an animal.  Turkey pop!".

98.    This brutal seizure was documented on video by Tranchita.[5]

99.    Tranchita's heart broke that day, and it was the beginning of many months of health decline, sleep deprivation, and emotional distress, that plagues Tranchita to this day.

100.    During the seizure Defendant Mooi told Tranchita that he had interviewed several of her neighbors and they all said that were "quite fond" of her coyotes and said she took good care of them.

101.    Defendant Mooi told Tranchita he knew she had Federal licensing.

102.    Ruby Wilson, Cook County Animal Control Officer, was present for these statements.

103.    At the raid and seizure, Tranchita made many attempts to try to convince Defendant Mooi to allow her to obtain any permit IDNR wanted her to hold.

104.    Defendant Mooi told her that it would make no difference and the coyotes would be seized regardless.

---

[5] https://youtu.be/-e3JZ8AdJ3M (April 24, 2019--The violent, inhumane capture of Tranchita's educational coyote, Luna, bleeding, gasping for air, and being dragged on an incorrectly used choke hold pole); https://youtu.be/WWLQtNzG_fY (Tranchita's educational coyote, Peytah, being dragged on an incorrectly used choke hold pole, collapsing from the cutting off of his airway).

105.     Defendant Mooi handed Tranchita a pre-signed and pre-dated relinquishment form and told Tranchita, in the presence of Cook County Animal Control Officer Ruby Wilson, that if she did not sign the surrender form,

      a.  her coyotes would waste away at the IDNR facility, where the cages were small and where her coyotes would probably die or be "euthanized due to stress of the new environment."

      b.  her coyotes would most likely be put down or die from stress in small quarters at a holding facility if she did not sign the relinquishment form.

106.     Defendant Mooi told Tranchita that if she signed the relinquishment form that the coyotes would go to a spacious facility with an enclosure of one-acre for each coyote.

107.     While Defendant Mooi was pressuring Tranchita to surrender the coyotes, Tranchita had full view of the brutal seizure of her beloved coyotes, which was ongoing right in front of her.

108.     During this time Defendant Mooi was very close to Tranchita demanding her signature on the relinquishment form at the time.

109.     While Defendant Mooi was pressuring her to sign the relinquishment form, and while Tranchita had full view of the brutal seizure of her beloved coyotes, Defendant Mooi stroked Tranchita's breast, which caused her to jump back in shock.

110.     Tranchita signed the relinquishment form under extreme duress.

111.     Tranchita signed the surrender form because she did not want her coyotes to be "euthanized" by the State of Illinois and did not want them to live the rest of their lives in a small cage.

112.    The relinquishment form dated April 24, 2019 stated that the coyotes were "being seized based upon a violation of Illinois State law" Sections "720 ILCS 5.48-10b" and "520 ILCS 5.2.33."

113.    Tranchita was not given a copy of the relinquishment form or the warrant.

114.    Mooi promised her that the next day she would get copies of all her paperwork that he confiscated.

115.    She never received copies of any of this removed paperwork.

116.    Six days after signing the relinquishment form, Tranchita emailed Defendant Callahan and Defendant Mooi's supervisor, Jed Whitchurch informing them that she rescinds the relinquishment as it was signed under extreme duress and false pretenses.

117.    The Day After the raid and seizure of Tranchita's Coyotes, IDNR Conservation Officer Suzanne Klemme told Tranchita,

    a.  Mooi was wrong about the educational permit and it was *not* what she needed.

    b.  Coyotes are not allowed in Illinois at all.

118.    Tranchita asked Officer Klemme, what kind of permits were possessed by the facilities that Defendant Mooi told her the coyotes would go to because she had signed the surrender form.

119.    Klemme told Tranchita that that facility had licensing like a zoo, which is exactly the licensing Tranchita had -- a Federal USDA Class C Exhibitor License.

120.    After the raid and seizure, Ruby Wilson, the Cook County Animal Control Officer, who was present at the raid and seizure, confided in Tranchita that she (Wilson) and other officers from Cook County Animal Control who were present and participated in the raid, had discussed Defendant Mooi's "heavy-handed" treatment of Tranchita.

121.    Wilson also witnessed Defendant Mooi flippantly telling Tranchita to call a suicide help hotline because she seemed "upset".

122.    Defendant Mooi failed to generate an IDNR Activity Report of the raid.

123.    Although there exists an Activity Report for the month of April 2019, the raid of Tranchita's home on April 24, 2019 was not contained in that Activity Report.

124.    These bi-weekly Activity Reports inform the public via IDNR's website what is occurring in the area of enforcement.

125.    It is not IDNR's practice and pattern to seize Fur-bearing Mammals when a person lacks the Fur-bearing permit. IDNR has allowed many facilities and persons to possess coyotes without a Hound Running Area permit.

126.    Immediately following the raid and seizure, Tranchita went online and paid the $25 fee for a 2019 Illinois Furbearing Mammal Breeder Permit (which is all it takes, because the IDNR does not conduct inspections for animal care like the USDA does for its exhibitor's license).

127.    Tranchita also applied for the educational permit Defendant Mooi said she needed, but her application was completely ignored by the IDNR.

128.    Tranchita applied for two types of rehabilitation permits in May of 2019.

129.    Both permits she applied for required extensive documentation of programs conducted in the past and programs for the future.

130.    Tranchita included photos and outlines, everything that was required including USDA documentation.

131.    Yet her request for these permits was completely ignored.

132.    Less than a month after Tranchita's coyotes were seized, In May 2019, the very same IDNR District 4 (Counties: Cook & DuPage) where Defendant Mooi is assigned, and the district

in which Tranchita's property sits, allowed an individual who possessed a red fox without a valid

permit, to obtain a Fur-Bearing Mammal Breeder permit during the "random commercial

inspection of a furbearing mammal breeder."

133.    As set forth in "Illinois Conservation Police Bi-Weekly Report" for the weeks of May 16-

31, 2019,

> District 4 – Captain Jed Whitchurch (Counties: Cook & DuPage)
> COOK COUNTY CPO Sanford and CPOT Elliot conducted a
> random commercial inspection of a furbearing mammal breeder. It
> was discovered that the individual was in possession of a red fox
> without a valid permit to do so, and a citation was issued for the
> violation. The individual gained compliance by purchasing a valid
> furbearing mammal breeder permit upon completion of the
> inspection.

134.    The activity report set forth above, shows that a man with a fox was allowed to renew his

lapsed fur bearing permit, and his fox was not seized, and IDNR allowed him to keep his fox.

135.    An Illinois Conservation Police Field Report evidences that the fox was not seized, and

the owner was given a chance to obtain the Fur-bearing Mammal Breeder permit,



The purpose of this report is to document the random commercial inspection of Lee Torres, a fur-bearing mammal breeder in Chicago, IL on 05/19/2019. The inspection was conducted in accordance with department policy and at the directive of the Illinois Department of Natural Resources (IDNR) Headquarters in Springfield,IL.

On Friday, 05/17/2019, CPO Chase Sanford #531 spoke with Lee Torres (W/M, DOB [redacted]) via telephone regarding a random commercial inspection. Torres informed CPO Sanford that he was still in possession of a fox at his Chicago, IL address. Torres advised that he would be home on Sunday morning and agreed to meet with him then.

On Sunday, 05/19/2019, I, Conservation Police Officer (CPOT) Brian Elliot #560 and CPO Chase Sanford #531, conducted a random commercial inspection of Lee Torres, a fur-bearing animal breeder in Chicago, IL. Prior to the inspection, I was able to use the Illinois Department of Natural Resources (IDNR) Point-of-Sale (POS) system to determine Torres hadn't possessed a valid Fur-Bearing Mammal Breeder's Permit until shortly after our phone conversation on 05/17/2019. In fact, prior to renewing his permit, Torres' permit had been expired since 03/31/2018 (see attached POS record).

I contacted Torres at his residence [redacted] at approximately 10:10 AM. CPO Sanford and I were in a fully-marked police vehicle and in full police uniform. Upon making contact, I discovered Torres had purchased the Fur-Bearing Mammal Breeder's Permit in 2017 before purchasing a marbled red fox to utilize as a house pet. At the time of the inspection the fox was still present at Torres' residence. I examined the fox, which was located in the backyard of the residence at the time of the inspection. I also examined the purchase receipt for the fox, which was purchased from "Tiny Tracks Exotic Animals" in Auburn, IN. The purchase date on the receipt was 06/02/2016 (see attached).

I advised Torres his permit to possess the fox had been expired for over a year. Torres stated he didn't know that he had to renew the permit annually. Torres renewed the permit on 05/17/2019 at approximately 2:51 PM (see attached valid permit), shortly after CPO Sanford had spoken with Torres via telephone.

136.    Defendant Mooi targeted Tranchita, and he threatened her, sexually and physically assaulted her, and intimidated her.

## VII.    Tranchita is criminally Charged with not Holding a Hound Running Area permit and a Fur-bearing Mammal Breeder permit.

137.    After the raid and seizure, in May of 2019, IDNR filed a criminal complaint against Tranchita, charging her with three violations of the Illinois Wildlife Act, (1) Count 1, 520 ILCS 5/2.33(dd) ("Prohibitions), "It is unlawful to take any species protected by this Act and retain it alive except as provided by administrative rule"; 2) Count 2, 520 ILCS 5/3.26 ("Hound Running Area permits; Requirement"; and 3) Count 3, 520 ILCS 5/2.30 (Fur-Bearing Mammals).

## VIII.    The State amends the Hound Running Area permit violation to a Fur-bearing Mammal Breeder permit violation, and Tranchita pleads Guilty to not holding a Fur-bearing Mammal Breeder permit

138.    On June 26, 2019, the State amended Count 2 (The Hound Running Area permit violation) to a violation of 520 ILCS 5/3.25 (the Fur-bearing Mammal Breeder permit Violation).

139.    On September 17, 2019, Tranchita pleaded guilty to Amended Count 2 - not having a Fur-bearing Mammal Breeder permit (520 ILSC 5/3.25).

140.    Pursuant to the plea agreement Counts 1 and 3 were dismissed.

141.    Tranchita received six months court supervision, a $100 fine, and was ordered to pay fees and costs of $197.

142.    It was not until after IDNR raided Tranchita's property and seized her coyotes, in April of 2019, that she learned IDNR now demanded she have a State Hound Running Area permit as well as a breeder permit.

143.    Tranchita had been initially cited with not having a Hound running permit but that citation was amended to not having a Fur bearing mammal breeder permit during court proceedings.

144.    All other citations were dropped at the end of criminal court proceedings in Sept. 2019 when Tranchita entered into a plea agreement with the state of Illinois/IDNR.

145.    Tranchita was asked to plead guilty ONLY to not having a fur-bearing mammal breeder permit up to date for 2019 at the time of the raid and seizure in April 2019.

146.    Tranchita agreed to plead guilty to the criminal charges only because IDNR told her that otherwise the State of Illinois would not allow Luna, the last surviving coyote, to be transferred to the Indiana Coyote Rescue Center.

147.    The plea was strictly to save Luna's life, since she was faring very poorly in the inappropriate, indoor IDNR-approved facility.

148.    Only after Tranchita agreed to plead guilty to not possessing a Fur-bearing Mammal Breeder Permit, did the State of Illinois agree to allow Luna to be moved to an outdoor facility.

149.    In a plea bargain that felt like extortion, the State offered to move Luna to an outdoor facility, if and only if Tranchita pled guilty to the lapsed furbearing permit and closed the case.

150.    It was her realistic fear that Luna would soon die if she were not moved outdoors to a more appropriate environment.

151.    So Tranchita did plead guilty, because it is true that she did not possess a 2019 furbearing permit at the time of the raid, but most important to her was the urgency to move Luna outdoors to save her life. The State forced her to make a life-or-death decision.

152.    The State, during the criminal case, told Tranchita the only way it would let Luna move to the Indiana Coyote Rescue Center was if she pled guilty so that the case could be closed.

153.    The State claimed they could not transport Luna out of state while the case was open.

154.    Tranchita made a life-or-death decision as she feared for Luna.

155.    IDNR and Tranchita agreed during the criminal case, that the sole survivor, Luna be
transferred to Indiana Coyote Rescue Center.

156.    The agreement was made on the record, and specifically states that Tranchita is not
relinquishing her property rights in Luna or her property interest in this coyote.

**IX.    Tranchita's Fur-bearing Mammal Breeder permit**

157.    A week after the raid and seizure, on May 3, 2019 Tranchita obtained her 2019-2020 Fur-
bearing Mammal Breeder permit.

158.    IDNR,

        a.  issued Tranchita a 2011-2012 Fur-bearing Mammal Breeder permit,

        b.  issued Tranchita a 2012-2013 Fur-bearing Mammal Breeder permit,

        c.  issued Tranchita a 2013-2014 Fur-bearing Mammal Breeder permit,

        d.  issued Tranchita a 2014-2015 Fur-bearing Mammal Breeder permit,

        e.  issued Tranchita a 2015-2016 Fur-bearing Mammal Breeder permit,

        f.  issued Tranchita a 2019-2020 Fur-bearing Mammal Breeder permit,

        g.  issued Tranchita a 2020-2021 Fur-bearing Mammal Breeder permit.

        h.  Issued Tranchita a 2021-2022 Fur-bearing Mammal Breeder permit.

159.    Tranchita has held the mandatory $25.00 Fur-bearing Mammal Breeder permit for the
following years, (1) 2011-2012; (2) 2012-2013; (3) 2013-2014; (4) 2014-2015; (5) 2015-2016;
(6) 2019-2020; (7) 2020-2021; and (8) 2021-2022.

160.    Tragically, Tranchita forgot to obtain the annual Fur-bearing Mammal Breeder permit after the 2015 permit expired in 2016.[6]

161.    Each annual Fur-bearing Mammal Breeder permit expires on March 31 of the following year.

162.    Soon after the April 24, 2019 raid and seizure, on May 3, 2019, Tranchita obtained her 2019-2020 Fur-bearing Mammal Breeder permit.

163.    Tranchita was not going to risk being further targeted for not holding the annual Fur-bearing Mammal Breeder permit, so prior to the expiration of the prior year's permit, on March 2, 2020 Tranchita obtained her 2020-2021 Fur-bearing Mammal Breeder permit.

164.    Tranchita obtained the 2019-2020 Fur-bearing Mammal Breeder permit in the hope that the elderly and ailing Luna would be able to return home for her last days on this earth.

165.    Tranchita's 2020-2021 Fur-bearing Mammal Breeder permit will expire on March 31, 2021.

166.    Tranchita obtained a 2021-2022 Fur-bearing Mammal Breeder permit on March 1, 2021.

167.    To obtain the 2019-2020, 2020-2021, and 2021-2022 Fur-bearing Mammal Breeder permit, Tranchita went online to IDNR's permit webpage.

168.    The Fur-bearing Mammal Breeder permit application process

    a.  Takes no more than five minutes.

    b.  Cannot be compared in any form or manner to the rigorous application and inspections process required by the USDA to obtain a Class C Exhibitor License.


**X.     Hound Running Area permit**

---

[6] The Fur-bearing Mammal Breeder permit expires on March 31 of the following year.

169.     It was not until after the raid and seizure in 2019, when the State criminally charged Tranchita for not possessing a Hound Running Permit, that IDNR informed her that she was required to hold a Hound Running Area permit, in addition to the Fur-bearing Mammal Breeder permit.

170.     As soon as she learned that IDNR was requiring her to possess a Hound Running Area permit she went online and obtained that permit.

171.     IDNR,

    a.   On May 18, 2019 issued a 2019-2020 Hound Running permit to Tranchita.

    b.   On May 22, 2019 revoked Tranchita's 2019-2020 Hound Running permit because, according to IDNR, the permit was issued in error.

    c.   Required Tranchita to complete a "correct" application which was attached to the revocation letter.

172.     Tranchita completed and mailed in the corrected application.

173.     After Tranchita received notification of the revocation of the Hound running permit she had purchased, on June 19, 2020, Tranchita submitted to IDNR a petition for hearing and a variance request, requesting an acreage variance because,

    a.   Luna is non-releasable and would never be released on acreage to be used as live bait to train hound dogs, so the acreage is not needed.

    b.   Luna would be contained, as she always had been while in Tranchita's care, in escape-proof enclosures that had been approved by inspecting USDA veterinarians for the previous 13 years.

174.     Tranchita also requested a variance be granted for the hound running area requirements of electric fencing, an ear tag for her coyote Luna, and hound running area signage, as none of

25

these would ever be necessary as Tranchita would not be participating in any hound running

activity and Tranchita does not have hunting dogs that need to be separated from coyotes by an

electric fence.

175.    Tranchita asked to be allowed to pay IDNR the $250 yearly fee for a hound running area

permit so that IDNR might be satisfied that Tranchita made every effort to obtain any permit

they requested of her.

176.    On August 26, 2019 IDNR rejected her second attempt to obtain a Hound Running Area

permit because,

     a.    Tranchita's Hound Running Application did "not meet the requirements provided in

        17 Illinois Administrative Code Part 970 [ ] for an HRA Permit.  Specifically: The

        proposed HRA does not meet the definition of an HRA.  The minimum HRA acreage

        requirement is not achievable in the location proposed."

     b.    "The proposed HRA is located in a developed urban area where the operation of an

        HRA would not be compatible or appropriate."

177.    On April 30, 2020, IDNR issued a 2020-2021 Hound Running Area permit to Tranchita.

178.    On April 30, 2020 Tranchita

     a.    went online to the State of Illinois website to purchase her hound running permit.

     b.    entered the information requested, such as her IDNR Customer Number, Driver

        License Number, Social Security Number, and Date of Birth.

     c.    checked the "Permits" option of "848 Hound Running Area".

     d.    paid the fee.

179.    The 2020 Hound Running permit expires on March 31, 2021.

180.    The only reason Tranchita procured a 2019-2020 and 2020-2021 Hound Running Area

permit was so that she can be reunited with Luna at Tranchita's property in Illinois.

181.    IDNR has not revoked the 2020-2021 Hound Running Area permit.

182.    Currently Tranchita holds both a 2021-2022 Fur-bearing Mammal Breeder Permit and a

2020-2021 Hound Running Area permit.

183.    Tranchita has been unsuccessful in obtaining a 2021-2022 Hound Running Area permit

because, there is no longer an option on the IDNR website to obtain this permit, and there are no

instructions on that website informing a person how to obtain this permit.

## XI.    Illinois Office of the Executive Inspector General investigates Defendant Mooi

184.    The Illinois Office of the Executive Inspector General Investigated Defendant Mooi as a

result of a complaint made by an anonymous source.

185.    Tranchita and her attorneys met with Inspector Edward Escamilla on several occasions.

186.    Mr. Escamilla questioned Tranchita about how she felt when Mooi touched her breast.

187.    Mr. Escamilla was especially concerned with these actions by Defendant Mooi.

188.    Mr. Escamilla told Tranchita that others involved would be interviewed, but that she

would not be informed of the outcome of their investigation.

## XII.    Tranchita Attempts to Get Luna Back in State Court,

189.    Soon after the raid and seizure, on May 14, 2019, Tranchita "filed a six-count [42 U.S.C.

1983] complaint in which she alleged claims under the fourth and fourteenth amendments." against

Defendant Mooi, Cook County, and other unknown police officers.  See *Tranchita v. Dep't of Nat.

Res.*, 2020 IL. App. (1st) 191251, ¶ 9 (May 1, 2020).

190.    The causes of action were as follows,

27

a.  Count 1 sought a TRO/Preliminary Injunction seeking an Order which included the request for an order for the immediate return of the four coyotes (at that time Tranchita did not know that three of her coyotes had died while in the possession of Dawn Keller).

b.  Count 2 sought declaratory relief requesting that the relinquishment form signed by Plaintiff was not voluntary.

c.  Count 3, a Fourth Amendment Unreasonable seizure and Fourteenth Amendment Due Process pertaining to the April 24, 2019 seizure.

d.  Count 4 alleged a Fourth Amendment Unreasonable seizure and Fourteenth Amendment Due Process Monell Claims for failing to provide a pre deprivation hearing prior to the seizure.

e.  Counts 5 and 6 were state claims for Intentional Infliction of Emotional Distress and Respondent Superior.

191.  Inexplicably and tragically Tranchita's state attorneys failed to include in the state action the critical fact that Tranchita obtained and held a Fur-bearing Mammal Breeder permit prior to the filing of the state complaint.  And therefore, that operative fact was not before the state trial court or the state appeal court.

192.  The state court denied her motion for preliminary injunction.

193.  The civil case judge, Valderamma, denied Luna being returned to Tranchita because she did not possess a fur bearing mammal Breeder permit at the time of the seizure.

194.  Tranchita appealed that ruling.

195.  Tranchita's state attorneys did not include the fact that Tranchita was in possession of a 2019 Fur-bearing Mammal Breeder Permit, despite the fact that IDNR had issued her a Fur-

bearing Mammal Breeder Permit on May 3, 2019 prior to the May 14, 2019 filing of the state

1983 actions.

196.    Consequently, the issue of her possessing a current (at that time) valid Fur-bearing

Mammal Breeder Permit was not before the state appeal court.

197.    In May of 2020, the state appeal court affirmed the trial court's denial of her motion for

preliminary injunction.

198.    The state appellate court found there was no evidence submitted in the trial court that

Tranchita had renewed her fur-bearing mammal breeder permit.

199.    As stated by that state appeal court,

> Before the trial court was the fact that plaintiff did not have a valid fur-bearing
> mammal breeder permit at the time the IDNR seized her coyotes. Pursuant to the
> Wildlife Code, coyotes possessed without such a permit are contraband. Without a
> legitimate claim of entitlement to the property, plaintiff had no right to a property
> interest protected by due process when her coyotes were seized. Therefore, the trial
> court properly denied her motion for a preliminary injunction.

*Tranchita v. Department of Natural Resources*, 2020 IL App (1st) 191251, ¶ 24 (May 1, 2020).

200.    That appeal court also stated,

> From the moment her permit lapsed, plaintiff's possession of the coyotes violated
> section 3.25 of the Wildlife Code. Wildlife possessed "contrary to any of the
> provisions [hereof]" is contraband. Id. §1.2c. No person or party can assert legal
> ownership or right to possession of property that is contraband. *Dufauchard v. Ward*,
> 51 Ill. App. 2d 42, 46 (1964).

*Tranchita v. Department of Natural Resources*, 2020 IL App (1st) 191251, ¶ 17 (May 1, 2020).

201.    The state appeal court held "under Illinois law, a person must have a fur-bearing mammal

breeder permit before possessing or raising a coyote." *Tranchita v. Department of Natural*

*Resources*, 2020 IL App (1st) 191251, ¶ 16 (May 1, 2020).

202.    Subsequent to the appellate decision, Tranchita moved the state court to dismiss her

complaint and on May 22, 2020 the state court dismissed the case.

**XIII.   Illinois Fur-bearing Mammal Breeder Statute**

203.    A coyote is defined by the Wildlife Code as a "fur-bearing mammal[ ]."  520 ILCS

5/1.2g.

204.    A Fur-bearing Mammal Breeder permit is a "commercial license."

205.    According to IDNR's web page, a "Fur Bearing Animal Breeder is required to possess,

breed and/or sell the following species: Opossum, Raccoon, Mink, Red & Gray Fox, Beaver,

Muskrat, Badger, River Otter and Weasels.

206.    The Fur-bearing Mammal Breeder permit statute (Illinois's Wildlife Code 520 ILCS

5/3.25) states that a Fur-bearing Mammal Breeder permit must be procured before possessing a

coyote.

207.    The Fur-bearing Mammal Breeder permit statute, in relevant part states,

> Any individual who, within the State of Illinois, holds, possesses, or
> engages in the breeding or raising of live fur-bearing mammals,
> protected by this Act, except as provided in Sections 1.6 or 1.7,[7]
> shall be a fur-bearing mammal breeder in the meaning of this Act.
> Before any individual shall hold, possess or engage in the breeding
> or raising of live fur-bearing mammals, he shall first procure a fur-
> bearing mammal breeder permit. Fur-bearing mammal breeder
> permits shall be issued by the Department. The annual fee for each
> fur-bearing mammal breeder permit shall be $25. All fur-bearing
> mammal breeder permits shall expire on March 31 of each year.

520 ILCS 5/3.25.

208.    A coyote is categorized as a "fur-bearing mammal."  520 ILCS 5/1.2(g) (2018).

209.    Any person who wants to breed or raise a coyote must possess "a fur-bearing mammal

breeder permit" from IDNR.  520 ILCS 5/3.25 (2018).

---

[7] Section 1.6 and 1.7 are not relevant to this action.

210.    "[U]nder Illinois law, a person must have a fur-bearing mammal breeder permit before possessing or raising a coyote." *Tranchita v. Department of Natural Resources*, 2020 IL App (1st) 191251, ¶ 16 (May 1, 2020).

211.    The last paragraph of Fur-bearing Mammal Breeder permit Statute (520 ILCS 5/3.25) is the section which IDNR relies upon to bar Tranchita from possessing a coyote,

> No fur-bearing mammal breeder permits will be issued to hold, possess, or engage in the breeding and raising of striped skunks acquired after July 1, 1975, or coyotes acquired after July 1, 1978, except for coyotes that are held or possessed by a person who holds a hound running Area permit under Section 3.26 of this Act

520 ILCS 5/3.25.

212.    "Any person who violates section 3.25 or section 3.26 of the Wildlife Code "shall be guilty of a Class B misdemeanor." 520 ILCS 5/3.5 (2018)."

213.    The language in the Fur-bearing Mammal Breeder states that IDNR "shall" not issue a Fur-bearing Mammal Breeder permit to any person (who possesses a coyote) unless that person holds a Hound Running Area permit.  See 520 ILCS 5/3.25.

214.    If IDNR chooses to issue a Fur-bearing Mammal Breeder permit to a person who does not hold a Hound Running Area permit, the fault lies with IDNR, not the person who possesses coyotes with only a Fur-bearing Mammal Breeder permit.

**XIV.  Illinois Hound Running Area Statute**

215.    The Hound Running Area statute states,

> (a) Any person owning, holding, or controlling by lease, for a term of at least 5 years, any contiguous tract of land having an area prescribed by administrative rule who desires to establish a hound running area to pursue authorized species with hounds in a way that is not designed to capture or kill the authorized species, shall apply to the Department for a hound running Area permit under this Section. The application shall be made under oath of the applicant

31

or under oath of one of the applicant's principal officers if the applicant is an association, club, or corporation. The annual fee for each hound running Area permit is $250. All hound running Area permits expire on March 31 of each year.

Every applicant under this Section must also hold a fur-bearing mammal breeder permit or a Class B commercial game breeder permit, as appropriate.

520 ILCS 5/3.26(a).

216.    "Any person who violates section 3.25 or section 3.26 of the Wildlife Code "shall be guilty of a Class B misdemeanor." 520 ILCS 5/3.5 (2018)."

217.    Although Defendants claims that a Hound Running Permit is required of each person who possesses a coyote, the Hound Running Administrative Code states that a person possessing a Hound Running permit may obtain coyotes from "[i]ndividuals who hold a valid Fur-bearing Mammal Breeders permit * * * ."  Ill. Adm. Code Section 970.60 ("Sources of Captive-Reared and Wild Animals").

218.    The Hound Running Administrative Code requires a holder of the permit to maintain records on *inter alia*, "[t]he date of mortality or discovery of mortality of any coyote, fox or raccoon."  Ill Admin Code 970.20(b).

219.    The Hound Running Area permit requirements mandates Tranchita ear tag her coyotes. Ill. Admin. Code tit. 17, § 970.50.

220.    The Hound Running Area permit requirements only allow "fit animals" to be released into the hound running areas.  Ill. Admin. Code tit. 17, § 970.80(c).

221.    Fit means,

Animals free of injuries that might prevent them from evading hounds and, in the case of raccoons, foxes and coyotes, treated for parasites (i.e., roundworms, tapeworms, hookworms) and inoculated to prevent diseases (i.e., canine distemper, hepatitis, parainfluenza, parvovirus) that might infect domestic dogs or others of their kind.

Ill. Admin. Code tit. 17, § 970.10.

222.    Luna is not fit because she cannot be vaccinated.

223.    The Hound Running Area permit also requires the coyotes to be vaccinated for canine distemper, hepatitis, parainfluenza, parvovirus.  Ill. Admin. Code tit. 17, § 970.10.

224.    Luna cannot be vaccinated due to the dangers.

225.    Two USDA veterinarians who conducted an inspection of Tranchita's facility and her private veterinarian, advised her that giving the coyotes vaccines intended for dogs could kill them.

226.    An animal that is not "fit" must be "euthanized by gunshot or by a licensed veterinarian." Ill. Admin. Code tit. 17, § 970.80(e).

227.    "Coyote and fox hound running areas shall have an area of not less than 160 contiguous acres with a dog-proof escape area in each 20 acre tract."  Ill. Admin. Code tit. 17, § 970.40(d).

228.    The Hound Running Area is required to have "[e]lectric wires with sufficient current to contain coyotes, foxes and raccoons and deter hounds shall be placed on and along the perimeter of hound running areas * * * ." ."  Ill. Admin. Code tit. 17, § 970.40(f)(4).

229.    Hound running acreage and fencing requirements are impossible to satisfy on Tranchita's property as she does not have the space required by the Hound Running Area permit.

230.    The Hound Running area is required to have signage, that must be "purchased from the Department", and this signage must be "conspicuously posted on the perimeter fence of hound running areas at intervals of 500 feet or less with at least one sign on each side of the hound running area."  Ill. Admin. Code tit. 17, § 970.40(c).

231.    No information can be found as to what language is on the signage.

232.    Luna's USDA status as non-releasable makes her unsuitable for hound running.

33

233.    All Tranchita's coyotes were deemed non-releasable on every inspection by USDA veterinarians because they are too accustomed to humans, cannot survive without human assistance, and wild coyotes are territorial, and her coyotes would be attacked and killed if released.

234.    The Hound Running Area permit requires the applicant to have a two-coyote minimum for a hound running area.  See Illinois Administrative Code Section 970.40(a) ("Coyote and fox hound running areas shall contain not less than 2 animals and shall not contain more than 4 animals per each full 20 acres.").

235.    If Luna is returned to Tranchita, she has no intention of getting another coyote, and will not meet the requisite two-coyote minimum requirement.

236.    Tranchita's coyotes enjoyed dogs whenever they had the opportunity to interact, which makes Luna unsuitable for hound running, because Luna will run toward the dogs and want to play.

237.    Luna is hand-raised, semi-domesticated and docile, unlike a wild coyote that would give chase if released.

238.    Tranchita does not want to train hound dogs to hunt, and she does not want to have hound dogs.

239.    The acreage required for a Hound running area is for the purpose of letting a coyote loose on that acreage and letting multiple hound dogs chase down and potentially attack the coyote.

240.    The acreage required does not support anything in the interest of the animal that is used in live bait training.

241.    The acreage only supports the activity of training hunting dogs to pursue animals on open land.

34

**XV.** **Hound Running or "Penning"**

242. Hound Running is inherently an inhumane activity and the animals are more often than not hurt and killed by the hound dogs.

243. The Hound Running statute is a perfect example of how the cruel practice has been overlooked because of the way the law was written.

244. Many large organizations are working fervently to outlaw hound running, and some states have already made it illegal.

245. People trying to stop this practice, compare it to dog fighting, which is now a federal crime.

246. It is common knowledge that Hound runners take coyotes that have been trapped by licensed trappers or they are trappers themselves.

247. The animals are injured by the trapping and then thrown into pens to be used as live bait.

248. Videos photos and descriptions are available all over the internet and clearly show what happens to animals when they are pursued by hounds.

249. According to the Humane Society of the United States,

> [I]investigations conducted by several state wildlife agencies, including Indiana, Alabama and Virginia, have documented the cruelty inherent in penning operations -which are essentially penned animal fighting venues - as well as the rampant smuggling of wildlife across states lines that these facilities perpetuate. Such exhibitions are cruel, unsporting competitions where dogs are required to chase down and injure or kill animals such as foxes and coyotes. Dogs are judged on their aggression in pursuit, and on their success in killing a trapped animals.
>
> As documented in one recent investigation, once an animal is caught, the dogs often engage in a tug of war over the animal, sometimes literally tearing the animal apart. Before the event, the dogs are trained using small animals in fenced enclosures, and are given stimulants to enhance performance. Moreover, trapped

       animals sold into the live market are frequently sold illegally across state lines, and endure inhumane cramped, long distance transport before arriving at a pen. None of these actions are currently regulated by USDA under the AWA.[8]

250.    According to the Animal Welfare Institute,

       'Penning' is the brutal practice of placing live foxes and coyotes in an enclosed pen as bait for hunting dogs. Predictably, this blood sport frequently ends violently for the prey animals, who are often cornered, maimed, and killed by the packs of dogs that are set upon them. Despite its inherent cruelty, penning is legal in several states across the country. Growing public awareness of what happens within these pens, however, is encouraging more and more governments to ban or restrict penning. [9]

251.    Dogs also get harmed in this brutal practice.[10]

252.    Videos of this brutal practice can be watched on YouTube.[11]

253.    Once these horrific images are seen, it is difficult to unsee them.

254.    Even though Illinois regulations state the animals should not be killed during hound

running training, everyone that has witnessed or delved into Hound running or hounding

---

[8] HSUS Letter to USDA, Nov. 27, 2007, available at https://webcache.googleusercontent.com/search?q=cache:KOcJQiSE8qYJ:ncsportingdog.org/wp-content/uploads/2017/04/hsus_ltr_11-27-07.pdf+&cd=3&hl=en&ct=clnk&gl=us

[9] "Indiana Coyote Penning—An Inside Look at Animal Abuse and Cruelty – AWI Publication, available at http://www.projectcoyote.org/documents/IN_Penning_Report_PC_ALDF_AWI_Final_low_res.pdf, page 2.

[10] Inside the controversial culture of using dogs to hunt coyotes, Washington Post, December 17, 2015, available at https://www.google.com/url?q=https%3A%2F%2Fwww.washingtonpost.com%2Fnews%2Fin-sight%2Fwp%2F2015%2F12%2F17%2Fthe-beauty-and-controversy-of-hunting-coyotes-with-hounds%2F%3FoutputType%3Damp&sa=D&sntz=1&usg=AFQjCNH6LaUsWx95uYjPw3YHGdPWC8m3IQ

[11] Shockingly this Michigan Hound Hunter was Found Not Guilty, Humane Society of the United States, 2014, https://youtu.be/KaKHUfKkWEc; See also Coyote Hunting with Hounds is Legalized Dog-Fighting! https://youtu.be/03LJZAKo4bY

activities know that the ultimate goal of the people that do this is to kill the coyotes and other animals.

255. The maiming or killing of a coyote cannot be prevented when a pack of dogs is released on a single coyote.

## XVI. IDNR Creates an Exception to the Permit Requirements

256. Although the Wildlife Code does not provide any exceptions to the dual permit requirement (Fur-bearing Mammal Breeder permit and Hound Running Area permit), Defendants, during this litigation have asserted that a Fur-bearing Mammal Breeder permit and a Hound Running Area permit are not required to possess coyotes if the person is rehabbing a coyote and holds a "rehabilitator permit".

257. Defendants have asserted in this Action that seven of the ten entities and individuals identified in Plaintiff's Complaint as being similarly situated, possess a 2020 "rehabilitator permit" which, according to Defendants allows them to "rehabilitate wildlife in 2020."

258. Defendants have identified "Flint Creek Wildlife Rehabilitation, Dawn Keller, Forest Preserve District of DuPage County d/b/a Willowbrook Wildlife Center, Fox Valley Wildlife Center, Treehouse Wildlife Center, Hoo Haven Wildlife and Education Center, and Karen M. Herdklotz" as holding "a rehabilitator permit as of April 2020 or June 2020."

259. "The Department [of Natural Resources] is authorized to make rules and regulations for carrying out, administering, and enforcing the provisions of this Act. These rules and regulations shall be called and hereinafter referred to as administrative rules." 520 ILCS 5/1.15.

260. According to Illinois Administrative Code, Section 260.350(a), "Agency rules that are not adopted in accordance with the procedures set forth in the Act are invalid and unenforceable."

261.    "Rule" means each agency statement of general applicability that implements, applies, interprets, or prescribes law or policy.  (5 ILCS 100/1-70).

262.    "No agency rule is valid or effective against any person or party, nor may it be invoked by the agency for any purpose, until it has been made available for public inspection and filed with the Secretary of State as required by this Act."  5 ILCS 100/5-10(c).

263.    Until Defendants filed their Opposition to Plaintiff's Motion for Injunctive Relief, in this case, their position was as follows,

    a.    "[F]ur-bearing mammal breeder permits for coyotes are allowed only for "persons who hold[ ] a hound running Area permit.' id. § 3.25; see id. § 3.26.""

    b.    "The possession of a fur bearing breeder permit alone, or with a USDA Exhibitor's license, does not allow you to possess coyotes in the State of Illinois.

    c.    "In addition to the fur-bearing mammal breeder permit, a person who wishes to keep coyotes also must have a hound running Area permit.

    d.    "As you have been informed repeatedly, under the Wildlife Code, an individual must possess both a fur-bearing mammal breeder permit **and** a hound running Area permit to possess a coyote in Illinois.  As a result, even if Ms. Tranchita now has a fur-bearing mammal breeder permit, she still cannot legally possess a coyote under the Wildlife Code."

264.    During the proceedings in this above captioned case, Defendants announced,

    a.    that persons can keep coyotes without holding a Hound Running Area Permit,

    b.    that there are other ways to legally keep coyotes other than possessing a fur bearing mammal breeder permit and hound running area permit.

    c.    zoos, rehabilitation facilities, and scientific facilities may also legally keep coyotes under certain circumstances.

    d.    520 ILCS 5/3.22 is an exception to the requirement that to possess a coyote a person must hold a Fur-bearing Mammal Breeder permit and a Hound Running Area permit,

    e.    "[o]f the ten entities and individuals in Plaintiff's complaint, IDNR records show that

seven out of ten had a "scientific and special purpose permit" – commonly referred to by IDNR as a rehabilitator permit, in 2020 that allowed them to rehabilitate wildlife in 2020",

f.  the "rehabilitator permit" "allows an individual or entity to keep a wild animal with the goal of releasing it back into the wild."

g.  a rehabilitator permit does not authorize a person to possess coyotes indefinitely.

## XVII. Tranchita's Animal Welfare Act USDA Class C Exhibitor License

265.  Every year, from 2006 to present, the United States Department of Agriculture has issued Tranchita an annual Class C Exhibitor License.

266.  Tranchita's Class C Exhibitor License is issued by the USDA pursuant to the Animal Welfare Act (7 U.S.C. 2121, et seq.).

267.  Tranchita obtained this license so she could educate the public about coyotes and be allowed to have the public view the coyotes.

268.  The USDA Class C Exhibitor License subjected Tranchita to yearly unannounced inspections by USDA Veterinarians.

269.  During these inspections, the USDA Veterinarians discussed in detail with Tranchita,

a.  her required obligations to provide humane care, including medical, food, shelter, and containment.

b.  mandated protocols vis-à-vis the educational public tours.

270.  On February 12, 2021, Tranchita had a lengthy discussion with her USDA inspecting veterinarian, Dawn Barksdale, DVM.

271.  USDA Veterinarian told Tranchita,

    a.  that if she were inspecting Tranchita's USDA federally licensed facility and she witnessed hound dogs chasing or attacking her non-releasable coyote Luna, she would easily see that such an activity caused Luna stress and/or injury, and this would be a violation of the AWA standards of care.

    b.  that if Tranchita had participated in such a Hound Running activity, she would be in violation of AWA regulations.

272.  USDA Veterinarian Barksdale explained to Tranchita,

    a.  that training dogs to hunt a coyote is obviously and inherently going to cause the prey animal stress and injury,

    b.  Luna is not releasable and therefore not suitable as a live bait animal, because she is not a wild caught coyote, and is instead a domesticated coyote that has been in Tranchita's care for her entire life up until the day of the seizure.

    c.  Because Luna cannot be released, she would therefore never be suitable as live bait to train hunting dogs.

273.  USDA Veterinarian Barksdale noted that Tranchita's USDA approved escape-proof enclosures are not only to protect the public from the animals escaping, but also to protect the coyotes from other animals that might cause them harm, such as other wildlife or dogs.

274.  Tranchita's USDA approved escape-proof enclosures consist of double chain link fencing, which is prison-grade thick, consisting of a 7 ft high perimeter fence and an inner enclosure that is also 7 ft high and has 4 ft overhang on the top so that the animals cannot climb out and 4 ft of fencing laid on the ground so that the animals cannot dig out.

275.  Furthermore, there is a third fence which is a privacy cedar fence which is six feet high and surrounds Tranchita's property.

276.    The 35x100 ft chain link enclosure that Luna was housed in, is extremely large compared to any standard size enclosure that is required by USDA or IDNR. it is more than adequate for her care, it is larger than where she currently is contained, and Luna can run within its boundaries.

277.    Tranchita made a $25,000.00 investment in this USDA approved and inspected escape-proof enclosure.

278.    In 13 years of USDA inspections Tranchita has had no escapes, no bites, no harm to the public whatsoever, and no harm to any domesticated animals.

279.    The Hound Running Area permit requires signage (presumably to restrict the public from entering the area), while her USDA exhibitor's license requires public viewing to be allowed.

280.    The Hound Running Area permit requires electric fencing, which would be dangerous to the public who comes to Tranchita's refuge to be educated about coyotes.

281.    The Hound Running Area permit requires coyotes to be ear tagged, and this runs afoul of the AWA and her license because it is an act which inflicts harm, suffering, or stress upon the coyotes.

## XVIII.    The Animal Welfare Act

282.    The purpose of the Animal Welfare Act ("AWA") is "to protect certain animals from inhumane treatment and neglect."

283.    "The AWA prohibits staged dogfights, bear or racoon baiting, cockfighting, and similar animal fighting ventures."

284.    The AWA was enacted as "a statutory mandate that helpless creatures deserve the care and protection of a strong and enlightened public."  H.R. Rep. No. 91–51 (1970), reprinted in 1970 U.S.C.C.A.N. 5103, 5104.

285.   The AWA,

> requires that basic standards of care and treatment be provided for certain animals bred and sold for use as pets, used in biomedical research, transported commercially, or exhibited to the public. Individuals who operate facilities in these categories must provide their animals with adequate care and treatment in the areas of housing, handling, sanitation, nutrition, water, veterinary care, and protection from extreme weather and temperatures. Although Federal requirements establish basic standards, regulated businesses are encouraged to exceed these standards.

286.   the Animal Welfare Act standards which Tranchita is required to abide by are contained in the USDA Animal Care "Blue Book".

287.   The Blue Book states at Section 2.131 titled "Handling of Animals", states,

   a.   "Handling of all animals shall be done as expeditiously and carefully as possible in a manner that does not cause trauma, overheating, excessive cooling, behavioral stress, physical harm, or unnecessary discomfort."

   b.   "physical abuse shall not be used to train, work, or otherwise handle animals."

   c.   "during public exhibition any animal must be handled so there is minimal risk of harm to the animal and to the public, with sufficient distance and/or barriers between the animal and the general viewing public so as to assure the safety of animals and the public."

   d.   "Animals shall be exhibited only for periods of time and under conditions consistent with their good health and well-being."

288.   The Blue Book at Section 3.142 states, "Care shall be exercised to avoid handling of the primary enclosure in such a manner that may cause physical or emotional trauma to the live animal contained therein."

**XIX.  Others Possess Coyotes Without Holding a Fur-bearing Mammal Breeder Permit and a Hound Running Area Permit**

289.  Defendants cannot deny that there are others in the State of Illinois who own or possess coyotes without holding the required Fur-bearing Mammal Breeder permit.

290.  Defendants cannot deny that there are others in the State of Illinois who own or possess coyotes without holding the required Hound Running Area permit.

291.  It was only until this Action was filed that Defendants created an exception to the requirement that a person who possesses a coyote must hold both a Fur-bearing Mammal Breeder permit and a Hound Running Area permit.

292.  According to Defendants, seven of the ten entities and individuals identified by Plaintiff as being similarly situated, possess a 2020 "rehabilitator permit" which, according to Defendants allows them to "rehabilitate wildlife in 2020."

293.  Defendants have identified "Flint Creek Wildlife Rehabilitation, Dawn Keller, Forest Preserve District of DuPage County d/b/a Willowbrook Wildlife Center, Fox Valley Wildlife Center, Treehouse Wildlife Center, Hoo Haven Wildlife and Education Center, and Karen M. Herdklotz" as holding "a rehabilitator permit as of April 2020 or June 2020."

294.  The purpose of a rehabilitator permit, according to Defendants, is to "allow[s] an individual or entity to keep a wild animal with the goal of releasing it back into the wild."

295.  The facts bely this new theory and show that the persons and entities which Defendants claim hold rehabilitator permits have not released coyotes into the wild, and instead maintain those coyotes as permanent residents.

**A.  Flint Creek Wildlife Rehabilitation and Dawn Keller**

43

296.    Defendant Mooi lied about the idyllic life Tranchita's coyotes would lead if she surrendered them.

297.    The same day IDNR seized Tranchita's coyotes, IDNR gave possession of the coyotes to Dawn Keller, the Founder and Director of Flint Creek Wildlife Rehabilitation.

298.    Three weeks after IDNR seized Tranchita's four coyotes, three of her coyotes died in the possession of Dawn Keller and Flint Creek – both who have never held a Fur-Bearing Mammal Breeder permit or a Hound Running Area permit.

299.    Despite Mooi's claim that if Tranchita signed the surrender form, her coyotes would go to an idyllic refuge, the cruel truth was that her coyotes were transported to no paradise.

300.    En route to Flint Creek Wildlife Rehabilitation Center, the traumatized and injured coyotes were needlessly vaccinated with a parvovirus/distemper combination, with no prescription and no veterinarian present.

301.    Then they were hauled 70 miles north to Flint Creek Wildlife Rehabilitation Center in Barrington, Ill., and held in small quarters.

302.    Three weeks after Tranchita's coyotes were seized, they died while in the possession of Dawn Keller and Flint Creek.

303.    Luna was the sole survivor.

304.    According to Flint Creek's website,

> "Founded in 2003, Flint Creek Wildlife Rehabilitation is a state and federally licensed, private, not-for-profit 501(c)3 wildlife rehabilitation center dedicated to the care of injured and orphaned wildlife and to educating the public about wildlife and wildlife-related issues."[12]

305.    Dawn Keller is the Founder and Director of Flint Creek Wildlife Rehabilitation.

---

[12] https://flintcreekwildlife.org/about/

306.    Dawn Keller

    a.  has possessed coyotes.

    b.  currently possesses coyotes.

307.    Dawn Keller has never held

    a.  a Fur-bearing Mammal Breeder permit.

    b.  a Hound Running Area permit.

308.    IDNR has never issued

    a.  a Fur-Bearing Mammal Breeder permit to Dawn Keller.

    b.  A Hound Running Area permit to Dawn Keller.

309.    IDNR knows Dawn Keller possesses, and has possessed coyotes.

310.    IDNR does not require Dawn Keller to hold a Fur-bearing Mammal Breeder permit.

311.    IDNR does not require Dawn Keller to hold a Hound Running Area permit.

312.    Flint Creek Wildlife Rehabilitation,

    a.  has possessed coyotes.

    b.  currently possesses coyotes.

313.    Flint Creek has never held

    a.  a Fur-bearing Mammal Breeder Permit.

    b.  a Hound Running Area permit.

314.    IDNR has never issued,

    a.  a Fur-Bearing Mammal Breeder Permit to Flint Creek.

    b.  a Hound Running Area permit to Flint Creek.

315.    IDNR knows Flint Creek and Dawn Keller possess coyotes because,

    a.  IDNR gave possession of Tranchita's coyotes to Flint Creek on April 24, 2019.

b. On May 22, 2020, a person found two coyote pups and called Illinois Department of Natural Resources who then referred the finder to Flint Creek, who then took possession of the coyote pups.[13]

c. A May 3, 2019 email exchange between Dawn Keller/Flint Creek and Tim Schweizer (a Spokesman for IDNR) evidences that IDNR knows Dawn Keller and Flint Creek possess coyotes.

316. Flint Creek in 2019, 2020, and 2021 did not possess any Federal USDA license, despite falsely claiming they do on their website.

317. Public records indicate that Flint Creek does not possess any federal USDA licenses.

318. Public records indicate that Dawn Keller has never been issued a Fur-bearing Mammal Breeder Permit.

319. Public records indicate that Dawn Keller has never been issued a Hound Running Area Permit.

320. Public records indicate that Flint Creek has never been issued a Fur-bearing Mammal Breeder Permit.

321. Public records indicate that Flint Creek has never been issued a Hound Running Area Permit.

322. IDNR has not, and does not, require Flint Creek to hold a Fur-bearing Mammal Breeder permit.

323. IDNR has not, and does not, require Flint Creek to hold a Hound Running Area permit.

---

[13] "Orphaned coyote pups on the mend at Flint Creek after nearly drowning in den", May 22, 2020, Barrington Hills Observer, available at https://barringtonhillsobserver.com/2020/05/22/orphaned-coyote-pups-on-the-mend-at-flint-creek-after-nearly-drowning-in-den/

324.    A news article dated May 27, 2018 shows that Dawn Keller and Flint Creek Wildlife Rehabilitation Center, possessed a coyote since May of the prior year.

325.    According to the article, "[a] fisherman found [Peace the coyote] in a burlap bag last May [2017] in a Cook County Forest Preserve pond in Barrington Hills. Five other pups drowned. All had been beaten."

326.    The article also discusses "[t]he center's longtime coyote, Beautiful * * * ."

327.    Flint Creek and Dawn Keller, according to IDNR, each hold a "rehabilitator permit".

328.    This rehabilitator permit, according to IDNR, exempts Flint Creek and Dawn Keller from the requirement of holding a Fur-bearing Mammal Breeder permit.

329.    This rehabilitator permit, according to IDNR, exempts Flint Creek and Dawn Keller from the requirement of holding a Hound Running Area permit.

### B. Forest Preserve District of DuPage County d/b/a Willowbrook Wildlife Center

330.    Because Dawn Keller and Defendant Mooi would not permit Tranchita to visit Luna, Tranchita obtained a court ordering allowing visits.

331.    During a state court hearing on this violation of the court order, Tranchita's attorney told the judge that Tranchita was being denied what was written in the court order.

332.    The attorney for IDNR stated that he still would not allow Tranchita physical contact with Luna.

333.    It was at this moment Defendant Mooi took a step forward and put both thumbs up and smiled showing his approval of IDNR's position of not allowing Tranchita to have physical contact with Luna.

334.    Dawn Keller and Defendant Mooi were not willing to abide by that order, so Luna was moved to Willowbrook Wildlife Center.

335.    On May 31, 2019 Luna was transferred to Willowbrook Wildlife Center in Glen Ellyn, Illinois.

336.    During her court permitted visits with Luna, Tranchita was often guarded by IDNR officers during these visits.

337.    When IDNR officers could not be present for Tranchita's court ordered visits, DuPage County forest preserve police officers were present.

338.    These officers told Tranchita that if it were up to them Luna would be back home with her and that these actions by Defendants were strictly a show of bravado and power and they had no logical explanation for Defendants behavior.

339.    Defendant Mooi continued to interfere with Tranchita's court permitted visitations as well.

340.    One of the IDNR officers during one of the visits bragged about killing countless coyotes for $8 a pelt, while Tranchita was trying to make the best of the short time she had with her bonded coyote

341.    Other IDNR officers would bark orders at Tranchita, "Don't reach out to her!" and "If she comes near you, don't touch her!"

342.    One of the IDNR officers told Tranchita they were following instructions from IDNR Sgt. Mooi to prohibit any contact between her and Luna, and they continued even after the court ordered contact visits.

343.    At Willowbrook, Luna was kept in a small dark indoor room, which was approximately 12 by 25 feet.

344.    This room was significantly smaller than the space Tranchita has for Luna at her refuge in Tinley Park, which is 35 by 100 feet.

48

345.  Willowbrook Wildlife Center

    a.  has possessed coyotes.

    b.  currently possesses coyotes.

346.  Willowbrook Wildlife Center has never held

    a.  a Fur-bearing Mammal Breeder permit.

    b.  a Hound Running Area permit.

347.  IDNR has never issued

    a.  a Fur-Bearing Mammal Breeder permit to Willowbrook Wildlife Center

    b.  a Hound Running Area permit to Willowbrook Wildlife Center

348.  IDNR knows Willowbrook Wildlife Center possesses and has possessed coyotes.

349.  IDNR has not, and does not, require Willowbrook Wildlife Center to hold a Fur-bearing Mammal Breeder permit.

350.  IDNR has not, and does not, require Willowbook to hold a Hound Running Area permit.

351.  Like Tranchita, Willowbrook possesses a USDA Class C Exhibitor license.

352.  Willowbrook, according to IDNR, holds a "rehabilitator permit".

353.  This rehabilitator permit, according to IDNR, exempts Willowbrook from the requirement of holding a Fur-bearing Mammal Breeder permit.

354.  This rehabilitator permit, according to IDNR, exempts Willowbrook from the requirement of holding a Hound Running Area permit.

### C.  Treehouse Wildlife Center

355.  Treehouse Wildlife Center Inc is in Dow, Illinois.

356.  Treehouse Wildlife Center

    a.  has possessed coyotes.

    b.   currently possesses coyotes.

357.   Treehouse Wildlife Center, has never held

    a.   a Fur-bearing Mammal Breeder permit.

    b.   a Hound Running Area permit.

358.   IDNR has never issued,

    a.   A Fur-Bearing Mammal Breeder permit to Treehouse Wildlife Center.

    b.   A Hound Running Area permit to Treehouse Wildlife Center.

359.   Treehouse Wildlife Center possesses a 2020 USDA Class C Exhibitor License.

360.   IDNR has not, and does not, require Treehouse Wildlife Center to hold a Fur-bearing Mammal Breeder permit.

361.   IDNR has not, and does not, require Treehouse Wildlife Center to hold a Hound Running Area permit.

362.   Treehouse Wildlife Center, according to IDNR, holds a "rehabilitator permit".

363.   This rehabilitator permit, according to IDNR, exempts Treehouse Wildlife Center from the requirement of holding a Fur-bearing Mammal Breeder permit.

364.   This rehabilitator permit, according to IDNR, exempts Treehouse Wildlife Center from the requirement of holding a Hound Running Area permit.

365.   Treehouse possesses two coyotes, one named Apache which it obtained in 2015, and one named Zuni which it obtained in 2011.

366.   According to Treehouse's website, these two coyotes (Apache and Zuni) are identified as "resident" animals.

367.   According to a news article, "Others, like Apache's penmate Zuni, were kept as pets only to be surrendered by their owners, leaving them unable to be released back into the wild."

368.    Treehouse conducts its operation on "residential property" according to county government records.

###    D.  Wheaton Park District DBA "Cosley Zoo"

369.    Wheaton Park District, dba Cosley Zoo is in Wheaton, Illinois.

370.    Cosley Zoo

   a.   has possessed coyotes.

   b.   currently possesses coyotes.

371.    Wheaton Park District, dba Cosley Zoo has never obtained,

   a.   a Fur-bearing Mammal Breeder permit.

   b.   a Hound Running Area permit.

372.    IDNR has never issued,

   a.   a Fur-Bearing Mammal Breeder permit to Wheaton Park District, dba Cosley Zoo.

   b.   a Hound Running Area permit to Wheaton Park District, dba Cosley Zoo.

373.    IDNR knows Wheaton Park District, dba Cosley Zoo has possessed coyotes.

374.    IDNR knows Wheaton Park District, dba Cosley Zoo currently possesses coyotes.

375.    Cosley Zoo possesses coyotes.

376.    Cosley Zoo holds a 2020 USDA Class C Exhibitor License.

377.    IDNR has not, and does not, require Cosley Zoo to hold a Fur-bearing Mammal Breeder permit.

378.    IDNR has not, and does not, require Cosley Zoo to hold a Hound Running Area permit.

379.    According to Cosley Zoo's Facebook page, "Wiley the coyote has been living at Cosley Zoo since 2014 * * * [and he] found his forever home at Cosley Zoo where he helps to connect people with animals and nature."

380.  Cosley Zoo does not hold a "rehabilitator permit".

### E.  Hoo Haven Wildlife and Education Center

381.  Hoo Haven Wildlife and Education Center is in Durand, Illinois.

382.  Hoo Haven

    a.  has possessed coyotes.

    b.  currently possesses a coyote.

383.  Hoo Haven has never obtained

    a.  a Fur-bearing Mammal Breeder permit.

    b.  a Hound Running Area permit.

384.  IDNR has never issued,

    a.  a Fur-Bearing Mammal Breeder permit to Hoo Haven.

    b.  a Hound Running Area permit to Hoo Haven.

385.  Hoo Haven does not possess a 2020-2021 USDA Class C Exhibitor License.

386.  Hoo Haven currently possesses Angel the Coyote.

387.  IDNR has not, and does not, require Hoo Haven to hold a Fur-bearing Mammal Breeder permit.

388.  IDNR has not, and does not, require Hoo Haven to hold a Hound Running Area permit.

389.  Hoo Haven, according to IDNR, hold a "rehabilitator permit."

390.  This rehabilitator permit, according to IDNR, exempts Hoo Haven from the requirement of holding a Fur-bearing Mammal Breeder permit.

391.  This rehabilitator permit, according to IDNR, exempts Hoo Haven from the requirement of holding a Hound Running Area permit.

**F. Karen M. Herdklotz**

392. Karen M. Herdklotz is the Director of Hoo Haven Wildlife and Education Center.

393. Herdklotz

    a. has possessed coyotes.

    b. currently possesses Angel the Coyote.[14]

394. Herdklotz has never obtained

    a. a Fur-bearing Mammal Breeder permit.

    b. a Hound Running Area permit.

395. IDNR has never issued,

    a. a Fur-Bearing Mammal Breeder permit to Herdklotz.

    b. a Hound Running Area permit to Herdklotz.

396. Herdklotz does not possesses a 2020-2021 USDA Class C Exhibitor License.

397. IDNR has not, and does not, require Herdklotz to hold a Fur-bearing Mammal Breeder permit.

398. IDNR has not, and does not, require Herdklotz to hold a Hound Running Area permit.

399. Herdklotz, according to IDNR, holds a "rehabilitator permit."

400. This rehabilitator permit, according to IDNR, exempts Herdklotz from the requirement of holding a Fur-bearing Mammal Breeder permit.

401. This rehabilitator permit, according to IDNR, exempts Herdklotz from the requirement of holding a Hound Running Area permit.

**G. Fox Valley Wildlife Center**

---

[14] https://www.hoohaven.org/thisweek.htm

402.    Fox Valley Wildlife Center is in Elburn, Illinois.

403.    Fox Valley Wildlife Center,

    a.  has possessed coyotes.

    b.  currently possesses coyotes.

404.    Fox Valley Wildlife Center, has never obtained,

    a.  a Fur-bearing Mammal Breeder permit.

    b.  a Hound Running Area permit.

405.    IDNR has never issued

    a.  a Fur-Bearing Mammal Breeder Permit to Fox Valley Wildlife Center,

    b.  a Hound Running Area permit to Fox Valley Wildlife Center,

406.    IDNR knows Fox Valley Wildlife Center has possessed coyotes.

407.    IDNR knows Fox Valley Wildlife Center currently possesses coyotes.

408.    Fox Valley possesses a 2020 USDA Class C Exhibitor License.

409.    IDNR has not, and does not, require Fox Valley to hold a Fur-bearing Mammal Breeder permit.

410.    IDNR has not, and does not, require Fox Valley to hold a Hound Running Area permit.

411.    IDNR claims Fox Valley holds a "rehabilitator permit".

412.    This rehabilitator permit, according to IDNR, exempts Fox Valley from the requirement of holding a Fur-bearing Mammal Breeder permit.

413.    This rehabilitator permit, according to IDNR, exempts Fox Valley from the requirement of holding a Hound Running Area permit.

### H. Big Run Wolf Ranch

414.    Big Run Wolf Ranch is in Lockport, Illinois.

415.    Big Run Wolf Ranch operate on "residential property."

416.    Big Run Wolf Ranch operates on a 3.26-acre lot.

417.    Big Run Wolf Ranch possesses a bear, a cougar, a tiger, multiple wolves, and other animals.

418.    Big Run Wolf Ranch

   a.  has possessed coyotes.

   b.  currently possesses coyotes.

419.    Big Run Wolf Ranch has never held

   a.  a Fur-bearing Mammal Breeder permit.

   b.  a Hound Running Area permit.

420.    IDNR has never issued,

   a.  a Fur-Bearing Mammal Breeder Permit to Big Run Wolf Ranch.

   b.  a Hound Running Area permit to Big Run Wolf Ranch.

421.    IDNR knows Big Run Wolf Ranch has possessed coyotes.

422.    IDNR knows Big Run Wolf Ranch currently possesses coyotes.

423.    Big Run Wolf Ranch has possessed coyotes since 2011.

424.    Currently, Big Run Wolf Ranch possesses at least two coyotes, Mahala; and Miwok.

425.    "Mahala, a purebred mid-western coyote, arrived as an orphan from a nuisance trapper. The trapper relocated the parents and brought three rescued coyote pups to BRWR. Mahala was kept because of his wonderful personality. Mahala was named after one of our biggest supporters, Stan Michalak."

426.    Big Run Wolf Ranch has possessed Miwok since 2011.

427.  "Miwok arrived at BRWR in 2011 from a rehabber in Illinois. She was named for the Native American tribe that inhabited Yosemite National Park. Coyotes are very important to the ecological balance of the region in controlling pests, such as rabbits and rodents."

428.  Big Run Wolf Ranch possessed coyotes in 2019 and 2020.

429.  IDNR has not, and does not, require Big Run Wolf Ranch to hold a Fur-bearing Mammal Breeder permit.

430.  IDNR has not, and does not, require Big Run Wolf Ranch to hold a Hound Running Area permit.

431.  Like Tranchita, Big Run Wolf Ranch possesses a 2020-2021 USDA Class C Exhibitor License.

432.  Big Run does not hold a "rehabilitator permit."

### I.  John Basile

433.  John Basile is the Founder and President of Big Run Wolf Ranch.

434.  John Basile conducts his coyote operation on "residential property" according to county government records.

435.  According to Big Run Wolf Ranch's website, "John Basile, President, has held a USDA federal license and has been working with large North American predators for 30 years."

436.  The USDA, however, does not list him as possessing any USDA licenses.

437.  Big Run Wolf Ranch is in Illinois.

438.  John Basile

    a.  has possessed coyotes.

    b.  currently possesses coyotes.

439.  John Basile has never obtained,

      a.  A Fur-bearing Mammal Breeder permit.

      b.  a Hound Running Area permit.

440.    IDNR has never issued,

      a.  a Fur-Bearing Mammal Breeder Permit to John Basile.

      b.  a Hound Running Area permit to John Basile.

441.    IDNR knows John Basile has possessed coyotes.

442.    IDNR knows John Basile currently possesses coyotes.

443.    John Basile has possessed coyotes since at least 2011.

444.    Currently, John Basile possesses, at a minimum, two coyotes, Mahala and Miwok.

445.    John Basile, as early as 2011, has not possessed a USDA Class C Exhibitor License.

446.    John Basile has never held a Fur-bearing Mammal Breeder permit.

447.    IDNR has not, and does not, require John Basile to hold a Hound Running Area permit.

448.    John Basile does not hold a USDA Class C Exhibitor License.

449.    John Basile has never held a USDA Class C Exhibitor License.

450.    John Basile does not hold a "rehabilitator permit."

451.    On the day of the raid and seizure in April 2019, Cook County Animal Control Officer Ruby Wilson informed Defendant Mooi that John Basile has the same USDA licensing that Tranchita had, and that Basile's coyotes are permanent residents.

## XIX.    Tranchita's Religious Beliefs Prevent Her from Running Hounds

452.    Tranchita's religious, ethical, and moral beliefs prevent her from hound running.

453.    Holding a hound running area permit contravenes Tranchita's protected beliefs.

454.    Hound running is absolutely disdainful to Tranchita, and her beliefs prevent her from engaging in these activities and prevent her from desiring to hound run.

455.    The Hound Running Statute (520 ILCS 5/3.26(a)) states that if a person "desires to establish a hound running area to pursue authorized species with hounds in a way that is not designed to capture or kill the authorized species, [they] shall apply to the Department for a hound running area permit under this Section."  Id.

456.    Tranchita does not desire to run hounds after coyotes.

457.    Tranchita's religious belief requires her to "do unto others as you would have them do unto you."

458.    This religious belief extends to animals as well as humans.

459.    Tranchita believes that hound running is a terribly unethical practice and to her, it is an extreme moral violation to force animals to fight and attack and cause injury and death.

460.    Tranchita would never subject her coyotes or dogs or any animal to the stress, cruelty, pain, confusion, and suffering that is inflicted upon animals during hound running sessions.

461.    Tranchita is an educator and the thought of being placed in the category of an unethical coyote torturer and killer by her state agency is utterly disappointing and cruel.

462.    It is cruel and insulting to suggest that Tranchita, as an educator and protector of coyotes, would be required to get a Hound running permit where animals are subjected to chase after chase, stress and injury and inhumane death.

463.    Tranchita is stunned, hurt, and feels devastated that Illinois wants to categorize her, a wildlife rescuer and educator with the worst of the worst abusers of coyotes--the "hounders."

**XX.    Protected Interest**

464.    From 2012 until April 24, 2019, IDNR knowingly permitted Tranchita to possess coyotes without holding a Hound Running Area permit.

58

465.    Despite the Fur-bearing Mammal Breeder permit Statute stating that IDNR will not issue a Fur-bearing Mammal Breeder permit without a Hound Running Area permit, IDNR issued Tranchita a Fur-bearing Mammal Breeder permit for the five years, without her holding a Hound Running Area permit.  520 ILCS 5/3.25.

466.    Since 2012, IDNR however has issued *eight* Fur-bearing Mammal Breeder permits to Tranchita.

467.    The requirement that Tranchita possess a Hound Running Area Permit to possess coyotes has been applied exclusively to Tranchita and is punitive and retaliatory.

468.    Historically IDNR has allowed Tranchita to possess coyotes without holding a Hound Running Area permit.

469.    Historically IDNR has not required others to hold a Fur-bearing Mammal Breeder permit.

470.    Historically IDNR has not required others to hold a Hound Running Area Permit.

**XX.    In 2019 IDNR Issue Only Two Hound Running Area permits**

471.    In 2019 IDNR

   a.  issued only two Hound Running Area permits

   b.  issued a Hound Running Area permit to Paradise Hills Fox Pen.

   c.  issued a Hound Running Area permit to Running L. Fox Pen.

472.    In the entire state of Illinois in 2019, these were the only two entities who possessed a 2019 hound running permit.

473.    Both entities are

   a.  hunting clubs whose mission is not to offer sanctuary for wildlife for educational exhibiting.

   b.  specifically exist to hunt wildlife, and to run hounds after caged foxes and coyotes.

474.     No information can be found online about these hunt clubs, suggesting they are a somewhat underground operation.

## XXI.    Luna is On Borrowed Time

475.     Luna has been separated from Tranchita for more than 22 months, with only rare, non-contact visits allowed by IDNR prior to being moved to Indiana Coyote Rescue Center, and with Luna in Indiana, Tranchita is separated by geography (145-mile distance from Tranchita's to Luna) and Covid 19 restrictions.

476.     At 14 years of age, Luna is on borrowed time.

477.     Luna will be 15 in April 2021.

478.     Based on an average lifespan of coyotes in captivity, which is 15 to 16 years old, and Luna's 15th birthday in April of 2021, it is fair to assume that Luna's time on this Earth is coming to an end, regardless of where Luna is located.

479.     Tranchita desires to be reunited with her before Luna dies.

480.     Luna is under constant stress and is not doing well.

481.     Luna's enclosure is outside, but there ends the comparison with her habitat of 13 years. Luna is alone with no human or same-species interaction and with no enrichment.

482.     At 25 x 25 feet, her current enclosure is less than one-fifth the size of the 35 x 100-foot enclosure that waits for Luna on Tranchita's property.

483.     Even after almost a year and a half in Indiana, Luna's surroundings are still unfamiliar and unsafe to her.

484.     Luna paces incessantly and has worn a circular track in her enclosure,  a behavior recognized as unhealthy in any animal.

485.     She is constantly nervous and on vigil, fearing noises and any human approach.

60

486.    Only when Tranchita visits does Luna show trust in a human.

487.    This is no way for an elderly 14-year-old coyote to live her last years and this constant stress will shorten what time she has left.

488.    The recent construction at the Indiana facility has only exacerbated the stress she is experiencing.

489.    Tranchita can drive the 145 miles to visit her only once every two or three weeks. The few hour-a-month visits are hardly a respite for Luna.  Additionally, Tranchita's visits are at the discretion of the Indiana refuge's owner, who barred her for three months this year during the COVID-19 pandemic and limits her visits in general.

490.    According to IDNR, "[f]ew coyotes live past 3 to 4 years of age. The oldest coyote found in a study conducted in Illinois during 1996 to 1997 was 13 years old."

491.    Many post-traumatic stress triggers at the Indiana facility exacerbate Luna's torment, including activity as unavoidable as road traffic, ongoing construction (to expand the operation) with heavy equipment, even people walking nearby.

492.    Luna no longer trusts humans, even the caretaker at the refuge.

493.    It is no surprise, considering the terror caused by those who seized her 22 months ago and the poor-to-inhumane treatment she received from virtually every other human she has encountered since.

494.    Luna needs to come home to Illinois to live the last days of her life with Tranchita.

495.    There are two petitions asking IDNR to let Luna be returned, that received over 49,000 signatures from concerned outraged and heartbroken citizens.

496.    Two letters from the Indiana Coyote Rescue Center,  advocate for Luna's reunification with Tranchita in Illinois.

497.    A letter from Tranchita's veterinarian, Kate Ball, DVM, advocates for Luna being returned to Tranchita.

498.    Certified Animal Behaviorist Steve Dale has also observed Luna and has submitted his observations to this Court.

499.    Videos taken of Tranchita's visits with Luna are sad to watch but are informative as to the stressful environment she is currently in, and Tranchita's bond with Luna.

500.    Indiana Coyote Rescue Center has agreed to return Luna to Tranchita when a court orders that Luna can be reunited with Tranchita in Illinois.

501.    Luna was a happy and well-adjusted coyote while in the possession of Tranchita for 13 years.[15]

502.    Luna has exceeded the average life span for a coyote but is not doing well in Indiana.

503.    The single desire Tranchita has is to be reunited with Luna for her last days on this earth.

504.    Luna's enclosure is outside, but there ends the comparison with her habitat of 13 years.

505.    In Indiana, Luna is alone with no human or same-species interaction and with no enrichment.

506.    At 25 x 25 feet, her current enclosure is less than one-fifth the size of the 35 x 100-foot enclosure that waits for Luna on Tranchita's property.

## XXII.  A Life Forever Changed and Emptied of Joy and Purpose

507.    The damage to Tomi Tranchita's life cannot be measured.

---

[15] https://youtube/QH92EVIsOAI (Luna happy, engaging, and making eye contact, her normal calm happy self); https://youtube/-k-ZNF9wjig (Luna gets a toy); https://youtube/p3dU6-jVj4A (Luna getting some enrichment in Tranchita's care); https://youtube/FkBcfjf-h68 (Luna and Sandy getting treats); https://youtube/hQLu5a3hAkU (Luna greets Tranchita on a snowy morning).

508.   Some assumed she had a full life outside of her work with coyotes.

509.   Without an immediate family, however, it was her work with her coyotes that filled her life.

510.   Now that her animals are gone and her refuge is vacant, Tranchita has lost both her joy and her sense of purpose.

511.   Her connection to the community through education and her sense of contributing to society have vanished. Her rewarding professional pursuit and the animals she was so proud of are all gone.

512.   Her life's work swept away in one morning by a hell-bent State officer.

513.   Twenty-two months after the raid and seizure, Tranchita's grief has not subsided.

514.   Friends have learned to not wish her "happy birthday" or "merry Christmas."

515.   A simple "Have a nice day" from patrons at her customer service job brings her to tears and she retreats to the restroom to compose herself.

516.   At her performance review, her supervisor commented on how sad she was and that it was not appropriate at work.

517.   Her supervisor offered to help her, but there is nothing anyone can do to ease her sadness.

518.   Tranchita sees her $25,000 enrichment-filled enclosures sit empty.

519.   Years of investment and heart-felt commitment have been destroyed, leaving Tranchita with an immeasurable sense of loss that can never be replaced.

520.   Only the return of Luna to Tranchita can begin to heal the devastation and loss that Tranchita experiences every day.

521.   Luna is elderly and ailing, and time is of the essence.

522.   Tranchita is fearful that IDNR will seize Luna again if Luna is returned to her in Illinois.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 VIOLATION OF THE EQUAL PROTECTION
### CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

523.    The allegations contained in the above preceding paragraphs are re-alleged and

incorporated by reference as if fully set forth herein.

524.    Tranchita's equal-protection claim is the class-of-one variety.

525.    Tranchita alleges that Defendants have not required any other person or entity to hold the

permits it claims Tranchita is required to hold.

526.    Despite the fact that IDNR has stated in litigation that Illinois law requires the issuance of

both the Fur-bearing Mammal Breeder Permit and the Hound Running Permit, in order to

possess coyotes, it has made exceptions for others.

527.    Defendants have no rational basis for requiring Tranchita to hold both a Fur-bearing

Mammal Breeder permit and a Hound Running Area permit when the Defendants have created

exceptions for others.

528.    Defendants have no rational basis for requiring Tranchita to hold both a Fur-bearing

Mammal Breeder permit and a Hound Running Area permit when the Defendants allowed her to

possess coyotes as long as she held a Fur-bearing Mammal Breeder Permit.

529.    Defendants have no rational basis for their actions in treating Tranchita differently than

the others who are similarly situated.

530.    The method or means employed by Defendants is not rationally related to the stated goal

of the Wildlife Act.

531.    The method or means employed by Defendants is not rationally related to the purpose of the legislation.

532.    The degree of similarity between Tranchita and the comparators is high, in that the comparators and Tranchita have possessed coyotes in the State of Illinois without holding a Hound Running Area permit.

533.    Tranchita is the only person in the state of Illinois who is being required to obtain a Hound Running Area permit.

534.    Tranchita is the only person in the state of Illinois who is being required to obtain both a Fur-bearing Mammal Breeder Permit and a Hound Running Area permit to possess a coyote.

535.    No rational person could regard the circumstances of Tranchita to differ from those of the comparators to a degree that would justify the differential treatment on the basis of a legitimate government policy.

536.    The similarity in circumstances and difference in treatment are sufficient to exclude the possibility that Defendants acted on the basis of a mistake.

537.    A prudent person would think that comparators are similarly situated.

538.    Tranchita, compared with the comparators, is being selectively treated.

539.    There is no compelling state interest being protected by treating Tranchita differently.

540.    If there were such a compelling interest, it could surely be protected in a less burdensome way, than by barring Tranchita from being reunited with Luna in Illinois.

541.    Defendants have intentionally and purposefully discriminated against Tranchita.

542.    Defendants' have not required any other persons who possesses coyotes in the State of Illinois to hold a Hound Running Area permit.

543.    This permit requirement is selective and discretionary and motivated by bad faith and animus.

544.    The difference in treatment between Tranchita and the others similarly situated is a result of retaliatory and malicious motivations.

545.    Defendants have violated Tranchita's right to Equal Protection under the Constitution of the United States.

**COUNT II**
**CONFLICT PREEMPTION**

546.    The allegations contained in the above preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

547.    IDNR's requirement that a Hound Running Area permit must be obtained to possess a coyote, is preempted based upon the conflict preemption doctrine.

548.    It is impossible for Tranchita to comply with both federal and state law.

549.    The policy requiring Tranchita to run hounds to possess a coyote stands as an obstacle to the accomplishment and execution of federal purposes and objectives of the Animal Welfare Act.

550.    The Animal Welfare Act, 7 U.S.C. § 2131-2159 ("the Act"), regulates the transportation, purchase, sale, housing, care, handling, and treatment of animals, with the intent of fostering humane treatment and care of animals and protecting animal owners from theft of their animals. See 7 U.S.C. § 2131.

551.    The purpose of the Animal Welfare Act is to foster humane treatment and care of animals and to protect the owners of animals from the theft of their animals. 7 U.S.C. § 2131.

552.    The State's policy of requiring a person to possess a Hound Running Area permit to possess a coyote must give way because it conflicts with federal law.

553.    It is physically impossible for Tranchita to comply with both state and federal law.

554.    The policy requiring Tranchita to run hounds and to possess a hound running permit stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the AWA.

555.    The Secretary of Agriculture is authorized to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors.'" 7 U.S.C. § 2143(a)(1).

556.    The Secretary of Agriculture 'shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary." 7 U.S.C. § 2143(a)(8).

557.    Defendants' requirement that Tranchita hold a Hound Running Area permit in order to possess a coyote is not a "standard in addition to those standards promulgated by" USDA.

558.    Defendants' policy requiring Tranchita to obtain a Hound Running Area permit is in direct conflict with the Animal Welfare Act.

## COUNT III
## SECTION 1983 VIOLATION OF FREE EXERCISE CLAUSE OF THE 1st AMENDMENT TO THE U.S. CONSTITUTION

559.    The allegations contained in the above preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

560.    Tranchita has a right to freedom of personal conscience.

561.    Requiring her to possess a permit to engage in a cruel practice, is contrary to her religious beliefs.

562.    Defendants' policy is overbroad because it impinges upon First Amendment rights.

563.    The Fur-bearing Mammal Breeder permit is overbroad because it impinges upon First Amendment Rights.

564.    The requirement that Tranchita must hold a hound running permit to possess a coyote deters her from engaging in First Amendment religious belief.

565.    There is no compelling state interest in requiring a person to desire to run hounds when it is against their religious belief.

566.    There is no rational relationship to a legitimate governmental interest in requiring only Tranchita to obtain the Hound Running Area permit.

567.    Defendants require conduct that Tranchita's religion proscribes.

568.    Possessing a Hound Running Area permit significantly compromises recognized First Amendment protections of parties not before the Court.

### COUNT IV
### 42 U.S.C. § 1983 VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

569.    The allegations contained in the above preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

570.    Defendants have deprived Tranchita of the benefits of the Fur-bearing Mammal Breeder permit by now requiring a Hound Running Area permit.

571.    This requirement applies only to Tranchita.

572.    The permit which Tranchita has a right to the benefits of, is her 2020 and 2021 Fur-bearing Mammal Breeder Permits.

573.    Based on custom, policy, or mutually explicit understanding, Tranchita's 2021 Breeder Permit entitles her to possess a coyote without also owning a Hound Running Permit.

574.    Tranchita has no avenue by which to object to the threat of seizure if she brings Luna back to her property.

575.    The State will seize Luna again, as is clearly shown through the correspondences from IDNR to Tranchita's state litigation attorney.

576.    The possibility of permanent erroneous deprivation is significant if Tranchita brings Luna to Illinois without a declaration from this Court that she is permitted to possess a coyote with only a Fur-bearing Mammal Breeder permit.

577.    There is no burden upon the state, as it has allowed many others to possess coyotes without possessing a Hound Running Area permit.

578.    There is no burden upon the state, as it has allowed Tranchita from 2021 to 2019 to possess coyotes as long as she held a Fur-bearing Mammal Breeder permit.

579.    And the State has also allowed others to possess coyotes without the Fur-bearing Mammal Breeder permit.

580.    Many exceptions have been made.

581.    The State and Tranchita had a mutually explicit understanding that she could possess coyotes in the State of Illinois provided she held a Fur-bearing Mammal Breeder permit.

582.    As she currently possesses such a permit, and as IDNR issued her that permit, she should be allowed to possess a coyote in Illinois.

583.    Tranchita has a legitimate claim of entitlement to the continued enjoyment of the benefits of the Fur-bearing Breeder Mammal permit, that being possessing a coyote.

584.    Tranchita is entitled to due process before deprivation of this interest.

585.    However, she will receive no due process as there is no mechanism by which to ensure that occurs prior to the realistic threat of seizure.

586.    Defendant has no opportunity to contest, prior to a deprivation.

## *REQUEST FOR RELIEF*

Plaintiff respectfully requests the following relief:

a. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 declare that if Tranchita holds a valid Fur-bearing Mammal Breeder permit, she is authorized under Illinois law to possess Luna, the coyote.

i. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 declare that requiring Tranchita to hold a Hound Running Area permit is preempted by the Federal Animal Welfare Act.

j. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 declare that requiring Tranchita to hold a Hound Running Area permit violates the First Amendment to the United States Constitution.

k. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 declare that requiring Tranchita to hold a Hound Running Area permit violates the Due Process clause of the Fourteenth Amendment to the United States Constitution.

l. Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 declare that requiring Tranchita to hold a Hound Running Area permit violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

m. Order that a jury determine all issues not settled by this Court;

n. Award any other equitable relief as the Court deems just.

Respectfully submitted,

/s/ Richard Rosenthal
RICHARD BRUCE ROSENTHAL
(NY Reg. No. 1637677)
545 E. Jericho Turnpike
Huntington Station, New York 11746
*Attorney for Plaintiff*

70

## CERTIFICATE OF SERVICE

I certify that on March 5, 2021, I caused a copy of the foregoing *First Amended Complaint* to be filed electronically on CM/ECF, which will cause a notice of filing to be sent to all counsel of record who have entered appearances.

/s/ Richard Rosenthal
RICHARD BRUCE ROSENTHAL