**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TOMI TRANCHITA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 20 C 5956 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| COLLEEN CALLAHAN, JOHN FISHER, ) | |
| and JOSHUA MOOI, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff Tomi Tranchita was raising four coyotes at her home in Tinley Park, Illinois,

when, on April 24, 2019, agents from the Illinois Department of Natural Resources ("IDNR")

seized her coyotes. She had held fur-bearing mammal breeder permits ("Breeder Permit") in the

past but did not hold one at the time of the seizure, and according to the IDNR, she also needed a

hound running area permit ("Hound Running Permit") to lawfully possess coyotes at her home.

Three of Tranchita's four coyotes have since died but the remaining coyote, Luna, currently lives

at the Indiana Coyote Rescue Center ("ICRC") in Burlington, Indiana. Tranchita wants the

ICRC to return Luna to her but asserts that the ICRC will only do so pursuant to a court

declaration that she is legally able to possess coyotes in Illinois. As a result, Tranchita asks the

Court to declare unconstitutional either the statutory requirement of holding a Hound Running

Permit to own coyotes in Illinois or the IDNR's enforcement of that requirement against her, and

to enjoin Defendants Colleen Callahan (IDNR Director), John Fischer (IDNR legal counsel), and Joshua Mooi (an IDNR Conservation Police Sergeant) accordingly.[1]

Tranchita alleges that the U.S. Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 *et seq.*, preempts the Hound Running Permit requirement within Illinois' Wildlife Code (the "Code"), and that the requirement violates the Free Exercise Clause of the First Amendment and Illinois' Religious Freedom Restoration Act ("RFRA"), 775 Ill. Comp. Stat. 35. Tranchita further alleges that the IDNR's enforcement of the requirement against her violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Defendants move to dismiss Tranchita's second amended complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Tranchita has not adequately alleged any legal claim. Because Tranchita agrees to withdraw her RFRA claim in light of Defendants' motion, the Court dismisses it without prejudice for refiling in state court. Tranchita fails to sufficiently plead an actual conflict between the AWA and the Code and thus, the Court dismisses her conflict preemption claim without prejudice. The Court dismisses Tranchita's free exercise claim without prejudice because based on the allegations in the SAC, the Hound Running Permit requirement is neutral, generally applicable, and rationally related to a legitimate government purpose. Because Tranchita fails to sufficiently allege that invidious discrimination caused Defendants' selective enforcement of the Code against her and conceivable rational bases exist for the differential treatment, the Court dismisses her equal protection claim without prejudice. Finally, the Court

---

[1] Tranchita also named Kwame Raoul, Illinois' Attorney General, as a defendant, but the Court dismissed Raoul from this case on October 19, 2020. Doc. 12.

dismisses Tranchita's due process claim without prejudice because the SAC fails to adequately allege a protected property interest that entitles her to own coyotes.

## BACKGROUND[2]

### I.    Breeder and Hound Running Permits

Under Illinois law, an individual may not lawfully possess a coyote without a Breeder Permit. 520 Ill. Comp. Stat. 5/1.2g, 3.25; *see also Tranchita v. Dep't of Nat. Res.*, 2020 IL App (1st) 191251, ¶ 16 ("[U]nder Illinois law, a person must have a fur-bearing mammal breeder permit before possessing or raising a coyote."). For coyotes acquired after July 1, 1978, Section 3.25 of Illinois' Wildlife Code (the "Code") states that the IDNR will not issue a Breeder Permit unless the individual also holds a Hound Running Permit. 520 Ill. Comp. Stat. 5/3.25 ("No fur-bearing mammal breeder permits will be issued to hold, possess, or engage in the breeding and raising of . . . coyotes acquired after July 1, 1978, except for coyotes that are held or possessed by a person who holds a hound running area permit under Section 3.26 of this Act."). A Hound Running Permit allows an individual to have a "hound running area" where dogs may chase certain "authorized species . . . in a way that is not designed to capture or kill" the chased animals. *Id.* § 3.26(a). To receive a Hound Running Permit for coyotes, the recipient must have, among other things, a hound running area that is at least ten contiguous acres. *See id.* (stating that hound running areas will "hav[e] an area prescribed by administrative rule"); Ill. Admin. Code tit. 17, § 970.40(d)(1), (2) (requiring for coyotes at least ten to eighty contiguous acres "for inexperienced hounds one year or less in age" and at least one hundred sixty contiguous acres for

---

[2] The Court takes the facts in the background section from the SAC and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

older hounds).  Thus, since July 1978, the IDNR may issue Breeder Permits to those who wish to possess coyotes only if the individual also has a Hound Running Permit.

However, in practice, the IDNR has issued Breeder Permits to those who possess coyotes but do not have Hound Running Permits after July 1978.  Tranchita has cared for orphaned coyotes, including Luna, at her home in Tinley Park, Illinois since 2006.  In 2012, in response to a call that the IDNR received regarding Tranchita's coyotes, an IDNR officer inspected Tranchita's property.  The IDNR officer told Tranchita that she only needed to obtain a Breeder Permit to lawfully own her coyotes in Illinois.  In response, Tranchita obtained a Breeder Permit and renewed it annually until 2016.  She did not have or attempt to obtain a Hound Running Permit until after the IDNR seized her coyotes in 2019.  Therefore, Tranchita successfully obtained Breeder Permits to raise her coyotes from 2012 through 2016 without having a Hound Running Permit.  Moreover, Tranchita points to ten other individuals or entities that have possessed or currently possess, with the IDNR's knowledge, coyotes without a Hound Running Permit or Breeder Permit.

## II.   Luna's Seizure

Mooi, an IDNR Conservation Police Sergeant, moved into a home located less than one block from Tranchita in the spring of 2019.  Soon after, Mooi heard Tranchita's coyotes while walking his dog and began to investigate whether Tranchita lawfully possessed the coyotes. Starting in 2016, Tranchita forgot to renew her Breeder Permit and thus, in 2019, Tranchita did not have a valid Breeder Permit.  However, because she exhibited her coyotes to the public, Tranchita has annually obtained a United States Department of Agriculture ("USDA") Class C exhibitor license ("Exhibitor License") since 2006 and had a valid Exhibitor License in 2019. While investigating Tranchita's coyotes, Mooi climbed her fence to view her backyard without

4

her consent and without a warrant. On April 23, 2019, Mooi obtained a warrant to search

Tranchita's residence for evidence of various Code violations, including "Unlawful Possession

of a Fur-Bearing Mammal without a Fur-Bearing Mammal Breeders permit." Doc. 51 ¶ 70.

While obtaining the warrant, Mooi failed to inform the magistrate judge that Tranchita had a

valid Exhibitor License at the time or that she had held Breeder Permits in the past.

The next day, on April 24, 2019, six armed IDNR officers, including Mooi, came to

Tranchita's house and demanded to see her coyotes. The officers inspected Tranchita's property,

confiscated her coyote records, and forcefully seized her coyotes. Throughout the encounter, the

officers made jokes about the situation and laughed with each other. Unlike her 2012 IDNR

encounter, Mooi refused to allow Tranchita to purchase a Breeder Permit that day to keep her

coyotes and instead told her she needed an "educational permit from the State" to raise coyotes.

*Id.* ¶ 86 (emphasis omitted). At Mooi's request and while under duress, Tranchita signed a

relinquishment form, which stated that the IDNR seized her coyotes "based upon a violation of

Illinois State law." *Id.* ¶ 113. While Mooi pressured her to sign the form, he "stroked

Tranchita's breast, which caused her to jump back in shock." *Id.* ¶ 110. The Illinois Office of

the Executive Inspector General later questioned Tranchita regarding this incident but did not

inform her of the outcome of the investigation into Mooi's conduct.

The IDNR officers took Tranchita's four coyotes to the Flint Creek Wildlife

Rehabilitation Center ("Flint Creek"). Three of the coyotes died while at Flint Creek; Luna is

the only surviving coyote. Mooi would not allow Tranchita to visit Luna while she was at Flint

Creek, so Tranchita obtained a court order allowing her to do so. While in court, an IDNR

attorney asked the court to forbid Tranchita from physical contact with Luna and in response,

"Mooi took a step forward and put both thumbs up and smiled showing his approval of [the]

5

IDNR's position." *Id.* ¶ 335. Despite the court order, Mooi continued to interfere with Tranchita's visitations with Luna. During one visit, an IDNR officer told Tranchita that he was "following instructions from IDNR Sgt. Mooi to prohibit any contact between her and Luna." *Id.* ¶ 344. During another visit, a DuPage County Forest Preserve officer told Tranchita that Defendants' actions "were strictly a show of bravado and power and they had no logical explanation for Defendants' behavior." *Id.* ¶ 340. In May 2019, the IDNR filed a criminal complaint against Tranchita charging her with three Code violations, including Hound Running Permit violations. Tranchita ultimately pled guilty to owning coyotes without a Breeder Permit and as part of the plea agreement, the IDNR agreed to transfer Luna to her current location at the ICRC.

### III.  **Tranchita's Permits Since the Seizure**

Shortly after the seizure, on May 3, 2019, Tranchita applied for and obtained a Breeder Permit and has since renewed it annually. She also applied for an educational permit, as suggested by Mooi, and two different "rehabilitation permits" but she did not receive a response from the IDNR regarding her applications. *Id.* ¶ 129. On May 18, 2019, Tranchita applied for and obtained a Hound Running Permit online. However, the IDNR revoked the permit four days later, claiming it had issued the permit in error and indicating that Tranchita had filled out an incorrect application. After completing the correct application, Tranchita received notification that the IDNR revoked her Hound Running Permit. Tranchita petitioned for a hearing to appeal the decision and sought a variance on the Hound Running Permit requirements because she did not intend to actually run hounds. On August 26, 2019, the IDNR rejected her variance request because her property was too small to meet the statutory definition of a hound running area and

6

her house was in a "developed urban area where the operation of an [hound running area] would not be compatible or appropriate." *Id.* ¶ 177.

In March 2020, Tranchita again applied for and obtained a Breeder Permit and in April 2020, she again applied for and obtained a Hound Running Permit.[3]  However, these permits expired on March 31, 2021.  Tranchita successfully obtained a 2021 Breeder Permit, which expires on March 31, 2022, but has been unable to obtain a 2021 Hound Running Permit because the IDNR website no longer contains an option to apply for such a permit and does not contain instructions for applying by other means.  Therefore, Tranchita currently only holds a Breeder Permit.

## IV.     Tranchita's Lawsuits

On May 14, 2019, Tranchita sued the IDNR, Mooi, and Cook County in Illinois state court, alleging violations of her Fourth and Fourteenth Amendment rights.  Ultimately, an appellate court upheld the trial court's determination that Tranchita "did not have a protected property interest in [Luna] because she did not possess the proper Illinois permit at the time of the seizure." *Tranchita*, 2020 IL App (1st) 191251, ¶ 10.  However, the Illinois appellate court did not address whether a Breeder Permit was sufficient to possess a coyote or whether an individual must have both a Breeder Permit and a Hound Running Permit to possess a coyote.  After the appellate court's decision, Tranchita voluntarily dismissed her state case and subsequently filed this lawsuit in October 2020.

As of the filing of the SAC, Luna still lives at the ICRC.  However, she is old and in poor health, and Tranchita wants her to spend her final days of life at Tranchita's home.  The ICRC

---

[3] The IDNR asserted in this litigation that it also issued Tranchita's 2020 Hound Running Permit in error. *See* Doc. 13-1 at 3 ("In April 2020, due to a technological error with the IDNR website's permit payment portal, Ms. Tranchita was able to submit payment for a 2020-21 hound running area permit and receive a 2020-2021 hound running area permit.").

agreed to return Luna to her if a court declares that Tranchita is lawfully able to own coyotes in Illinois. Thus, Tranchita does not seek damages but instead a declaration that "she is authorized under Illinois law to possess Luna" if she holds a valid Breeder Permit and an injunction restraining Defendants in their official capacities from requiring her to hold a Hound Running Permit.[4] Doc. 51 at 72. Tranchita moved for a temporary restraining order ("TRO") and a preliminary injunction shortly after filing her federal complaint. The Court denied the motion, finding that Tranchita was not likely to succeed on the merits of her claims. Doc. 28. Defendants now move to dismiss the SAC, arguing that she has failed to sufficiently allege her claims.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P.12(b)(6); *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chi.*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the

---

[4] Tranchita expressly limits her claims against Defendants to those allowed by the *Ex Parte Young* doctrine, which provides an exception to a state's sovereign immunity under the Eleventh Amendment by permitting a private party to "sue a state officer in his or her official capacity to enjoin prospective action that would violate federal law" or the Constitution. *Ameritech Corp. v. McCann*, 297 F.3d 582, 585–86 (7th Cir. 2002) (citation omitted).

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Iqbal*, 556 U.S. at 678.

## ANALYSIS

The Court organizes its analysis of Tranchita's claims into two categories, which it will address in turn: (1) her allegations that the Hound Running Permit requirement to raise coyotes is unconstitutional (preemption and free exercise claims); and (2) her allegations that the IDNR's enforcement of that requirement against her is unconstitutional (equal protection and due process claims).

## I. Constitutionality of the Hound Running Permit Requirement

### A. Conflict Preemption Claim

Tranchita alleges that the Hound Running Permit requirement is unconstitutional because it conflicts with the AWA and thus violates the Supremacy Clause. U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, lawfully-created federal statutes may preempt conflicting state statutes. *DeHart v. Town of Austin*, 39 F.3d 718, 721 (7th Cir. 1994) ("When the federal government acts within its constitutional authority, it is empowered to preempt state or local laws to the extent it believes such action to be necessary to achieve its purposes."). Federal law may preempt state law in three situations: when Congress expressly states so, when a federal regulatory scheme implies exclusive congressional legislative power, and in cases of "actual conflict." *Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984). Tranchita's claim falls into the "actual conflict" category, which occurs "when 'compliance with both federal and state or local regulations is a physical impossibility,' or when state or local law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *DeHart*, 39 F.3d at 721 (citations omitted); *see* Doc. 51 ¶¶ 550–51 (alleging that "[i]t is impossible for

9

[Tranchita] to comply with both federal and state law" and that the Code's Hound Running Permit requirement "stands as an obstacle to the accomplishment and execution of [the] federal purposes and objectives of the [AWA]").  Defendants move to dismiss Tranchita's preemption claim, arguing that Tranchita can clearly comply with both laws and noting that the Seventh Circuit has held that the AWA does not preempt state laws that regulate wild animals, like the Code.[5]  The Court agrees.

Tranchita alleges that it is impossible for her to comply with both the requirements of her Exhibitor License (issued pursuant to the AWA) and the Code's Hound Running Permit.  Specifically, Tranchita alleges that a USDA Veterinarian told her that if she "witnessed hound dogs chasing or attacking . . . Luna . . . [that] would be a violation of the AWA standards of care."  *Id.* ¶ 273.  However, the Code does not require a Hound Running Permit holder to actually engage in hound running—it merely provides a permit to engage in hound running if one so chooses; thus, the laws do not actually conflict in this respect.  *See Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1009 (7th Cir. 2020) ("The question for 'impossibility' is whether the private party could independently do under federal law what state law *requires* of it." (emphasis added) (citation omitted)).  Tranchita also alleges that the Hound Running Permit's electric fencing and ear tagging requirements conflict with her Exhibitor License because they could be dangerous to the public viewing the coyotes and could "inflict[] harm, suffering, or stress upon

---

[5] Tranchita argues that Defendants improperly rely on the Court's TRO opinion throughout their motion to dismiss because the "law-of-the-case doctrine" does not apply to the Court's TRO opinion given that the Court did not "actually decide[] the issue[s] in question" at the TRO stage.  Doc. 61 at 3 (quoting *Jokich v. Rush Univ. Med. Ctr.*, No. 18 C 7885, 2019 WL 1168106, at *9 (N.D. Ill. Mar. 13, 2019).  However, in response, Defendants clarify that their "reliance on this Court's prior opinion is not based on 'law of the case,'" Doc. 67 at 2, and the Court does not interpret Defendants' motion to argue that the Court is bound by any portion of its TRO opinion under the law-of-the-case doctrine.  Instead, Defendants merely cite to the Court's TRO opinion to support their arguments that Tranchita fails to sufficiently state a claim.  The Court sees no issue with this.

the coyotes." Doc. 51 ¶ 283. The Code does require Hound Running Permit holders to have an electrified fence surrounding the hound running area and to tag the coyotes' ears. *See* Ill. Admin. Code tit. 17, § 970.40(e), (f), (j) (requiring compliance with fencing provisions to obtain Hound Running Permit); *id.* § 970.50(b) (requiring each coyote possessed under a Hound Running Permit to "be marked with a unique ear tag").

Specifically, the SAC alleges that if she followed the electrified fence and ear tagging requirements, she would violate AWA regulations that require handling animals "in a manner that does not cause trauma, . . . behavioral stress, physical harm, or unnecessary discomfort," 9 C.F.R. § 2.131(b)(1), and handling "the primary enclosure" in a way that avoids causing "physical or emotional trauma" to the animal within, *id.* § 3.142(b). However, Tranchita does not identify any authority to support her claim that using an electrified fence or ear tags would violate these AWA regulations. To the contrary, the Court reads the AWA regulations to permit ear tags for animals such as coyotes. *See* 9 C.F.R. § 2.50(e)(2)(iii) (allowing tags to be "applied to" all animals other than dogs or cats). Moreover, Tranchita fails to sufficiently plead that it is physically impossible to comply with both laws and in the Court's view, it is possible to do so. For example, Tranchita could construct a second, non-electrified fence just inside the perimeter of the hound running area. Such a solution, to be sure, might be absurd or wasteful, but it would presumably allow one to fully comply with both laws. *See DeHart*, 39 F.3d at 722 ("Even if the [state law] produces onerous consequences for DeHart's business, preemption is not established."). It is thus not physically impossible for Tranchita to comply with both the AWA and the Code. *See, e.g.*, *Stark v. Rutheford*, 442 F. Supp. 3d 1084, 1088 (S.D. Ind. 2020)

11

(finding "[n]o such impossibility exist[ed]" between AWA and "Indiana statutes regulating [plaintiff's] animal activities").

Finally, Tranchita alleges that the Code presents an obstacle to accomplishing Congress' purposes and objectives in enacting the AWA. "A court should not find conflict preemption 'unless that was the clear and manifest purpose of Congress.'" *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (citation omitted). The purpose of the AWA is "to foster humane treatment and care of animals and to protect the owners of animals from the theft of their animals." *DeHart*, 39 F.3d at 722. The AWA specifically states that the law "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary." 7 U.S.C. § 2143(a)(8). In light of this, the Seventh Circuit has held that "it is clear that the [AWA] does not evince an intent to preempt state or local regulation of animal or public welfare. Indeed, the [AWA] expressly contemplates state and local regulation of animals." *DeHart*, 39 F.3d at 722. The Code, which regulates wildlife in Illinois, is clearly a law which "fall[s] within the category of public welfare, health, and safety—areas of law that states have traditionally occupied under their historic police powers." *Stark*, 442 F. Supp. 3d at 1088. Tranchita provides no argument for the inapplicability of this well-established precedent. Because Tranchita fails to sufficiently plead that it is impossible to comply with both the AWA and the Code's Hound Running Permit requirement or that the Code is an obstacle to the accomplishment of Congress's objectives in enacting the AWA, the Court dismisses her conflict preemption claim. *See, e.g.*, *Miss. Pet Breeders Ass'n v. Cnty. of Cook*, 119 F. Supp. 3d 865, 872–73 (N.D. Ill. 2015) (relying on *DeHart* in dismissing

12

conflict preemption claim alleging AWA preempted Cook County ordinance that regulates the sale of dogs, cats, and rabbits by pet stores).

### B. Free Exercise Claim

Tranchita alleges that the Hound Running Permit requirement violates her First Amendment right to the free exercise of religion. Specifically, the SAC alleges that hound running is against Tranchita's "religious, ethical, and moral beliefs," Doc. 51 ¶ 454, and that "[r]equiring her to possess a permit to engage in a cruel practice[] is contrary to her religious beliefs," *id.* ¶ 563. "The Free Exercise Clause prohibits the government from 'plac[ing] a substantial burden on the observation of a central religious belief or practice' without first demonstrating that a 'compelling governmental interest justifies the burden.'" *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 631 (7th Cir. 2007) (alteration in original) (citation omitted). However, Defendants argue that the Code is neutral and generally applicable and therefore is subject to rational basis review instead of strict scrutiny. Indeed, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, --- U.S. ----, 141 S. Ct. 1868, 1876 (2021) (citing *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)); *see also Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) ("[*Smith*] holds that the Free Exercise Clause does not require a state to accommodate religious functions or exempt them from generally applicable laws.").

Thus, the first question is whether the Hound Running Permit requirement is neutral and generally applicable.[6] *St. John's*, 502 F.3d at 631. A law is neutral if it does not "infringe upon

---

[6] To allege a free exercise claim, Tranchita must also sufficiently plead that her religious beliefs are "sincere." *Young v. Lane*, 922 F.2d 370, 374 n.11 (7th Cir. 1991). However, Defendants do not dispute

or restrict practices because of their religious motivation." *Id.* In this case, the language of the Hound Running Permit requirement does not target, or even mention, a religious belief. *See* 520 Ill. Comp. Stat. 5/3.25–26. Neither is there any indication, and the SAC does not allege, that the purpose of the law was to restrict practices *because of* their underlying religious motivation. *See Fulton*, 141 S. Ct. at 1877 ("Government fails to act neutrally when it . . . restricts practices because of their religious nature."). Thus, the Court finds that the Hound Running Permit requirement is neutral. *See Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017) (finding statutes were neutral where they did "not target religion or religious institutions" and "[t]here [was] no allegation of an underlying religious animus").

A law is generally applicable if it does not "'invite' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). The Hound Running Permit requirement, by its language, applies equally to anyone in Illinois who wishes to raise coyotes, regardless of their conduct. 520 Ill. Comp. Stat. 5/3.25; *see Ill. Bible Colls.*, 870 F.3d at 639 (statutes were generally applicable because they "appl[ied] equally to secular and religious post-secondary institutions"). The statute does not contain a discretionary standard that "permit[s] the government to grant exemptions based on the circumstances underlying each application" for a Breeder Permit. *Fulton*, 141 S. Ct. at 1877. Further, the SAC does not allege that the Code "imposes a special disability on religions or religious beliefs and practices," *Ill.*

---

the sincerity of Tranchita's beliefs and "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989). Thus, the Court will proceed to analyze whether the Hound Running Permit requirement unlawfully impedes on Tranchita's right to exercise her alleged religious beliefs. *See Pérez v. Frank*, No. 06 C 248, 2007 WL 1101285, at *10 (W.D. Wis. Apr. 11, 2007) ("[F]ree exercise jurisprudence has emphasized deference to individuals' professed beliefs, so long as there is no reason to doubt their sincerity.").

*Bible Colls.*, 870 F.3d at 639, or "prohibits religious conduct while permitting secular conduct," *Fulton*, 141 S. Ct. at 1877. As a result, the Court finds that the Hound Running Permit requirement is also generally applicable.

If a law is both neutral and generally applicable, then it is constitutional so long as it "is rationally related to a valid government purpose." *Ill. Bible Colls.*, 870 F.3d at 639. Tranchita alleges that there is "no rational relationship to a legitimate governmental interest in requiring only Tranchita to obtain the Hound Running [] permit." Doc. 51 ¶ 568. However, the Code instructs that the IDNR may not issue Breeder Permits to *anyone* who wishes to possess coyotes after July 1978 unless the individual also has a Hound Running Permit, 520 Ill. Comp. Stat. 5/3.25; the Code does not single out Tranchita and the IDNR's failure to follow the Hound Running Permit requirement has no bearing on whether the requirement, as stated in the statute, has a rational basis.

Further, based on the allegations in the SAC, there is an easily-conceivable rational basis for the Hound Running Permit requirement: public safety. As alleged in the SAC, coyotes are wild animals, not pets, *see, e.g.*, Doc. 51 ¶ 21 ("A large part of [Tranchita's] educational mission has always been to inform the public that coyotes are NOT pets."), and when advocating for the requirement, Illinois House Representative David Reis asserted that "there[] [are] coyote problems in the suburbs," Doc. 51-1 at 89. Illinois clearly has a legitimate interest in keeping densely populated residential neighborhoods safe and it may do so by regulating who can possess wild animals and where. *See Mayle v. City of Chi.*, 803 F. App'x 31, 33 (7th Cir. 2020) ("The government has a legitimate interest in maintaining social order and public safety. It also may legitimately give the public predictability about what animals they may encounter in urban spaces." (citations omitted)); *DeHart*, 39 F.3d at 722 ("The regulation of animals has long been

15

recognized as part of the historic police power of the States."). Given the acreage requirements for those who hold Hound Running Permits, it is unlikely that an individual can lawfully own coyotes in Chicago or a suburban housing development after July 1978. As alleged in the SAC, the IDNR informed Tranchita that a hound running area is not "compatible or appropriate" in her backyard in Tinley Park because it is "in a developed urban area." Doc. 51 ¶ 177. Thus, based on the allegations in the SAC, a rational basis exists for the Illinois legislature to require an individual to hold a Hound Running Permit to raise coyotes—even if doing so incidentally violates the individual's religious beliefs. *See, e.g.*, *Williams v. Trump*, 495 F. Supp. 3d 673, 683 (N.D. Ill. 2020) (dismissing free exercise claim pursuant to Rule 12(b)(6) where government action "was supported by a rational basis" and "[a]ny burden it may have imposed on religion was only 'incidental'" (citation omitted)). The Court therefore dismisses Tranchita's free exercise claim. *See Ill. Bible Colls.*, 870 F.3d at 639 (upholding Rule 12(b)(6) dismissal of free exercise claim because statutes were neutral, generally applicable, and rationally related to a valid government purpose).

## II.     Constitutionality of the IDNR's Enforcement

### A.     Equal Protection Claim

Tranchita alleges that the IDNR violated her Fourteenth Amendment right to equal protection through a class-of-one claim. To adequately plead a class-of-one equal protection claim, Tranchita must "allege facts plausibly suggesting that she was 'intentionally treated differently from others similarly situated' and 'there is no rational basis for the difference in treatment.'" *Van Dyke v. Vill. of Alsip*, 819 F. App'x 431, 432 (7th Cir. 2020) (citation omitted). Tranchita alleges that the IDNR "ha[s] not required any other person or entity" in Illinois to hold both Breeder and Hound Running Permits to raise coyotes. Doc. 51 ¶ 527. The SAC alleges that

such selective treatment is "motivated by bad faith and animus," and therefore violates the Equal Protection Clause. *Id.* ¶ 545. Defendants move to dismiss Tranchita's equal protection claim, arguing that she fails to allege that Defendants treated her differently than similarly situated individuals or that "she was subject to invidious discrimination" and that Defendants clearly had a rational basis for its alleged selective enforcement of the Code. Doc. 53 at 7.

Much of the parties' briefing on Tranchita's equal protection claim focuses on the "similarly situated" requirement. However, "[a]s a general rule, whether individuals are similarly situated is a factual question for the jury." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004). Thus, "[p]laintiffs alleging class-of-one equal protection claims do not need to identify specific examples of similarly situated persons in their complaints." *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (alteration in original) (citation omitted). At this stage, Tranchita satisfies the "similarly situated" requirement so long as her allegations plausibly suggest that "at least one similarly situated comparator" exists. *Despard v. Bd. of Trs. of Ind. Univ.*, No. 14-CV-1987, 2015 WL 4946112, at *7 (S.D. Ind. Aug. 18, 2015). The SAC includes a list of ten individuals or organizations whom Tranchita alleges are similarly situated to her and whom the IDNR has allowed to own coyotes without a Hound Running Permit or Breeder Permit. *See* Doc. 51 ¶¶ 258–66; 291–453. Defendants argue that none of these individuals or organizations are similarly situated to Tranchita because none "had one or more coyotes living in their backyard in a residential neighborhood." Doc. 53 at 7. However, the SAC alleges that two entities possess coyotes "on 'residential property'" without a Breeder or Hound Running Permit. Doc. 51 ¶¶ 370, 417, 436. Thus, the Court finds, at this stage, that the

SAC suffices to plausibly allege that Defendants treated Tranchita differently than at least one similarly situated comparator.

However, the SAC must also plausibly allege that this disparate treatment had no rational basis.[7] *Van Dyke*, 819 F. App'x at 432. This is a high standard. *See D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) ("All it takes to defeat the plaintiffs' claim is a *conceivable* rational basis for the difference in treatment."). Tranchita alleges that the difference in treatment between her and the comparators stems from "bad faith," "animus," and "retaliatory and malicious motivations," Doc. 51 ¶¶ 545–46, but the SAC cannot survive by merely alleging an improper motive for differential treatment, *see D.B.*, 725 F.3d at 686 ("[A] given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity."). At the pleading stage, "[a]ll it takes to defeat [a class-of-one] claim is a *conceivable* rational basis for the difference in treatment," and plaintiffs may "plead themselves out of court if their complaint reveals a potential rational basis for the actions." *Miller*, 784 F.3d at 1121 (alterations in original) (citations omitted). That is precisely the case here. As explained above, based on the allegations in the SAC, there is an easily-conceivable rational basis for enforcing the Hound Running Permit requirement: to further Illinois' legitimate interest in public safety by restricting who and where an individual may possess a coyote. *See Mayle*, 803 F. App'x at 33 ("The government has a legitimate interest in maintaining social order and public safety." (citations omitted)). The SAC specifically alleges

---

[7] The Court notes that it is unsettled in the Seventh Circuit whether a plaintiff also must plead "animus, malice, or some other improper motivation" to sufficiently allege a class-of-one equal protection claim. *Frederickson v. Landeros*, 943 F.3d 1054, 1061 (7th Cir. 2019) ("[W]e have not definitively resolved the question whether it is sufficient for a plaintiff simply to allege differential treatment at the hands of the police with no rational basis, or if a class-of-one claim requires a plaintiff *additionally* to prove that the police acted for reasons of personal animus, malice, or some other improper personal motivation."). However, the Court need not resolve this question in deciding the sufficiency of Tranchita's claim.

18

that when denying Tranchita a Hound Running Permit, the IDNR informed her that a hound

running area in her backyard is not "compatible or appropriate" because it is "in a developed

urban area." Doc. 51 ¶ 177. Thus, based on the allegations in the SAC, a conceivable rational

basis exists for enforcing the Hound Running Permit requirement against Tranchita. *See also*

*Murphy v. Vill. of Plainfield*, 918 F. Supp. 2d 753, 757–58, 762–63 (N.D. Ill. 2013) (finding that

the defendant's enforcement of an ordinance against the plaintiffs but not others who were

violating the ordinance passed the rational basis test because it "served a government interest by

enforcing local law").

There are also conceivable rational bases for Defendants' failure to enforce the Breeder

and Hound Running Permit requirements against the two alleged comparators, including a lack

of resources to adequately address every Code violation. *See Chi. Studio Rental, Inc. v. Ill. Dep't*

*of Com. & Econ. Opportunity*, 940 F.3d 971, 980 (7th Cir. 2019) (noting a rational basis exists so

long as the Court identifies "a conceivable rational basis for the different treatment," even if it is

not "the actual basis for [the] defendant's actions"); *Esmail v. Macrane*, 53 F.3d 176, 178–79

(7th Cir. 1995) (noting that "simply failing to prosecute all known lawbreakers, whether because

of ineptitude or (more commonly) because of lack of adequate resources . . . has no standing in

equal protection law"). Nothing in the SAC suggests otherwise or negates this conceivable

rational basis. *See Miller*, 784 F.3d at 1121 ("[A] class-of-one plaintiff must, to prevail [on a

motion to dismiss], negative [in her complaint] any reasonably conceivable state of facts that

could provide a rational basis for the classification." (citation omitted)). If anything, the SAC

plausibly suggests that the IDNR lacks sufficient resources to administer and enforce the Code.

*See* Doc. 51 ¶ 54 (alleging Mooi discovered that Tranchita unlawfully possessed coyotes by

chance); *id.* ¶¶ 172, 177 (alleging the IDNR mistakenly issued Tranchita a Hound Running Permit even though she did not meet the statutory requirements).

Moreover, "certain forms of state action—as with the approval process and code enforcement at issue here—'involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.'" *Miller*, 784 F.3d at 1120 (quoting *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 603 (2008)); *see also Van Dyke*, 819 F. App'x at 432 ("[E]nforcement of [the law] is a prosecutorial decision, which entails selectivity." (citations omitted)). Because of its discretionary nature, selective or incomplete enforcement of the law does not, by itself, constitute a violation of the Fourteenth Amendment; in fact, such enforcement "is the norm in this country." *Hameetman v. City of Chi.*, 776 F.2d 636, 641 (7th Cir. 1985); *see also Engquist*, 553 U.S. at 604 ("[A]llowing an equal protection claim on the ground that a [speeding] ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action."); *Esmail*, 53 F.3d at 178–79 (finding that selective prosecution in the form of a government's "fail[ure] to prosecute all known lawbreakers . . . has no standing in equal protection law," even though "it involves dramatically unequal legal treatment," with some people "being punished and others getting off scot-free").

Thus, "an exercise of prosecutorial discretion, unless based on some invidious discrimination, is not typically a basis for a class-of-one challenge." *Van Dyke*, 819 F. App'x at 432. In other words, Tranchita can only state a claim based on selective enforcement if she alleges invidious discrimination—action which is "wholly arbitrary" and "inconsistent with the Fourteenth Amendment." *Frederickson*, 943 F.3d at 106 ("[W]e have recognized that a party may allege that this type of 'invidious' action—wholly arbitrary, inconsistent with the

20

Fourteenth Amendment—is the only factor distinguishing the target from the rest of the population, and that such a showing suffices to prove the lack of a rational basis."); *see also McDonald*, 371 F.3d at 1001 (plaintiff must show "that there is no rational basis for the difference in treatment *or* the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant" (emphasis added) (citations omitted)); *Fenje v. Feld*, 398 F.3d 620, 628 (7th Cir. 2005) (acting "'out of sheer malice,' 'vindictiveness,' or 'malignant animosity' would state a claim for relief under the Equal Protection Clause" (quoting *Esmail*, 53 F.3d at 178–79)).

Defendants argue that Tranchita fails to adequately allege invidious discrimination and therefore, Defendants' selective enforcement of the Code against her cannot form an equal protection claim. Specifically, Defendants assert that "allegations that Defendant Mooi was rude do not amount to a viable claim that IDNR's decision to enforce the Wildlife Code was based on invidious discrimination." Doc. 53 at 5. In response, Tranchita argues that "Mooi took an interest in Tranchita and begun [sic] a twisted journey" to seize her coyotes. Doc. 61 at 4. The SAC alleges that: Mooi, an IDNR Conservation Police Sergeant, lived on the same block as Tranchita and heard her coyotes while walking his dog, Doc. 51 ¶¶ 53–55; in response, Mooi climbed her fence to view her backyard without her consent and without a warrant, *id.* ¶¶ 57–59; Mooi withheld material facts from a judge to obtain a search warrant to search Tranchita's home, *id.* ¶¶ 64–65, 95–96, 102; he yelled at her and made jokes during the search and seizure, *id.* ¶¶ 76, 86, 94, 97; he "stroked" her breast while pressuring her to sign a relinquishment form

during the search and seizure, *id.* ¶ 110; and he directed IDNR officers to "prohibit any contact between her and Luna . . . even after a court ordered contact visits," *id.* ¶ 344.

While the Court most certainly does not condone Mooi's behavior, it does not find that his alleged conduct gives rise to the sort of "prolonged harassment" or "extraordinary pattern" of harassment that the Seventh Circuit has found to constitute invidious discrimination in the exercise of prosecutorial discretion. *Miller*, 784 F.3d at 1120; *see, e.g.*, *Frederickson*, 943 F.3d at 1062 ("Class-of-one complaints typically allege that a defendant has either a personal financial stake or some history with the plaintiff, and that this stake or history demonstrates both the lack of a rational basis for the action and animus."); *Geinosky v. City of Chi.*, 675 F.3d 743, 745, 748 (7th Cir. 2012) (finding that "[a]bsent a reasonable explanation, and none has even been suggested yet, the pattern adds up to deliberate and unjustified official harassment that is actionable under the Equal Protection Clause" where plaintiff received twenty-four "bogus" parking tickets from several police officers within the same unit who were connected to his estranged wife). And Tranchita does not point the Court to any such analogous cases. In contrast to the extreme cases in which the Seventh Circuit has found invidious discrimination existed, the SAC's allegations do not "clearly suggest harassment by public officials that has no conceivable legitimate purpose," *Geinosky*, 675 F.3d at 748, or that Mooi took these actions "because of 'a vindictive or harassing purpose,'" *Frederickson*, 943 F.3d at 1062 (citation omitted). Because Tranchita fails to sufficiently allege invidious discrimination and conceivable rational bases exist for Defendants' selective enforcement of the Code, the Court dismisses Tranchita's class-of-one equal protection claim. *See, e.g.*, *Smith v. Wolf*, No. 13 cv 63, 2013 WL

3168753, at \*4 (N.D. Ill. June 20, 2013) (dismissing class-of-one claim because plaintiff "alleged uneven law enforcement rather than 'class-of-one' discrimination").

### B.        Procedural Due Process Claim

Finally, Tranchita alleges that the IDNR's Hound Running Permit requirement impermissibly deprives her of the benefits of her Breeder Permit—possessing a coyote—without the procedural due process of law required under the Fourteenth Amendment.[8]  However, Defendants argue that Tranchita's Breeder Permit does not give her a protected property interest that allows her to possess coyotes and so she cannot state a due process claim.  For the Constitution's procedural due process requirements to "apply in the first place," the plaintiff must establish an interest that is "within the Fourteenth Amendment's protection of liberty and property." *Proctor v. McNeil*, 14 F. Supp. 3d 1108, 1112 (N.D. Ill. 2014) (citation omitted); *see also Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) ("[I]n any due process case where the deprivation of property is alleged, the threshold question is whether a protected property interest actually exists.").  "To maintain a claim of property over a government-issued benefit, such as a license or permit, a plaintiff must show that she has 'a legitimate claim of entitlement to it,' rather than 'a unilateral expectation to it.'" *Dyson v. City of Calumet City*, 306 F. Supp. 3d 1028, 1041 (N.D. Ill. 2018) (citation omitted).  Defendants do not challenge Tranchita's claim of entitlement to the Breeder Permit itself, nor have they indicated

---

[8] The SAC did not specify whether Tranchita's due process claim was procedural, substantive, or both. However, Tranchita clarified that she only brings a procedural claim, not a substantive one. *See* Doc. 61 at 12 ("For clarification, Tranchita has not alleged a substantive due process violation in her Second Amended Complaint.").

an intention to revoke her current 2021 Breeder Permit. Accordingly, the Court proceeds with the assumption that Tranchita is indeed legitimately entitled to the Breeder Permit.

However, the Court must ascertain whether the Breeder Permit grants Tranchita the right or benefit to possess coyotes, as Tranchita alleges. Here, the statute itself does not create such a right. As discussed above, the statute instructs that the IDNR will not issue a Breeder Permit to an individual for possessing coyotes unless the individual also holds a Hound Running Permit. 520 Ill. Comp. Stat. 5/3.25. Despite this, Tranchita alleges that "[b]ased on custom, policy, or mutually explicit understanding, Tranchita's 2021-2022 Furbearing Breeder Permit entitles her to possess a coyote without also holding a Hound Running Permit." Doc. 51 ¶ 575. It is true that "mutually explicit understandings" can create a protected property interest. *Davis v. City of Chi.*, 841 F.2d 186, 188 (7th Cir. 1988). "An established custom or policy may be used as evidence that a mutually explicit understanding exists," but "a merely subjective and unilateral expectancy is *not* protected by due process." *Id.*

Tranchita points to allegations in the SAC that indicate that in 2012, an IDNR officer told her that she only needed to obtain a Breeder Permit to lawfully own coyotes. However, even if a property interest in owning coyotes existed because such a custom, policy, or mutual understanding existed in the past, that interest disappeared after the lapse of Tranchita's Breeder Permit in 2016. After that point, even under the alleged custom, policy, or understanding, Tranchita's possession of the coyotes was illegal, and one cannot have a protected interest in contraband. *See People v. Moore*, 410 Ill. 241, 247 (1951) ("If property is actually contraband no one can assert a legal ownership or right to possession that will be respected by any court."); *Tranchita*, 2020 IL App (1st) 191251, ¶¶ 17, 24 ("From the moment her permit lapsed, plaintiff's possession of the coyotes violated section 3.25 of the Wildlife Code. Wildlife possessed

24

'contrary to any of the provisions [hereof]' is contraband. . . . Without a legitimate claim of entitlement to the property, plaintiff had no right to a property interest protected by due process when her coyotes were seized." (alteration in original) (quoting 520 Ill. Comp. Stat. 5/1.2c)).

Since the seizure of Tranchita's coyotes, based on the allegations in the SAC, Defendants have made it abundantly clear that the IDNR does not regard a Breeder Permit as sufficient to grant Tranchita the right to own coyotes. *See, e.g.*, Doc. 51 ¶ 143 (in 2019, IDNR "demanded she have a State Hound Running Area permit as well as a breeder permit"); *id.* ¶ 265 ("In addition to the fur-bearing mammal breeder permit, a person who wishes to keep coyotes also must have a hound running Area permit."). Tranchita alleges that the IDNR has changed its position during this litigation about what permits an individual must have to lawfully own a coyote in Illinois. However, even where the IDNR's stated requirements for owning coyotes have allegedly been inconsistent, the insufficiency of a Breeder Permit alone has remained consistent, *see id.* ¶ 265 (coyotes only allowed for those holding both Breeder and Hound Running Permits); *id.* ¶ 266 (coyotes now allowed for those who hold rehabilitation permits), and the SAC does not point to any individuals that currently own coyotes solely with a Breeder Permit.

In light of this, the SAC does not plausibly allege the existence of a custom, policy, or mutual understanding between Tranchita and the IDNR regarding her ability to currently own coyotes. The Court has no reason to doubt Tranchita's sincere belief that a mutual understanding existed between herself and the IDNR such that a Breeder Permit alone allowed her to own coyotes in the past. However, based on the allegations in the SAC, any such understanding became unilateral rather than mutual in 2019 and the IDNR's current policy is that Tranchita must hold both a Breeder Permit and a Hound Running Permit to own coyotes. *See Davis*, 841

F.2d at 188 ("[A] merely subjective and unilateral expectancy is *not* protected by due process."). Thus, because Tranchita has not shown that she has a protected property interest that entitles her to possess coyotes in Illinois, the Court finds that she has not adequately pleaded a procedural due process claim. *See, e.g.*, *Henrichs v. Ill. L. Enf't Training & Standards Bd.*, 306 F. Supp. 3d 1049, 1058 (N.D. Ill. 2018) (dismissing procedural due process claim pursuant to Rule 12(b)(6) because plaintiffs had "no right to, and thus no property interest in, the concealed carry permits that they seek"). As a result, the Court grants Defendants' motion to dismiss Tranchita's due process claim and dismisses the claim.

## III. Leave to Replead

Defendants ask the Court to dismiss the SAC with prejudice because Tranchita "has had three chances to state a claim, and she has failed to do so each time; yet another complaint will not change that fact." Doc. 53 at 16. However, as Tranchita points out, the Court has not yet dismissed Tranchita's complaint. Instead, in light of the Court's TRO opinion, Tranchita sought leave to amend her complaint twice. Thus, the Court will allow Tranchita one more opportunity to amend her complaint in light of this opinion. However, the Court encourages Tranchita to strongly consider the Court's opinion in its entirety and to address any potential pleading deficiencies if she chooses to replead.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [52]. The Court dismisses the SAC without prejudice.

Dated: February 9, 2022

_____
SARA L. ELLIS
United States District Judge

26